1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE MIDDLE DISTRICT OF GEORGIA

3                              MACON DIVISION

4                    _____

5

6    THE UNITED STATES OF AMERICA,    :
                                      : Case No. 5:05-CR-13(HL)
7    VS                               :
                                      :  October 29, 2007
8                                     :   Macon, Georgia
     RICHARD BEN GLAWSON, DEFENDANT.:
9    _____        Volume I of III

10                         CRIMINAL JURY TRIAL

11           BEFORE THE HONORABLE JUDGE HUGH LAWSON
             UNITED STATES DISTRICT JUDGE, PRESIDING

12
     APPEARANCES:

13
     FOR THE GOVERNMENT:         CHARLES CALHOUN
14                               VERDA COLVIN
                                 UNITED STATES ATTORNEY'S OFFICE
15                               P.O. BOX 1702
                                 MACON, GA 31202-1702
16
     FOR THE DEFENDANT:          FRANKLIN J. HOGUE
17                               HOGUE & HOGUE, LLP
                                 P.O. BOX 1795
18                               MACON, GA 31202

19

20

21

22
     _____

23
                        *SALLY L. GRAY, USCR*
24                        *P.O. BOX 875*
                        *MACON, GA 31202-0875*
25
                         *(478-752-3497)*

```
 1                    INDEX TO PROCEEDINGS

 2                     OCTOBER 29, 2007

 3                     VOLUME I of III

 4    PRELIMINARY CHARGE AND OPENING STATEMENTS          3

 5    GOVERNMENT'S WITNESSES:

 6   RAFIQ AHMAD

 7           DIRECT EXAMINATION BY MR. CALHOUN          26

 8           CROSS EXAMINATION BY MR. HOGUE            74

 9

10   BILLY JOHNSON

11           DIRECT EXAMINATION BY MS. COLVIN          89

12

13   KATINA ROCHELLE FORT

14           DIRECT EXAMINATION BY MS. COLVIN         105

15           CROSS EXAMINATION BY MR. HOGUE           124

16           REDIRECT EXAMINATION BY MS. COLVIN       133

17

18   JAMES JORDAN

19           DIRECT EXAMINATION BY MR. CALHOUN        135

20           CROSS EXAMINATION BY MR. HOGUE           182

21           REDIRECT EXAMINATION BY MR. CALHOUN      190

22

23    CERTIFICATE OF REPORTER                         193

24

25
```

```
 1                    P R O C E E D I N G S
 2    OCTOBER 29, 2007
 3              THE COURT:  All right, this is United States of
 4    America against Richard Ben Glawson.  Is the government ready?
 5              MR. CALHOUN:   The government is ready, Your Honor.
 6              THE COURT:  Is the defendant ready?
 7              MR. HOGUE:  We're ready, Your Honor.
 8              THE COURT:  Any preliminaries?
 9              MR. CALHOUN:   Not by the government, Your Honor.
10              THE COURT:  All right, ask the jury to come in,
11    please.
12    (Jury In; 9:55 a.m.)
13              THE COURT:  Good morning, ladies and gentlemen.
14              JURORS:  Good morning.
15              THE COURT:  We are about ready to begin.  I
16    apologize for the delay, but it could not be helped.  Let the
17    jury be sworn, please.
18              DEPUTY CLERK:  Ladies and gentlemen of the jury,
19    please raise your right hand and repeat after me:  I do
20    solemnly swear that I shall well and truly try the issues
21    herein now joined in this indictment and a true verdict make
22    according to the law and evidence, so help me God.
23              THE COURT:  Now, ladies and gentlemen, you have been
24    impaneled to try the case of the United States of America
25    against Richard Ben Glawson.  Mr. Glawson is charged with the
```

1   offenses of distribution of cocaine base, distribution of

2   marijuana, possession with intent to distribute marijuana,

3   felony possession of a firearm, and escape from federal

4   custody.

5          This is a criminal case as contrasted to a civil case.

6   Criminal trials result when a person accused of a crime in an

7   indictment returned by the grand jury enters a plea of not

8   guilty, thereby denying all of the essential allegations of

9   the indictment.

10          The allegations of the indictment as opposed by the

11   plea of not guilty forms the issues which you must try and

12   resolve, namely whether the defendant is, in fact, guilty or

13   not guilty of the crimes or any of the crimes charged in the

14   indictment.

15          It is essential that you understand the fact that the

16   defendant has been indicted does not constitute any evidence

17   of guilt, nor should you infer that the defendant is guilty

18   just because he has been indicted.  The indictment is merely

19   the manner in which the charges are brought before the court

20   for a trial.

21          The defendant enters upon this trial presumed to be

22   innocent.  This presumption of innocence remains with and

23   protects the defendant until and unless it is overcome by

24   evidence sufficient to satisfy you beyond a reasonable doubt

25   of the defendant's guilt.

1          The burden of proving the guilt of the defendant rests

2     upon the government, that is, the government must prove each

3     essential element of the offense charged in the indictment

4     beyond a reasonable doubt.

5          A reasonable doubt is just what it says.  It is a

6     doubt based upon reason.  It is the doubt of a fair-minded,

7     impartial juror, honestly seeking the truth.  It is a doubt

8     arising from the evidence, from a lack of evidence, from a

9     conflict in the evidence, or from any combination of these

10    things, but it is not an arbitrary nor a capacious doubt.

11         However, the government is not required to prove the

12    guilt of the defendant beyond all possible doubt.  Moral and

13    reasonable certainty is all that can be expected in a legal

14    investigation, but no person shall be convicted upon

15    speculation or conjecture.

16         It will be your duty to ascertain the truth of the

17    case from a factual standpoint from the evidence and only from

18    the evidence presented before you during the trial.  It will

19    be my duty to determine what law is applicable to the case and

20    to instruct you on that law, and I will do that at the

21    conclusion of the trial.

22         You will then take the law as I explain it to you and

23    apply it to the facts of the case as you find the facts of the

24    case to be, and by this application of law to fact and of fact

25    to law you will arrive at a verdict in the case.

1              One of your most important functions is to determine

2     the credibility or the believability of the witnesses.   In

3     passing upon their credibility and in determining the weight

4     to be given to the testimony of the witnesses, you may

5     consider all of the facts and circumstances of the case, the

6     witnesses' manner of testifying, their intelligence, their

7     means and opportunity for knowing the facts to which they

8     testify, the probability or improbability of their testimony,

9     their interest or lack of interest in the outcome of the case

10    and their personal credibility insofar as that may

11    legitimately appear from the trial of the case.

12             The evidence in the case will consists of two things:

13    Testimony of the witnesses and exhibits.   Testimony is what

14    the witnesses say under oath from the witness stand.   Exhibits

15    are documents, photographs, or other physical objects,

16    including audio or videotapes possibly which may be admitted

17    into evidence.

18             There are two kinds of evidence:   Direct and

19    circumstantial.   Direct evidence is the testimony of a witness

20    who asserts actual knowledge of a fact, such as an eye

21    witness.   Circumstantial evidence is proof of a chain of facts

22    or circumstances indicating that the defendant is guilty or

23    not guilty.   The law makes no distinction as to the weight

24    that you may give to either direct or circumstantial evidence.

25             In considering the evidence you may make deductions

1    and reach conclusions which reason and common sense lead you

2    to make and in doing so you should not be concerned about

3    whether the evidence is direct or circumstantial.  You must

4    consider all of the evidence, but you are not required to

5    accept all of the evidence.

6         You should consider whether you believe or disbelieve

7    what each witness had to say and how important that testimony

8    was.  You may believe or disbelieve any witness in whole or in

9    part.  I caution you that what the lawyers say is not

10   evidence.  The inferences and suggestions which the lawyers

11   make in their questions are not evidence.

12        The opening statements and concluding arguments of the

13   lawyers are not evidence.  Moreover, anything that I may say

14   during the trial of the case is not evidence.  The lawyers may

15   use charts or drawings to assist them in questioning witnesses

16   or in illustrating their arguments, but if these aids are not

17   admitted into evidence, then they will not go into the jury

18   room with you for your consideration.

19        The evidence, as I've said, is either the testimony of

20   the witnesses from the witness stand or the admitted exhibits

21   and nothing else.  The trial will begin with the opening

22   statements of the attorneys, and in their opening statements

23   the attorneys will explain to you their contentions concerning

24   the facts of the case.

25        The government will then call and question its

1    witnesses and the government's witnesses will be cross

2    examined by defense counsel.

3         When the government has presented its evidence, then

4    the defendant may call witnesses and may present other

5    evidence if he wishes to do so, but the defendant is under no

6    obligation to present any evidence and no unfavorable

7    inference shall be drawn against the defendant if he does not

8    present evidence.  The entire burden of proving the guilt of

9    the defendant rests upon the government.  The defendant is not

10   required to prove his innocence.

11        Listen carefully to all of the evidence and don't jump

12   to conclusions before all of the evidence has been presented.

13   I'll give you additional instructions at the conclusion of the

14   trial.  Meanwhile, we are ready to begin, and the government

15   may open.

16        MR. CALHOUN:  Thank you, Your Honor.  Good morning.

17   Ladies and gentlemen, this is a criminal case, as the court

18   pointed out.  It is a case in which a defendant went on a --

19   for lack of a better word -- a crime spree that began

20   June 3rd, 2003 when he sold a quantity of crack cocaine and

21   continued up to November 30th, 2004, when he was stopped in a

22   car and marijuana was found in the car.  It continued and

23   concluded on December 31st, 2006, when he escaped from the

24   Bibb County Jail in Macon, Georgia.

25        My name is Charles Calhoun.  I'm one of the

1   prosecutors assigned to this particular case.  It will be my

2   job to prove the elements listed on your indictment.  At the

3   first table, my counsel table, is Ms. Verda Colvin.  She's

4   also a prosecutor from my office, and she will be helping me

5   in the prosecution of this case.  Seated next to her in the

6   tan suit -- I think it's tan -- is Special Agent Rafiq Ahmad

7   with the ATF.  He is one of the case agents that investigated

8   the crimes alleged in the indictment.

9       Seated next to him in the white shirt is Milton

10  Hooper.  Mr. Hooper is one of the technicians from our office.

11  He will be making sure that the computer stuff that we've

12  generated to help you understand the facts in this case work

13  properly.

14      The purpose of an opening statement, as the court

15  alluded to, is just to give you ladies and gentlemen an idea

16  what we, the government expects the evidence to show in this

17  particular case.  I will basically present three types of

18  evidence during the course of this trial.  The first type will

19  be live testimony.

20      Now, this live testimony will be from police officers,

21  case agents who were involved in the investigation of this

22  case.  We will also have people, non-law enforcement type

23  people who were familiar with the defendant and who will

24  satisfy certain elements, particularly the element of identity

25  as it relates to the defendant.

1          In addition to the live testimony, the government also

2   intends to produce videotapes, and what the case agent did in

3   this particular case, each one of the buys, each one of the

4   purchases of crack cocaine or marijuana from the defendants

5   was videotaped, and we intend to offer the videotapes during

6   the course of this particular trial.

7          Now, some of the videotapes are better than other

8   videotapes.  Some of the audiotapes are better than other

9   audiotapes.  And what we've done to kind of help you follow

10  the audiotapes is to draft transcripts, and it is hoped that

11  these transcripts will help you follow the evidence in this

12  particular case.

13         We will also have photographs.  Now, the photographs

14  came from the videotapes.  As I mentioned a moment ago, each

15  time the defendant sold some illegal drugs that was

16  videotaped, and what we did with Mr. Hooper, the gentleman in

17  the white shirt, was to go back and pull still photographs of

18  each one of those videotapes, again, to assist you in

19  following the chronology of the case.

20         We'll also have documentary evidence, and one example

21  of that is we have the actual bond paperwork that was used by

22  the defendant when he escaped from the Bibb County Jail.

23         Now, each of you have been provided with copy of

24  indictment.  I noticed that most of you have it in your hand.

25  I want to talk a little bit more about that indictment as it

1    relates to the evidence that will be presented to you during

2    the course of this trial.  You will notice that it says United

3    States.  That indicates that this is a federal criminal case.

4    You will also notice it says United States versus Richard Ben

5    Glawson.

6         And I expect the evidence to show that during the

7    course of this trial the defendant rarely if ever used his

8    right name being Richard Ben Glawson.  You will notice that

9    during the course of this trial he on occasion used Terry

10   Green, he on occasion used Ricky Odom, he on occasion used

11   Cary Glawson or Terry Butler during various aspects of this

12   trial.

13        You also will notice that the indictment is divided

14   into counts.  As memory serves me, I think there are seven

15   counts on your indictment.  Now, each one of those counts

16   represents a crime which the government alleges that the

17   defendant committed.  Now, some of these crimes are different

18   and some of these crimes are similar, and I'm going to go over

19   those with you right now.

20        I draw your attention to Count One of the indictment.

21   Now, Count One charges that on June 3rd, 2003 -- and that's

22   the date that's alleged in the indictment, that's the date the

23   crime is alleged to have committed, that's the date that the

24   government will focus on in presenting its case -- it is

25   alleged that the defendant distributed or sold a quantity of

1    crack cocaine.  Now, as you might expect, and I'm sure it's a

2    surprise to no one, the sale of crack cocaine is a crime.  It

3    is a federal crime.  If that were not the case, then none of

4    us would be here this morning.  So Count One charges that the

5    defendant sold a quantity of crack cocaine.

6         Now, Count Two is a little bit different from Count

7    One.  Count Two also alleges a sale of an illegal substance,

8    but this sale of illegal substance is not crack cocaine.  In

9    Count Two it's alleged that on June 4th, 2003, the defendant

10   sold a quantity of marijuana.  So the only difference between

11   Count One and Count Two is both allege different drugs, but

12   the foundation of both is that a sale of illegal substance

13   took place.

14        Count Three alleges that on June 20th, 2003, the

15   defendant sold a quantity of the crack cocaine.  So, here

16   again, we're back to a sale case, alleging on that particular

17   date the defendant sold a quantity of crack cocaine.

18        Count Four, it is alleged on June 23rd the defendant

19   sold more than five grams of crack cocaine.  So, here again,

20   we're dealing with another sale by the defendant of an illegal

21   drug, that being crack cocaine.

22        Now, Count Five is a little different.  Here, instead

23   of a sale case, it is alleged that on that particular occasion

24   referred to in the indictment the defendant possessed an

25   illegal drug, that illegal drug being marijuana, and at the

1    time he possessed it, he possessed it with intent to

2    distribute it.  That's just another fancy way of saying he

3    possessed it with the intent to sell it.

4        Count Six of your indictment is totally different.

5    There are certain individuals who because of their background

6    are not allowed to have a firearm, and the defendant falls in

7    that category.  Count Six charges that the defendant possessed

8    a firearm on the date in the case, that date being July 3rd,

9    2003.  He had a firearm in his possession and that firearm

10   being a nine millimeter Smith and Wesson pistol.

11       The last count, Count Seven of the indictment, alleges

12   that on or about December 26th, 2006, the defendant, after

13   having being placed in the Bibb County Jail by an order of the

14   district court judge -- not the judge who is presiding over

15   the case today, but a different judge -- that he escaped from

16   that facility.  And those are the counts alleged in the

17   indictment.

18       I want to talk to you a little bit about the procedure

19   that Special Agent Ahmad and the other law enforcement

20   officers involved in this case followed before they actually

21   made the control purchases of crack cocaine from the

22   defendant, and the key word there being "controlled."

23       In terms of what the evidence will show in this

24   particular trial, this is not a situation in which you give a

25   person some money, and say, okay, you go out there, buy some

1    crack cocaine, and bring it back to me.  It's not one of those

2    situations.  Each one of those buys I just discussed with you

3    in the indictment was a controlled purchase of crack cocaine

4    or a controlled purchase of marijuana or a controlled purchase

5    of a firearm under the supervision of a law enforcement

6    officer.

7          Informants were used by the government, by the case

8    agent to make the purchase of crack cocaine, to make the

9    purchase of marijuana, and to make the purchase of the firearm

10   from the defendant.

11         Now, these informants, as you may guess, are people

12   who themselves have been caught dealing in cocaine, have been

13   caught dealing in firearms, and what they did, these

14   informants -- there are two of them, one is named Katina Fort,

15   the other's name is James Jordan -- they were both indicted in

16   federal court -- and as part of their plea agreement, they

17   agreed to assist law enforcement officers in investigating

18   other people, such as the defendant, Mr. Glawson, who

19   themselves were involved in the distribution of illegal drugs.

20   And their motivation for doing that was to get their time

21   reduced or get their time cut.

22         Now, following along, again, on the whole procedure

23   used before purchases of crack cocaine were made in this case,

24   the case agent, in order to document the particular purchase,

25   had these informants, either Ms. Fort or Mr. Jordan to make a

1     recorded phone call to the defendant, and you will notice

2     during the course of the trial that each time there was a

3     purchase of crack cocaine or a purchase of marijuana that a

4     phone call was made by one of these informants to this

5     defendant.

6           And during those phone calls the informant, either Ms.

7     Fort or Mr. Jordan, discussed various aspects of the purchase.

8     They would discuss the amount, they would discuss where the

9     purchase was to take place.  All those calls were recorded,

10    and you will hear those recordings during the course of this

11    particular trial.

12          And another thing that law enforcement is required to

13    do before one of those informants goes out to actually make a

14    purchase, and this was done in this particular case, was each

15    one of those informants before going out to make a buy from

16    this defendant, that informant was searched, that informant's

17    car was searched to make sure they were not hiding any

18    contraband on themselves or in their cars.  That was done

19    before each one of the buys in this case.

20          And also the money that was used by these informants

21    to make the purchase of illegal drugs from this defendant was

22    provided by law enforcement.  It was not a situation where

23    they went to their own pockets and provided the money to make

24    the buys; the money was provided by law enforcement.

25          And another significant aspect when you're talking

1       about controlled purchases as was the case in this case is

2       surveillance.  As I mentioned a moment ago, these informants

3       were not just let loose to go buy crack cocaine or marijuana

4        from this defendant.  Instead, Special Agent Ahmad and another

5       agent actually followed them from the meeting location to the

6       location where they met with the defendant.  That was on each

7       one of those buys those informants were followed to the

8       location.

9            And another critical aspect of the surveillance was

10      that the officers, at least one officer hid in the bushes with

11      a camcorder.  It was not a fancy-dancy, high-tech camcorder.

12      It's probably like one you would have at your house.  And what

13      that officer did while he was hiding in the bushes was to

14      video record the meetings between these informants and the

15      defendant at the time the defendant either sold the crack

16      cocaine, sold the marijuana, or sold the firearm, and we have

17      those videotapes.

18           Those videotapes a lot of times will not capture the

19      hand-to-hand sale of the firearm or the hand-to-hand sale of

20      the crack cocaine or the hand-to-hand sale of the marijuana

21      because on some of those occasions the defendant sold the

22      contraband in a bathroom.  So you won't have a videotape of

23      that, but you will have a videotape of the informants actually

24      meeting with the defendant.

25           Now, let me in terms of what the evidence will show

1    kind of go over with you factually what I anticipate the

2    evidence will show after each one of those buys alleged in the

3    indictment.  In order to assist me and also to assist you,

4    I've asked Mr. Hooper to do a diagram.  I'll explain the

5    diagram, if the court will allow me to go over here so I won't

6    be in the jury's way.  Put up the first diagram.

7              THE COURT:  Sure.

8              MR. CALHOUN:  Now, you'll notice that the very

9    first diagram alleges a date, that date being June 3rd, 2003,

10   which is Count One of your indictment.  On that date the

11   evidence will show that the informants, both of the

12   informants, met with law enforcement officers.  They were

13   searched and the vehicle was searched, and during that meeting

14   the informant made a phone call to Mr. Glawson and arranged

15   for the sale of a quantity of crack cocaine.

16        And following that phone call, the evidence will show

17   that the informant met Mr. Glawson at the Hooters restaurant

18   here in Macon, Georgia, and while at that location Mr. Glawson

19   sold the informant a quantity of crack cocaine, and there will

20   be a videotape of that buy.

21        The videotape will show Mr. Glawson arriving at the

22   Hooters in a white truck with an orange bed liner.  That

23   videotape will show the informant parking beside Mr. Glawson's

24   white vehicle.  That videotape will show the informant getting

25   out of her car, getting in Mr. Glawson's truck where the

1    transaction actually took place, where Mr. Glawson actually

2    sold the crack cocaine.  That videotape will also show Mr.

3    Glawson leaving the Hooters after the crack cocaine had been

4    sold by the informant.

5        The next date, June 4, 2003, which should correspond

6    to Count Two of your indictment, on that date a different

7    informant was used, that being Mr. James Jordan, and as was

8    the case on June 3rd, 2003, Mr. Jordan made a recorded

9    telephone call to Mr. Glawson.  They arranged to meet at

10   McDonald's Restaurant in Macon, Georgia.  You will have a

11   videotape of the defendant, Mr. Glawson arriving in that same

12   white truck with the orange bed liner that he used on June

13   3rd.  You will see the informant going into the bathroom, you

14   will see Mr. Glawson and the informant coming out of the

15   bathroom, and the drug transaction on this occasion actually

16   took place inside the bathroom.  So you have the telephone

17   call setting up the deal, and you have a videotape of the

18   actual meeting.

19       The third diagram should correspond to Count Three of

20   your indictment.  And on June 20th, 2003, Mr. Jordan again

21   made another phone call to the defendant to arrange a purchase

22   of crack cocaine, and true to form, the defendant arrived at

23   that McDonald's in that same white pickup truck that was used

24   on two prior occasions with the signature orange bed liner in

25   the back, and sold the informant, Mr. Jordan, a quantity of

1  crack cocaine.

2      On June 23rd, 2003, which should correspond to Count

3  Four of your indictment, Mr. Jordan again met with law

4  enforcement officers, a consensually monitored recorded

5  telephone call was made to the defendant, and as a result of

6  that phone call the defendant agreed to meet the informant

7  back at McDonald's, the same McDonald's that had been used on

8  June 4th and June 20th.  Now, you will have the videotape of

9  the defendant showing up in that same white truck with the

10  signature orange bed liner, and during that video the

11  defendant sold the informant a quantity of crack cocaine.

12      On the next chart, July 3rd, 2003.  During that

13  June 23rd, 2003 purchase, there was a discussion about the

14  sale of a firearm by the defendant.  That same firearm is

15  mentioned in Count Six of your indictment.  That sale took

16  place on June 3rd, 2003 at a Chevron station here in Macon,

17  Georgia.  We have a videotape or maybe one photo of the

18  defendant arriving at that station and actually selling the

19  firearm to the informant.

20      The next one, November 30th of 2003, this is a totally

21  different informant.  On November 30th, 2003, a guy by the

22  name of Chris Westfaul.  Chris had been stopped in a vehicle

23  long before November 30th and a quantity of marijuana was

24  found in his vehicle, and he was arrested for that.  At the

25  time of his arrest he agreed to cooperate in the investigation

1    of Mr. Glawson.  As part of his cooperation, what he did, he

2    made a call to Mr. Glawson to arrange for Mr. Glawson to bring

3    a quantity of marijuana -- I think it was a quarter pound of

4    marijuana -- to him at a local body shop.  Well, when Mr.

5    Glawson showed up, the police were waiting on him, he was

6    detained, arrested, and a quarter of a pound of marijuana was

7    found inside his vehicle.

8         And the last diagram there, which is December 31st,

9    2006 corresponds to the last count of your indictment, and

10   prior to December 31st, 2006, Mr. Glawson had been placed by

11   order of a federal judge in the Bibb County Law Enforcement

12   Center, which is a local jail here in Macon, Georgia.

13        He was able to escape from that facility by exchanging

14   the identity with another subject who was being held at the

15   Bibb County Law Enforcement Center, which brings me to the

16   last diagram.  In order to understand how Mr. Glawson was able

17   to escape from the Bibb County Law Enforcement Center or the

18   Bibb County Jail, I put together this diagram, and I want to

19   focus on the left-hand portion of that diagram, particularly

20   the top portion.

21        You will notice that across from Mr. Glawson's name

22   there's an inmate by the name of Card.  Now, Mr. Card had been

23   placed in the Bibb County Jail because he got into a little

24   altercation with his sister, and due to that altercation an

25   arrest warrant for family violence was taken out on him, and

1    he was placed in the Bibb LEC.  Mr. Card, because of the

2    nature of the charge, couldn't make a bond.  There was a $400

3    bond that he was allowed to make, but he didn't have the money

4    to make it, so he couldn't get out.

5        So what Mr. Glawson did -- who was not subject to a

6    bond and who was not supposed to be released from Bibb County

7    LEC -- the evidence will show that Mr. Glawson charmed up to

8    Mr. Card and was able to get from Mr. Card Mr. Card's phone

9    number, his mother's name and his address, and with that

10   information Mr. Glawson called his girlfriend, Angina Johnson,

11   who is the name directly below Mr. Glawson, and what he did,

12   Mr. Glawson told Ms. Johnson that I need $400 to make this

13   bond.

14       Now, keep in mind he's not supposed to make the bond.

15   Ms. Johnson was able to come up with the $400, she called

16   Melonise Taunton, who is Mr. Glawson's sister and gave her the

17   money, and once they got the money, they contacted Janet Card,

18   Mr. Card's mother.  Then Carswell and Taunton went to Allstate

19   Bonding and was able to secure a bond in the name of Mr. Card.

20       Well, they took that bond up to the service desk.

21   You'll notice the little square, you see service desk.  That

22   bond was given to a lady by the name of Jacquelyn Ridley, and

23   when Ms. Ridley got the bond, she inputted it into the

24   computer Card, and then she contacted the section of the jail

25   known as male booking, where Lynn Mattox was working and told

1    Ms. Mattox that there was a bond in the system for Card.

2         Well, Ms. Mattox contacted west control where both the

3    defendant and the Card guy were living.  They had two separate

4    cells.  But when they called back to west control, and they

5    sent an officer back to get Card, they had switched cells.

6         The evidence will show that Glawson was in Card's

7    cell, and Card was in Glawson's cell.  So when they went back

8    to get him, they brought who they thought was Card, and it

9    turned out to be Mr. Glawson, and Mr. Glawson walked out of

10   Bibb County Jail assuming the identity of Mr. Card.

11        Now, ladies and gentlemen, that's a brief overview of

12   what I expect the evidence to show in this particular case.

13   There's going to be a number of other types of evidence that

14   will be called on during the course of this particular trial

15   and on behalf of the U.S. Attorney's Office, we thank you for

16   your time and participation.

17        MR. HOGUE:  Imagine if you will a mistake so severe

18   that a person finds himself seated in a federal courtroom, a

19   United States District Court, indicted for serious felony

20   charges.  Imagine further that it's not just a mistake, but a

21   series of mistakes growing like an avalanche coming down the

22   mountainside collecting everything in its path.  Throw in a

23   couple of witnesses from the government that you will hear

24   from in this case who have an interest in the case, that is,

25   they have something to gain, informers, a handful of false

1    statements and perhaps even lies, and what you have is what we

2    have here this week, a man innocent sitting here on trial for

3    seven serious violent -- serious crimes.

4         Now, you've got perhaps notepaper there, I see, and

5    you're going to be able to follow the evidence by perhaps

6    doing something like this, putting down on one side mistakes,

7    and on the other side, lies, and putting in there whether a

8    witness who comes forwards and testifies has made an honest

9    mistake that might not matter, but it might or whether the

10   witness may be trying to deceive you.

11        Now, if Mr. Hooper could do something for me and put

12   back up the government's very first chart there just to give

13   you an example by the way we're beginning this case so that

14   you can follow and note what these witnesses provide, and I

15   presume the government put this chart together, and I also

16   presume what you see on there are some mistakes already.

17        For example, you see it says November 30th, 2003 as

18   one of the alleged crimes.  You've been given the indictment.

19   You can look at Count Five, and you can see that the grand

20   jury alleges that the crime occurred on November 30th of 2004.

21   Mistake?  Probably.  You also see that the symbol for

22   McDonald's is in that November 30, 2003 box on that chart, but

23   I believe what we're going to hear is some testimony about a

24   drug deal that went down at an auto body shop.  I don't

25   believe there's going to be any McDonald's anywhere.

1          Now, you might want to note that as you listen to the

2     evidence in this case and see what that might mean to you.

3     You also notice that the last box up there says December 31st

4     of 2006, but if you look at Count Seven of your indictment

5     you'll see the crime is alleged by the grand jury to have

6     occurred on December 25th, 2006.   A difference that matters, a

7     mistake?   Perhaps.

8          You also heard Mr. Calhoun say that it's not Lynn

9     Maher, but Mattox; again, a mistake.   But that's the kind of

10    thing that can grow and that you're going to hear from the

11    witness stand as the government calls its witnesses, and I put

12    them to the test in this case by cross examining each of them.

13         If you'll notice also in your indictment Counts One

14    through Four and Count Six all occur within a short period of

15    time.   So they all kind of go together.   They're all the ones

16    Mr. Calhoun told you are caught on videotape.

17         Now, what you'll notice by the evidence though, and I

18    want you to note it as you see it, those are June and July of

19    2003.   Mr. Glawson wasn't arrested then.   No one was arrested

20    then.   It was a year and a half later before he was arrested.

21    And all of the evidence in those five counts will hang on your

22    ability to discern who it is in a videotape, who it is on an

23    audiotape, whose name isn't Richard Glawson, whose people, the

24    informers dealing with him, with this person, this target,

25    don't even know the name Richard Glawson, they use a

1    completely different name.  And you'll want to ask what phone

2    number do they use, who does it connect to, who does any of it

3    connect to.  Is it Richard Glawson?  Those are the things

4    you're going to want to note.

5         You're going to hear in Count Five the marijuana count

6    which didn't happen at McDonald's, but at some auto body shop,

7    there's another person.  Now, Mr. Glawson is there too, and he

8    gets arrested.  But you'll need to hear whether he was simply

9    there.

10         What you can do, ladies and gentlemen, as you listen

11   to the case is ask yourselves what would the perfect case look

12   like if the government wanted me to come in here and hear

13   evidence for a few days and then decide a man's fate to

14   pronounce him guilty, what should they bring to me to convince

15   me, to remove every reasonable doubt from my mind, and then in

16   the other column put there what did they bring to me, is it

17   perfect, is it enough.  That will be the question in the case.

18         And we'll put the government's case to the test.  How?

19   Through cross examination, through questioning closely the

20   witnesses as to their ability to see and hear and to their

21   truthfulness, and that will be how you decide at the end of

22   this case whether they have overcome their burden of proof and

23   proved to you beyond a reasonable doubt that this man who sits

24   here in this courtroom today is guilty or not.  And we'll come

25   and ask you to find him not guilty.

1      MR. CALHOUN:   The government calls Rafiq Ahmad.

2      DEPUTY CLERK:  Do you solemnly swear that your

3   testimony in this case shall be the truth, the whole truth,

4   and nothing but the truth, so help you God?

5      THE WITNESS:  I do.

6      DEPUTY CLERK:  State your name for the jury and

7   spell your first and last name.

8      THE WITNESS:  Members of the jury, my first name is

9   Rafiq, it's R-a-f-i-q, my last name is Ahmad, A-h-m-a-d.

10      MR. CALHOUN:  May I proceed, Your Honor?

11      THE COURT:  Please.

12                          **RAFIQ AHMAD**

13      Witness, having first been duly sworn, testified on

14                       DIRECT EXAMINATION

15   BY MR. CALHOUN:

16   Q.   Mr. Ahmad, how are you employed?

17   A.   I'm a special agent with the Bureau of Alcohol, Tobacco

18   and Firearms.

19   Q.   How long have you had that job?

20   A.   I have been with ATF now for 20 years.

21   Q.   Can you describe to the jury what your duties are with

22   ATF?

23   A.   Currently my duties include criminal investigative --

24   investigations or cases as it relates to alcohol, tobacco,

25   firearms and explosives, and here in this region, mostly

1   firearms and explosives.

2   Q.   Did you participate in the investigation of a Richard Ben

3   Glawson?

4   A.   Yes, I did.

5   Q.   And is Mr. Glawson in court today?

6   A.   Yes, he is.

7   Q.   Point to him and please describe what he has on.

8   A.   Yes, sir.  He's sitting to the right of Mr. Hogue at the

9   defense counsel's table while wearing a gray top.

10   Q.   At the time you initiated your investigation, did you

11   know Mr. Glawson by a different name?

12   A.   Yes.

13   Q.   What name was that?

14   A.   I knew him by two other names, Terry Butler and Terry

15   Green.

16   Q.   Now, what offenses or what crimes were the subject of

17   your investigation at the time you began your investigation of

18   Mr. Glawson?

19   A.   Beginning of the investigation, it was crimes involving

20   possession of narcotics with intent to distribute and

21   possession of a firearm.

22   Q.   Were you assisted in your investigation by other law

23   enforcement officers?

24   A.   Yes.

25   Q.   And what agencies and officers were they?

1    A.   Bibb County Sheriff's Department, and specifically,

2    officer -- Deputy Joseph Whitehead.

3    Q.   Now, as part of your investigation of Mr. Glawson, did

4    you have occasion to use informants?

5    A.   Yes.

6    Q.   How many informants did you use?

7    A.   Two.

8    Q.   And who were they?  What were their names?

9    A.   Katina Fort and James Jordan.

10   Q.   Now, were Fort and Jordan related?

11   A.   Yes.

12   Q.   If so, how?

13   A.   They were married.

14   Q.   What led to Fort and Jordan to start to cooperate with

15   your agency?

16   A.   In October 2002, if memory serves me correctly, both Mr.

17   Jordan and Ms. Fort were arrested for possession of narcotics

18   and possession of a firearm by a convicted felon.

19   Q.   Were they paid?

20   A.   No.

21   Q.   Now, as part of their cooperation, what were they asked

22   to do?

23   A.   They both indicated that they were able to buy quantities

24   of drugs and possible firearms from other individuals.

25   Q.   Now, before using either one of those informants to

1    attempt the purchase of an illegal drug, either crack or

2    marijuana, did you meet with them in advance?

3    A.    Yes.

4    Q.    And did a meeting take place before any purchase of

5    illegal drugs?

6    A.    Yes.

7    Q.    And were you present at all those meetings?

8    A.    Yes.

9    Q.    Who else was present?

10   A.    Joseph Whitehead and Billy Johnson.

11   Q.    Is Joseph Whitehead currently deceased?

12   A.    Yes.

13   Q.    What was the purpose of meeting with the informants prior

14   to making any controlled purchase of illegal drugs?

15   A.    There were several purposes, one of which was to search

16   the informants, both their person and their vehicle to ensure

17   that they did not have any drugs prior to the controlled

18   purchase.  We also make arrangements to make a phone call to

19   the defendant which we would attempt to record, and we would

20   also outfit both of the informants with any equipment that was

21   needed to record any of the transactions, be that audio

22   equipment, either recorder or transmitter, and we would also

23   attach equipment to their vehicle to allow us to be able to

24   monitor that transaction.

25   Q.    Now, which informant was used initially?

1    A.    Initially, Katina Fort.

2    Q.    Now, drawing your attention to June 3rd, 2003, did you

3    meet with both of those informants, Jordan and Fort?

4    A.    Yes.

5    Q.    And which informant was selected to actually make the

6    purchase on that occasion, that occasion being June 3rd, 2003?

7    A.    June 3rd, it was Katina Fort.

8    Q.    And why did you select Ms. Fort, as opposed to Mr.

9    Jordan, for the June 3rd, 2003?

10   A.    Ms. Fort actually knew the defendant, and Mr. Jordan did

11   not.

12   Q.    Now, during the meeting, did Ms. Fort make a phone call?

13   A.    Yes.

14   Q.    Were you present?

15   A.    Yes.

16   Q.    Was that call recorded?

17   A.    Yes, it was.

18   Q.    And who recorded that call?

19   A.    That was recorded by Investigator Joseph Whitehead.

20   Q.    What type of equipment was used to make that recording?

21   A.    If memory serves me correctly, we used either a digital

22   recorder that we actually hook up to the telephone by way of

23   attaching a microphone to it.

24   Q.    And how long did that call last?

25   A.    That call was probably no more than about two to three

1    minutes.

2    Q.   Who took possession of that tape after that phone call?

3    A.   That would have been Investigator Whitehead.

4    Q.   Were you present at the time?

5    A.   Yes.

6    Q.   Now, after the phone call, was Ms. Fort given some money?

7    A.   Yes, she was.

8    Q.   And how much money was she given?

9    A.   If memory serves me correctly, on this particular

10   occasion we were purchasing I believe a half ounce of crack

11   cocaine, and I believe she was given $500 for that purchase.

12   Q.   And was Ms. Fort searched?

13   A.   Yes.

14   Q.   What type of vehicle was she operating at the time?

15   A.   At the time she was driving a Chevy Cavalier, and it was

16   a convertible, it was a black Chevy Cavalier convertible.

17   Q.   And was the vehicle searched?

18   A.   Yes.

19   Q.   And was any contraband found either on Ms. Fort or inside

20   the vehicle?

21   A.   No, it was not.

22   Q.   After the informants had been searched and been allowed

23   to make a telephone call, where did Ms. Fort go?

24   A.   Ms. Fort left what we call -- when we initially meet, we

25   call that a briefing or staging location.  Ms. Fort left that

```
 1    location and proceeded to Hooters on Riverside Drive -- well,
 2    actually it's on Arkwright Road.
 3    Q.    And did you follow them?
 4    A.    Yes.
 5    Q.    Where did you park in order to conduct your surveillance?
 6    A.    Ms. Fort, I believe, parked in the back parking lot, and
 7    I parked -- myself and Investigator Whitehead -- parked across
 8    the street from where she was in a hotel parking lot.
 9    Q.    Now, was this nighttime or daytime?
10    A.    This was in the daytime.
11    Q.    Now, after Ms. Fort arrived at this parking lot that you
12    just described, did you have occasion to see the defendant
13    arrive?
14    A.    Yes, we did.
15    Q.    And where was the defendant when you first saw him
16    arrive?
17    A.    The defendant arrived in a white pickup truck and backed
18    his vehicle in beside Ms. Forte's vehicle.
19    Q.    Now, did you notice any distinguishing characteristics
20    about that white pickup truck?
21    A.    The white pickup truck had an orange bed liner.  The cab
22    portion of it had an orange bed liner in it.
23    Q.    Now, describe what you saw based on where you were
24    conducting your surveillance when Ms. Fort met the defendant
25    at the Hooters parking lot?
```

1  A.    Once the defendant arrived, Ms. Fort got out of her

2  vehicle and got into the defendant's vehicle on the

3  passenger's side.

4  Q.    Now, did she have a transmitter -- she, being Ms. Fort --

5  have transmitter on her when she got in the defendant's

6  vehicle?

7  A.    Yes.

8  Q.    And could you overhear the conversation?

9  A.    Yes.

10 Q.    Did you see Ms. Fort when she got out of the truck?

11 A.    Yes.

12 Q.    Approximately how long did Ms. Fort stay inside the

13 vehicle?

14 A.    Again, it was very brief, not more than five minutes.

15 Q.    And did you see defendant when he left?

16 A.    Yes.

17 Q.    Which way did he go?

18 A.    He drove out of the Hooters parking lot and proceeded

19 down toward, I believe it was Burger King, and then I think he

20 made a right and went south from our location.

21 Q.    And where did Ms. Fort go?

22 A.    Ms. Fort went back to our briefing or staging area.

23 Q.    And what did she surrender when she got back to the

24 staging area?

25 A.    Once she was at the staging area, she surrendered the

 1 | suspected crack cocaine to Investigator Whitehead.

 2 | Q.   And were you present?

 3 | A.   Yes.

 4 | Q.   Now, Special Agent Ahmad, you have been provided with

 5 | some exhibits, I believe?

 6 | A.   Yes.

 7 | Q.   I want to draw your attention to exhibit number one.

 8 | A.   I believe it's marked here as exhibit number one, yes,

 9 | sir.

10 | Q.   Do you recognize that exhibit?

11 | A.   Yes.

12 | Q.   What do you recognize that to be?

13 | A.   This is the truck that the defendant arrived to the

14 | Hooters in.

15 | Q.   Does that photo fairly reflect how the truck looked when

16 | you saw it on June 3rd, 2003?

17 | A.   Yes.

18 |          MR. CALHOUN:  The government moves to admit number

19 | one, Your Honor.

20 |          THE COURT:  It's admitted.

21 |          MR. HOGUE:  I haven't seen it yet, Your Honor.  I

22 | may have seen it somewhere along the way, but I don't know

23 | which number --

24 |          MR. CALHOUN:  These were taken from the video that

25 | was provided to Mr. Hogue previously.

1           THE COURT:  All right, show it to Mr. Hogue, please.

2           MR. CALHOUN:  We're going to give Mr. Hogue copies

3    of all of them so he'll have them.

4           THE COURT:  Well, let's get this settled before it's

5    admitted.

6           MR. HOGUE:  Your Honor, I don't have any objection

7    to this if it's from the video that I presume will be

8    authenticated at this point.  If that has not been done, I

9    don't believe it has, I guess these photos are coming from

10   some other source that hasn't been talked about yet.  So I do

11   object at this point.

12          THE COURT:  Well, the test here is not the source;

13   it's whether or not it's a fair representation of what it

14   purports to depict.  Do you object that it's not that?

15          MR. HOGUE:  Well, I don't know that I've heard

16   enough for me to know whether they are purporting it to be

17   what the photos depict.  I don't think they've done that.

18          MR. CALHOUN:  I think we have, Your Honor.

19          THE COURT:  Well, the witness identified the

20   photograph and said what it was.  I'm not sure that he used

21   the formulated words.  Perhaps you would ask him that

22   question, Mr. Calhoun.

23          MR. CALHOUN:  Yes, Your Honor.

24   BY MR. CALHOUN:

25   Q.   Mr. Ahmad, in reference to exhibit one, do you recognize

1  that exhibit?

2  A.   Yes, sir.

3  Q.   What do you recognize that to be?

4  A.   I recognize this to be a photograph of the defendant's

5  vehicle.

6  Q.   And does that photograph fairly --

7       MR. HOGUE:   Your Honor, may I interpose an objection

8  here.  I've let it go several times now, but it is conclusory

9  of the government to ask and the witness to answer that any of

10  this is the defendant's whatever -- him, the vehicle.  That's

11  the issue for the jury to decide, and the court's heard my

12  opening statement and the theory of our case.  They can call

13  it the target or whatever they want, but defendant is what --

14       THE COURT:   That's fair.  That's fair.  Whether or

15  not it was the defendant's vehicle is, in fact, a question for

16  the jury.  So you'll have to describe it in another way.

17       MR. CALHOUN:   Yes, Your Honor.

18  BY MR. CALHOUN:

19  Q.   Special Agent Ahmad, was this the vehicle that you

20  observed on June 3rd, 2003?

21  A.   Yes, that's correct.

22  Q.   And does it accurately reflect how the truck looked when

23  you saw it on June 3rd, 2003?

24  A.   Yes, sir, that's correct.

25       MR. CALHOUN:   We offer exhibit number one, Your

1    Honor.

2              MR. HOGUE:  No objection.

3              THE COURT:  It is admitted.

4              MR. CALHOUN:  Your Honor, we would like to publish

5    that exhibit by allowing Mr. Hooper to put it on the screen.

6              THE COURT:  Very good.  Well, go back.  There are

7    two trucks.  Which truck are you talking about?

8    BY MR. CALHOUN:

9    Q.   Special Agent Ahmad, can you identify which truck you

10   previously testified about?

11   A.   Yes.  On the picture and on the video it would be the

12   truck to the farthest left.

13             THE COURT:  All right, thank you.

14   BY MR. CALHOUN:

15   Q.   Special Agent Ahmad, drawing your attention to

16   exhibit number two, do you have that in front of you?

17   A.   Yes, sir.

18   Q.   Do you recognize that exhibit?

19   A.   Yes, sir.

20   Q.   Is that another photo of the truck that you observed on

21   June 3, 2003?

22   A.   Yes, sir.

23   Q.   Does it fairly and accurately reflect how the truck

24   looked when you made the observation on June 3rd, 2003?

25   A.   Yes, sir.

```
 1              MR. CALHOUN:  The government moves to admit number
 2    two, Your Honor.
 3              MR. HOGUE:  No objection.
 4              THE COURT:  It is admitted.
 5              MR. CALHOUN:  I'd like to publish it to the jury,
 6    Your Honor.
 7              THE COURT:  Very good.
 8    BY MR. CALHOUN:
 9    Q.   Now, Special Agent Ahmad, reviewing the screen, is that
10    the truck that you just previously testified about?
11    A.   Yes, sir.
12    Q.   Special Agent Ahmad, do you have exhibit number three in
13    front of you?
14    A.   Yes, sir.
15    Q.   And do you recognize that exhibit?
16    A.   Yes, sir.
17    Q.   Is that a photo of the truck that you previously
18    testified about as well?
19    A.   Yes, sir.
20    Q.   And does that photo also accurately reflect how the truck
21    looked when you saw it on June 3rd, 2003?
22    A.   Yes, sir, it does.
23              MR. CALHOUN:  The government moves to admit number
24    three, Your Honor.
25              MR. HOGUE:  No objection.
```

```
 1              THE COURT:  Admitted.

 2              MR. CALHOUN:  Like to publish it to the jury.

 3              THE COURT:  Go ahead.

 4    BY MR. CALHOUN:

 5    Q.   Now, Special Agent Ahmad, there are three vehicles listed

 6    on the screen, which one is the one that you testified about?

 7    A.   The one in question is the white vehicle in the middle

 8    between the black vehicle and the green vehicle.

 9    Q.   Do you recognize the black vehicle parked to the left of

10    the truck?

11    A.   Yes, sir, I do.

12    Q.   What do you recognize that to be?

13    A.   I recognize that to be the vehicle driven by Katina Fort.

14    Q.   And that's the informant?

15    A.   Yes, sir.

16    Q.   And Special Agent Ahmad, do you have exhibit number four

17    in front of you?

18    A.   Yes, sir.

19    Q.   And do you recognize that exhibit?

20    A.   Yes, sir.

21    Q.   Is that also a photo of the truck that you just testified

22    about?

23    A.   Yes, sir.

24    Q.   Does that photograph also accurately reflect how the

25    vehicle looked when you saw it?
```

1    A.   Yes, sir, it does.

2              MR. CALHOUN:  The government moves to admit number

3    four, Your Honor.

4              MR. HOGUE:  No objection.

5              THE COURT:  Admitted.

6              MR. CALHOUN:  Like to publish it to the jury.

7    BY MR. CALHOUN:

8    Q.   Special Agent Ahmad, looking at the photo, are you able

9    to identify anyone standing in or near that truck?

10   A.   Yes, sir.

11   Q.   Who is that?

12   A.    It's Katina Fort in the black shirt standing outside of

13   the black vehicle with her hand on the door handle or the

14   passenger side of the white vehicle.

15   Q.   And Special Agent Ahmad, do you have exhibit number five

16   in front of you?

17   A.   Yes, sir.

18   Q.   And do you recognize that photo?

19   A.   Yes, sir.

20   Q.   And is that a photo of the truck that you saw on

21   June 3rd, 2003?

22   A.   Yes, sir.

23   Q.   And does it fairly reflect how the truck looked when you

24   saw it on that day?

25   A.   Yes, sir.

```
 1              MR. CALHOUN:  The government moves to admit number
 2   five, Your Honor.
 3              MR. HOGUE:  No objection.
 4              THE COURT:  Admitted.
 5   BY MR. CALHOUN:
 6   Q.   Now, Special Agent Ahmad, looking at the screen, is that
 7   the truck you just testified about?
 8   A.   Yes, sir.
 9   Q.   And do you recognize the person who appears to be either
10   getting in or getting out of the truck?
11   A.   Yes, sir.
12   Q.   And who do you recognize that to be?
13   A.   That's Katina Fort.
14   Q.   Now, you have in front of you exhibit number six, I
15   believe?
16   A.   Yes, sir.
17   Q.   Is that also a photo of the truck that you saw on
18   June 3rd, 2003?
19   A.   Yes, sir.
20   Q.   And does that picture fairly and accurately reflect how
21   the truck looked when you saw it?
22   A.   Yes, sir.
23              MR. CALHOUN:  The government moves to admit number
24   six, Your Honor.
25              MR. HOGUE: No objection.
```

```
 1                   THE COURT:  Admitted.
 2    BY MR. CALHOUN:
 3    Q.    Special Agent Ahmad, is that the truck that you just
 4    testified about?
 5    A.    Yes, sir.
 6    Q.    And I noticed from looking at the photo, are you able to
 7    see the bed area of the truck?
 8    A.    Yes, sir.  Just slightly from this photo.
 9    Q.    Do you notice anything unusual about the bed area of the
10    truck?
11    A.    Just that it appears to be the orange bed liner.
12    Q.    Now, was Mr. Glawson arrested on June 3rd, 2003?
13    A.    No, sir, he was not.
14    Q.    Why was he not arrested?
15    A.    We were initially trying to further the investigation, so
16    there was no intent to arrest him at that particular time.
17    Q.    And when did you anticipate making another controlled
18    purchase from the person you knew as Mr. Glawson?
19    A.    If memory serves me correctly, we had that scheduled for
20    the next day, for the following day.
21    Q.    Would the following day have been June 4th, 2003?
22    A.    Yes, sir.
23    Q.    Drawing your attention to June 4, 2003, did you meet with
24    law enforcement officers on that date?
25    A.    Yes, sir.
```

1    Q.    Who all was present?

2    A.    There were a number of officers present, but

3    specifically, Investigator Whitehead and Investigator Billy

4    Johnson were present at that particular meeting.

5    Q.    Did you meet with either Ms. Fort or Mr. Jordan on that

6    day?

7    A.    Yes, sir, we did.   In fact, we met with both of them.

8    Q.    And which informant as between Jordan and Fort were to be

9    used to make a purchase on that date?

10   A.    On this particular date Mr. Jordan was going to be used

11   to make the purchase.

12   Q.    Now, at this time were you still operating under the

13   belief that the defendant was either Terry Green or Terry

14   Butler?

15   A.    That's correct.

16   Q.    Now, when you met with Mr. Jordan, did he make a phone

17   call?

18   A.    Yes, sir, he did.

19   Q.    And were you present?

20   A.    Yes, sir.

21   Q.    Was that call recorded?

22   A.    Yes, sir, it was.

23   Q.    Who recorded that phone call?

24   A.    Again, that was recorded by Investigator Joseph

25   Whitehead.

1   Q.   And what equipment was used to make that phone call?

2   A.   I believe it was just the standard recorder.

3   Q.   Was that the same type of equipment that had been used on

4   June 3rd?

5   A.   Yes, sir.

6   Q.   Now, after the telephone had been recorded, what happened

7   to the tape?

8   A.   Investigator Whitehead took possession of that.

9   Q.   Now, after that phone call, was Jordan provided with a

10  transmitter?

11  A.   Yes, sir.

12  Q.   Was this the same type of transmitter that had been

13  provided on June 3rd, 2003?

14  A.   Yes, that's correct.

15  Q.   Was Jordan searched?

16  A.   Yes.

17  Q.   Was the vehicle searched?

18  A.   Yes.

19  Q.   Was he driving the same vehicle that had been seen on the

20  screen on June 3rd, 2003?

21  A.   Yes.  I believe he was driving that same vehicle that

22  day.

23  Q.   Anything illegal found either in the vehicle or on the

24  person of Mr. Jordan when that search took place?

25  A.   No, sir.

1   Q.   Was he provided with some money?

2   A.   Yes.

3   Q.   How much money was Mr. Jordan provided with?

4   A.   On this occasion we were purchasing an ounce of

5   marijuana, and Mr. Jordan was provided with $125 for that.

6   Q.   Now, after Mr. Jordan had been searched and provided with

7   the money and made the phone call, did he leave the meeting

8   location?

9   A.   Yes.

10  Q.   And did you follow him?

11  A.   Yes.

12  Q.   Who was with you when you followed Mr. Jordan?

13  A.   Investigator Whitehead and Investigator Johnson.

14  Q.   Where did Mr. Jordan go?

15  A.   Mr. Jordan left this location, and initially we were

16  supposed to meet at Hooters, which was the same as the first

17  location, but the defendant changed that location and decided

18  to meet at the McDonald's.

19          MR. HOGUE:  Your Honor, I'm going to make my

20  objection again.  The defendant changed the location?  Again,

21  that's the question for the jury for the trial.  So target,

22  something, but not defendant.  It's conclusory.

23          MR. CALHOUN:  Your Honor, that particular area will

24  be covered when we call the informants anyway, so I'll go

25  along --

1            THE COURT:  Say that again.

2            MR. CALHOUN:  We will cover that area when I call

3    the informants themselves, so I think the objection is a fair

4    one.

5            THE COURT:  All right.

6    BY MR. CALHOUN:

7    Q.    Now, when you arrived, where did you go in order to

8    conduct your surveillance?

9    A.    On this particular occasion I had multiple surveillance

10   posts, and the reason for that was because we were initially

11   set to use one location, and the target changed that location

12   at the last minute, which necessitated my having to move my

13   surveillance post from where I was to another location.

14   Q.    And describe what you saw from your vantage point when

15   you were conducting surveillance?

16   A.    Initially the target went to the gas station, which is

17   directly across the street from McDonald's, and I believe on

18   the last controlled buy that we did we had not necessarily

19   definitively identified the tag number for that vehicle.  On

20   this occasion my original surveillance post was at the

21   McDonald's.  From McDonald's I was able to walk across the

22   street to the gas station where the target vehicle was parked,

23   and I was able to observe the target vehicle by walking right

24   next to it and actually spoke to the target himself at that

25   particular time to positively identify the target visually,

1   went back to my surveillance post --

2   Q.   Let me stop you a moment.  You said you spoke to the

3   target, do you see the target here in court today?

4   A.   Yes.

5   Q.   And who is?

6   A.   It's the gentleman sitting here at the defendant's table.

7   Q.   The person you previously identified as being Glawson?

8   A.   Yes.

9   Q.   Now, describe what you saw from where you were.

10   A.   From where I was initially I could see the target's

11   vehicle.  As I said, I got out of my vehicle and pretended to

12   use the telephone just to maintain surveillance and then

13   walked across the street to the gas station.  As I said, I

14   spoke to the target, went into the gas station itself and

15   bought a soft drink, came out, observe a vehicle and the tag

16   number, and went back to my surveillance post.  At that time

17   the target vehicle moved from the gas station and appeared to

18   be heading toward where I was in my surveillance post, so I

19   moved to another surveillance post.

20   Q.   And what did you observe?

21   A.   I observed the target and the informant, in this

22   particular case Mr. Jordan, arrive at the McDonald's and go

23   inside the McDonalds.

24   Q.   And based on what you observed, how long did Mr. Jordan

25   stay inside the McDonald's?

1    A.    Not more than five minutes.

2    Q.    And did you see Mr. Jordan when he left?

3    A.    Yes.

4    Q.    And did you follow him?

5    A.    Yes.

6    Q.    And where did you follow him to?

7    A.    He went back to the briefing or staging location.

8    Q.    What, if anything, did he surrender at this staging

9    location?

10    A.    That staging location he surrendered the marijuana

11    purchase from the target to Investigator Whitehead.

12          MR. CALHOUN:  Ms. Colvin, we're on exhibit seven

13    now?

14          MS. COLVIN:  Yes.

15    BY MR. CALHOUN:

16    Q.    Special Agent Ahmad, I think you have exhibit seven in

17    front of you?

18    A.    Yes, sir.

19    Q.    I'm going to ask you to look at exhibit seven, please.

20    Do you recognize the truck in that particular photo?

21    A.    Yes, sir.

22    Q.    Is that the truck that you previously referred to that

23    you saw on June 4, 2003?

24    A.    Yes, sir.

25    Q.    Does that photo fairly and accurately reflect how the

1    truck looked when you saw it on June 4, 2003?

2    A.    Yes, sir.

3    Q.    Now, is that the truck that you saw the target in while

4    you were conducting surveillance?

5    A.    Yes, sir.

6    Q.    Is that, the target that you previously referred to, is

7    that Richard Glawson?

8    A.    Yes, sir.

9           MR. CALHOUN:    The government moves to admit number

10   seven and publish it, Your Honor.

11          MR. HOGUE:    No objection.

12          THE COURT:    Admitted.    Publish it.

13   BY MR. CALHOUN:

14   Q.    Special Agent Ahmad, is this the truck that you were

15   referring to?

16   A.    Yes, sir.

17   Q.    And I noticed there's -- can you see the bed liner?

18   A.    Yes, sir.

19   Q.    Is that the same bed liner that you previously referred

20   to?

21   A.    Yes, sir.

22   Q.    There appears to be a subject in the truck.    Were you

23   ever able to identify the subject in the truck?

24   A.    No.    I was not able to identify the subject by name.

25   Q.    Drawing your attention to exhibit -- I believe it should

1    be exhibit eight -- do you have that in front of you?

2    A.    Yes, sir.

3    Q.    Do you recognize that truck shown in exhibit number

4    eight?

5    A.    In exhibit number eight it really does not show the truck

6    except for the top.  It mainly shows the target.

7    Q.    And the target, do you see that target in court this

8    morning?

9    A.    Yes.

10   Q.    And who is that?

11   A.    Mr. Richard Glawson.

12   Q.    And does that photo fairly reflect how the truck and what

13   you've referred to as the target looked on June 4, 2003?

14   A.    Yes, sir.

15         MR. CALHOUN:  The government moves to admit number

16   eight, Your Honor.

17         MR. HOGUE:  No objection.

18         THE COURT:  Admitted.

19   BY MR. CALHOUN:

20   Q.    Now, the person displayed in this photo, do you recognize

21   that person?

22   A.    Yes, sir.

23   Q.    Is that person in court today?

24   A.    Yes, sir.

25   Q.    Who do you recognize that to be?

1    A.    Mr. Glawson.

2    Q.    Now, do you notice anything different from the person you

3    saw in the exhibit number eight here and the person you

4    identified as Mr. Glawson?

5    A.    Yes, sir.

6    Q.    What difference do you notice?

7    A.    The person in exhibit number eight has braided hair, and,

8    of course, Mr. Glawson does not currently.

9    Q.    Do you have exhibit number nine in front of you?

10   A.    Yes, sir.

11   Q.    What is depicted on exhibit number nine?

12   A.    This is the target vehicle, the same white vehicle with

13   the orange bed liner exiting the McDonald's.

14   Q.    And does that photo fairly and accurately reflect how

15   that truck appeared when you saw it on June 4, 2003?

16   A.    Yes, sir.

17              MR. CALHOUN:   The government moves to admit number

18   nine, Your Honor.

19              MR. HOGUE:   No objection.

20              THE COURT:   Admitted.

21   BY MR. CALHOUN:

22   Q.    Now, is that the white truck that you just referred to?

23   A.    Yes, sir.

24   Q.    And the person that's seated in that truck, who do you

25   identify that to be?

1   A.   Mr. Glawson.

2   Q.   Now, was Mr. Glawson arrested after that June 4th

3   sequence of events that you just described?

4   A.   No, sir.

5   Q.   Why was he not arrested?

6   A.   Due to conversation that we had with the informants, we

7   believed that we could continue to further the investigation,

8   so we did not make an arrest at that particular time.

9   Q.   All right, I'm drawing your attention to June 20th, 2003.

10  Did you meet with Mr. Jordan and Ms. Fort on that date?

11  A.   Yes, sir.

12  Q.   And for what the purpose?

13  A.   The same purpose as previous purpose.  We met to search

14  both of the informants, to search their vehicle, to outfit

15  them with any electronic equipment necessary and to place a

16  recorded phone call.

17  Q.   And did the informant actually make a recorded phone

18  call?

19  A.   Yes.

20  Q.   Which informant made the phone call?

21  A.   On this particular occasion it was Mr. Jordan.

22  Q.   Were you present when that phone call was made?

23  A.   Yes.

24  Q.   Was that phone call recorded?

25  A.   Yes.

1   Q.   And who recorded the phone call?

2   A.   That was recorded by Investigator Whitehead.

3   Q.   And what type of equipment was used to make that

4   recording?

5   A.   We used the recorder, the same as we had used in the two

6   previous buys.

7   Q.   Now, how long did that phone call last?

8   A.   Again, that was probably a very brief phone call, not

9   less than two to three minutes.

10  Q.   What happened after the tape -- after the recording had

11  been made, what happened to the tape?

12  A.   Investigator Whitehead secured the tape.

13  Q.   After the phone call was the informant searched?

14  A.   Yes.

15  Q.   Was the vehicle searched?

16  A.   Yes.

17  Q.   Was any contraband found on either the informant or in

18  the vehicle?

19  A.   No, sir.

20  Q.   And were they supplied with a transmitter?

21  A.   Yes, sir.

22  Q.   Was it the same type of transmitter that had been used on

23  the prior occasion?

24  A.   Yes, sir.

25  Q.   And were they supplied with some money?

1    A.    Yes, sir.

2    Q.    After the informant had been supplied with the money and

3    had been searched and the vehicle searched, where did the

4    informant go?

5    A.    The informant then proceeded to the target location,

6    which was in the same area as the two previous purchases.   In

7    fact, we went to the same location as the previous purchase.

8    We went to a McDonald's.

9    Q.    And who was with you when you went to McDonalds?

10   A.    It was myself, Investigator Whitehead and Lieutenant

11   Billy Johnson.

12   Q.    Where did you park in order to watch what was going on

13   between the informant and what you describe as a target?

14   A.    If memory serves me correctly, we were parked directly

15   across the street in the gas station parking lot or somewhere

16   in that vicinity.

17   Q.    Did you have a occasion to see the defendant arrive at

18   that location?

19   A.    Yes.

20   Q.    And what was he driving?

21   A.    He was driving the same white truck with the orange bed

22   liner that we observed before.

23   Q.    Can you tell the jury what you saw based on where you

24   were located at the time?

25   A.    On this particular occasion the target had a little girl

1    with him.  And I believe, if my memory serves me correctly, on

2    the previously recorded phone call he referred to that little

3    girl as his daughter.  But he did have a little girl with him

4    when he came to meet at the location.  Both of the informants

5    were present at that particular purchase, both Ms. Fort and

6    Mr. Jordan, and that particular controlled buy took place

7    outside in the parking lot, meaning that they did not go

8    inside the McDonald's as they had previously.

9    Q.    And how many informants were observed by you outside in

10   the parking lot?

11   A.    Two.

12   Q.    That would be Mr. Jordan and Ms. Fort?

13   A.    That's correct.

14   Q.    Now, did you follow the informants after they left that

15   location?

16   A.    Yes.

17   Q.    And where did you follow them to?

18   A.    We followed them back to our staging location.

19   Q.    And what, if anything, did the informants turn over to

20   you?

21   A.    At that particular time, if memory serves me correctly,

22   we bought an ounce of crack cocaine, and that was surrendered

23   to Investigator Whitehead back at the staging location.

24   Q.    And were you present?

25   A.    Yes, sir.

1    Q.    Do you have exhibit number 10 in front of you?

2    A.    Yes, sir.

3    Q.    Do you recognize government's exhibit number 10?

4    A.    Yes, sir.

5    Q.    And what is depicted in number 10?

6    A.    Government's exhibit number 10, in the background what

7    you actually see is a McDonald's delivery truck.  The

8    individual to the far left in the photograph is Katina Fort.

9    The individual to the far right, standing to the rear of the

10   white truck is Mr. James Jordan, and the individual in the

11   middle holding the small girl is Mr. Glawson.

12   Q.    Does that photo fairly reflect the events as you saw them

13   on June 20, 2003?

14   A.    Yes, sir.

15         MR. CALHOUN:  The government moves to admit number

16   ten, Your Honor.

17         MR. HOGUE:  No objection.

18         THE COURT:  Admitted.

19   BY MR. CALHOUN:

20   Q.    Now, Agent Ahmad, do you see the informant on this

21   blow-up?

22   A.    Yes, sir.  Actually --

23   Q.    Where is the informant?

24   A.    There's one on the far left-hand side, which would be

25   right where the white arrow is pointing, the female is Katina

 1   Fort.  On the far right-hand side in the blue shirt is

 2   Mr. James Jordan, standing to the rear of the white pickup

 3   truck.

 4   Q.   And were you able to discern whether Mr. Glawson is

 5   depicted on this photo?

 6   A.   Yes.  Now, I couldn't say from this photo that that's

 7   Mr. Glawson's face, because as you can see on the photo his

 8   face is obstructed by a small child.

 9   Q.   Let's go to exhibit number 11.  I'll ask you to look at

10   exhibit number 11, and what is depicted there?

11   A.   This is a picture of Mr. Glawson entering the passenger

12   side vehicle -- passenger side of the white truck.

13   Q.   Does that photo fairly reflect how the scene appeared

14   when you saw it on June 20th, 2003?

15   A.   That's correct.

16        MR. CALHOUN:  The government moves to admit number

17   11, Your Honor.

18        MR. HOGUE:  No objection.

19        THE COURT:  Admitted.

20   BY MR. CALHOUN:

21   Q.   Do you recognize the person whose face is partially

22   covered by the door?

23   A.   Yes, sir.

24   Q.   Who is that?

25   A.   Mr. Glawson.

1    Q.    Do you have exhibit number 12 in front of you?

2    A.    Yes, sir.

3    Q.    Do you recognize what's depicted in exhibit number 12?

4    A.    Yes, sir.

5    Q.    What's that?

6    A.    This is another picture of Mr. Glawson, but instead of

7    him looking to the side as a profile that you just saw, he's

8    looking forward as if looking directly at the camera.

9    Q.    Does that photo fairly reflect how Mr. Glawson looked

10   when you saw him on June 20th, 2003?

11   A.    Yes, sir.

12              MR. CALHOUN:   The government moves to admit number

13   11, Your Honor.

14              MR. HOGUE:   No objection.   That was 12.

15              THE COURT:   Admitted.

16              MR. CALHOUN:   12, I'm sorry.

17   BY MR. CALHOUN:

18   Q.    Now, were you able to determine what the apparatus is on

19   Mr. Glawson's head when you saw him?   What is that?

20   A.    It's a pair of goggles.

21   Q.    Now, do you have exhibit number 13 in front of you?

22   A.    Yes, sir.

23   Q.    And do you recognize that exhibit?

24   A.    Yes, sir.

25   Q.    What is that exhibit?

1    A.   This is an additional photograph of Mr. Glawson.

2    Q.   Is that also on June 20th, 2003?

3    A.   Yes, sir.

4    Q.   And does that photo fairly reflect what you saw on

5    June 20th, 2003?

6    A.   Yes, sir.

7              MR. CALHOUN:   The government moves to admit number

8    13, Your Honor.

9              MR. HOGUE:   No objection.

10             THE COURT:   Admitted.

11   BY MR. CALHOUN:

12   Q.   Special Agent Ahmad, can you see the screen?

13   A.   Yes, sir.

14   Q.   Do you recognize that person on the screen?

15   A.   Yes, sir.

16   Q.   Do you see that person in court today?

17   A.   Yes, sir.

18   Q.   Who is that?

19   A.   That's Mr. Glawson.

20   Q.   Was Mr. Glawson arrested after that sale?

21   A.   No, sir.

22   Q.   Drawing your attention to June 23rd, 2003, did you meet

23   with the informants?

24   A.   Yes, sir.

25   Q.   And who was to make the purchase on June 23rd, 2003?

1   A.   On June 23rd, it was again to be Mr. Jordan.

2   Q.   And when you met with Mr. Jordan, did Mr. Jordan made

3   make a phone call?

4   A.   Yes, sir, he did.

5   Q.   And were you present?

6   A.   Yes, sir.

7   Q.   Was that phone call recorded?

8   A.   Yes, sir.

9   Q.   By whom?

10  A.   Investigator Whitehead.

11  Q.   And what type of equipment was used to make that

12  recording?

13  A.   We used a standard recorder, the same as used in the

14  previous purchases.

15  Q.   How long did that conversation last?

16  A.   Again, it was a very brief conversation, no more than two

17  to three minutes.

18  Q.   And what happened to the tape after the recording had

19  been made?

20  A.   It was secured by Investigator Whitehead.

21  Q.   And after that phone call was Mr. Jordan searched?

22  A.   Yes.

23  Q.   What type of car was he using on this occasion?

24  A.   On this occasion, he had his Chevy Cavalier, but instead

25  of it being a convertible as the previous one was, it was I

1    think a teal-colored, hard top Chevy Cavalier.

2    Q.    And was Mr. Jordan provided with some money?

3    A.    Yes.

4    Q.    And was he also given a transmitter?

5    A.    Yes, sir.

6    Q.    Now, was this the same transmitter that had been used on

7    the prior occasion?

8    A.    Yes.

9    Q.    Where did Mr. Jordan go after the phone call and after he

10   had been searched and after he had been provided with the

11   money?

12   A.    Mr. Jordan proceeded to the previous location which was

13   McDonald's.

14   Q.    Who was with him?

15   A.    Katina Fort was with him.

16   Q.    Now, did you follow them to that location?

17   A.    Yes, sir.

18   Q.    Do you recall where you parked in order to conduct your

19   surveillance?

20   A.    On this occasion I believe we parked in the same

21   location, or a similar location as before, so we would have

22   been across the street at the gas station.

23   Q.    How far were you from the gas station -- from where you

24   saw the informants?

25   A.    The gas station is directly across the street, so it's a

1   four-lane street, so probably less than 100 yards.

2   Q.   Did you have occasion to see Mr. Glawson while you were

3   conducting your surveillance?

4   A.   Yes.

5   Q.   And what was he driving?

6   A.   He was driving the white pickup truck with the orange bed

7   liner.

8   Q.   Was this the same truck you had seen on June 3rd, 2003,

9   June 4th, 2003?

10   A.   Yes, sir.

11   Q.   Now, describe what you saw when you saw the informants

12   arrive?

13   A.   The informants arrived, I believe, before Mr. Glawson

14   did, and they were parked on the street side of the McDonald's

15   parking lot.  So they would have been on the same side as was

16   previously seen in the last photo.  However, Mr. Glawson did

17   not park on that side.  He parked on the opposite side of the

18   McDonald's.

19   Q.   And did the informant go inside McDonald's?

20   A.   Yes.

21   Q.   And how long did the informant stay inside McDonald's?

22   A.   No more than five minutes, I don't believe.

23   Q.   And when the informant came out of the McDonald's, what

24   direction did he go?

25   A.   The informant went back to his vehicle.  So his vehicle

1    was parked probably about 30 feet or so from the doorway, he

2    walked from his vehicle to the doorway, and then when he came

3    out of the McDonald's, he went back to his vehicle.

4    Q.   Did you follow him -- him being the informant -- after he

5    left that location?

6    A.   Yes.   After he left in his vehicle -- we didn't follow

7    him ourselves, myself and Investigator Whitehead -- we had

8    other surveillance crews follow him to the staging location,

9    and myself and Investigator Whitehead followed Mr. Glawson's

10   vehicle.

11   Q.   Well, you followed the target vehicle?

12   A.   Yes, the target vehicle, I'm sorry.

13   Q.   And where did you follow the target vehicle to?

14   A.   We went north on I-75, and I believe we got off on

15   Riverside Drive and continued north on Riverside Drive.   We

16   continued to follow Mr. Glawson until he pulled off into a gas

17   station, at which time we broke off the surveillance.

18   Q.   Now, let me show you what you should have in front of you

19   marked as exhibit 14.   Do you have that in front of you?

20   A.   Yes, sir.

21   Q.   And do you recognize that photograph?

22   A.   Yes, sir.

23   Q.   What's reflected in that photograph?

24   A.   This photograph is a picture of Mr. James Jordan.   As I

25   said, his vehicle was parked a short distance from the

1    doorway.  So this photograph depicts Mr. Jordan walking from

2    his vehicle to the doorway of McDonald's.

3    Q.   Does that photo fairly reflect the scene as you observed

4    it on June 23rd?

5    A.   Yes.

6         MR. CALHOUN:  The government moves to admit number

7    14, Your Honor.

8         MR. HOGUE:  No objection.

9         THE COURT:  Admitted.

10   BY MR. CALHOUN:

11   Q.   Now, who is the person depicted in this scene?

12   A.   That's Mr. James Jordan.

13   Q.   That's the informant?

14   A.   Yes, sir.

15   Q.   Drawing your attention to exhibit number 15 -- which you

16   should have in front of you?

17   A.   Yes, sir.

18   Q.   Do you recognize that exhibit?

19   A.   Yes, sir.

20   Q.   And what is that?

21   A.   This is a picture of Mr. Jordan exiting the McDonald's

22   restaurant.

23   Q.   Does it fairly reflect how Mr. Jordan looked at the time

24   you made that observation?

25   A.   Yes, sir.

1          MR. CALHOUN:  The government moves to admit number

2     15, Your Honor.

3          MR. HOGUE:  No objection.

4          THE COURT:  Admitted.

5     BY MR. CALHOUN:

6     Q.   Now, the gentleman coming out of McDonald's, who do you

7     recognize that to be?

8     A.   That's Mr. James Jordan.

9     Q.   And is that the McDonald's you just testified about?

10    A.   Yes, sir.

11    Q.   Drawing your attention to exhibit number 16 -- which you

12    should have in front of you?

13    A.   Yes, sir.

14    Q.   Do you recognize that photo?

15    A.   Yes, sir.

16    Q.   What is depicted on that photo?

17    A.   This is a picture of Mr. Richard Glawson.

18    Q.   And does that photo fairly reflect how you saw Mr.

19    Glawson when you made that observation?

20    A.   Yes, sir.

21         MR. CALHOUN:  The government moves to admit number

22    16, Your Honor.

23         MR. HOGUE:  No objection.

24         THE COURT:  Admitted.

25    BY MR. CALHOUN:

1   Q.   The person seated in the cab of this truck, who do you

2   recognize that to be?

3   A.   Mr. Glawson.

4   Q.   Now, was Mr. Glawson arrested after that transaction?

5   A.   No, sir, he was not.

6   Q.   Did you anticipate making another transaction involving

7   Mr. Glawson?

8   A.   Yes.

9   Q.   Which informant was to be used on this next transaction?

10  A.   It was to be Mr. Jordan.

11  Q.   Drawing your attention to July 3rd, 2003, did you meet

12  with Mr. Jordan and Ms. Fort?

13  A.   Yes.

14  Q.   What was the purpose of that meeting?

15  A.   We met with Mr. Jordan and Ms. Fort to record the

16  telephone conversation and to outfit them with any audio

17  equipment that they would need and to search the vehicle for

18  possible contraband.

19  Q.   And during the meeting, who made the phone call?

20  A.   Mr. Jordan made the phone call.

21  Q.   And was that call recorded?

22  A.   Yes, sir.

23  Q.   By whom?

24  A.   It was recorded by Investigator Whitehead.

25  Q.   And what type of equipment was used to make that

1  recording?

2  A.   We used just a standard recorder that we had used for the

3  previous purchases.

4  Q.   How long did that recorded conversation last?

5  A.   That conversation was also very short, no more than two

6  minutes.

7  Q.   Do you recall what happened to the tape, the phone tape?

8  A.   Yes, sir.

9  Q.   What happened to it?

10  A.   Investigator Whitehead secured that tape.

11  Q.   Now, after that phone call, were the informants searched?

12  A.   Yes.

13  Q.   And was the car searched?

14  A.   Yes.

15  Q.   Was any contraband found either on the informant or in

16  the car?

17  A.   No, sir.

18  Q.   After the recorded phone call, did Mr. Jordan leave your

19  location?

20  A.   Yes, sir.

21  Q.   Did you follow him?

22  A.   Yes, sir.

23  Q.   Who was with you when you followed him?

24  A.   Investigator Billy Johnson and Investigator Whitehead.

25  Q.   Where did you follow Mr. Jordan to?  What location?

1    A.    Initial target location was a Chili's parking lot, which

2    would have been on Northside Drive.  A Chili's, and I believe

3    there was a clothing store, Manseur's that was also at that

4    intersection.  We had a couple of things happen.  We had the

5    Bibb County deputy in a marked unit drive up to the location,

6    so we didn't feel like it was safe to meet there.  And

7    additionally, Mr. Glawson called later on and said that he was

8    at the gas station probably about a half or a quarter mile

9    back down the road on Arkwright Road.

10   Q.    What did you observe at the time you were conducting your

11   surveillance?

12   A.    We observed Mr. Glawson's vehicle at the gas station, the

13   white truck with the orange bed liner and the informant's

14   vehicle, the Chevy Cavalier, the black one with the

15   convertible top at the gas station as well.  They were meeting

16   with Mr. Glawson.

17   Q.    How long did that meeting last?

18   A.    That was a very short meeting, probably about two minutes

19   at the most.

20   Q.    And after the informant left that location, was the

21   informant followed?

22   A.    Yes.

23   Q.    Where was the informant followed to?

24   A.    Investigate Whitehead and myself followed the informant

25   back to our staging location, which was probably about less

1    than a quarter mile from where we actually made the purchase.

2    Q.   What, if anything, did the informant turn over?

3    A.   At that particular time the informant turned over a Smith

4    and Wesson nine-millimeter handgun purchased from Mr. Glawson.

5              MR. CALHOUN:   May I approach, Your Honor.

6    Q.   Agent Ahmad, let me show you what's marked as government

7    52 and 52A and ask you to examine those, please.

8    A.   Government --

9    Q.   Do you recognize those?

10   A.   Yes, sir.

11   Q.   What do you recognize those to be?

12   A.   Exhibit 52 is a Smith and Wesson nine-millimeter firearm

13   that was surrendered to me by Mr. Jordan.

14   Q.   And is that firearm in substantially the same condition

15   now as it was at the time it was surrendered to you by Mr.

16   Jordan?

17   A.   Yes, sir.

18   Q.   And how about the other -- I think it's exhibit 52A?

19   A.   Yes.   52A is the magazine that was actually inside the

20   firearm at the time.

21   Q.   And at the time the firearm was given to you, what did

22   you do with it?

23   A.   I secured it and put the evidence tag on it at that

24   particular time and took it to the evidence vault.   But --

25   Q.   I'm sorry, go ahead.

1   A.   Prior to doing that, I had to do what we normally do when

2   we find a firearm -- and when I say "we," I mean law

3   enforcement officers -- which is called render the firearm

4   safe.

5   Q.   What is that?

6   A.   In doing so, I would remove the source of ammunition,

7   which is the magazine, and any ammunition that was contained

8   in the firearm.

9   Q.   Let me show you 52B.  Do you recognize what's in 52B?

10  A.   Yes, sir.

11  Q.   What is that?

12  A.   52B are the seven rounds of ammunition that were taken

13  from the firearm, because the firearm was loaded at the time

14  that I secured it from Mr. Jordan.

15  Q.   And you placed all two of those exhibits -- three of

16  those exhibits in your evidence room?

17  A.   Yes, sir.

18  Q.   And they remained there until today?

19  A.   Yes, sir.

20  Q.   Did you transport these exhibits to trial today?

21  A.   Yes, sir.

22          MR. CALHOUN:  The government moves to admit 52, 52A,

23  and 52B, Your Honor.

24          MR. HOGUE:  No objection.

25          THE COURT:  They are admitted.

1    BY MR. CALHOUN:

2    Q.    Special Agent Ahmad, did you test fire this firearm?

3    A.    Yes, sir.

4    Q.    What was the result of your test fire?

5    A.    It functioned as designed.

6    Q.    What does that mean?

7    A.    It means that when we actually put a round in the chamber

8    and pull the trigger, it actually expels the projectile as it

9    is designed to do.

10   Q.    Okay.  After Mr. Jordan had provided you with that

11   firearm, what did you do in order to further identify the

12   person in the white truck?

13   A.    While myself and Investigator Whitehead and Lieutenant

14   Johnson went back to the staging location to have Mr. Fort --

15   I'm sorry, Mr. Jordan surrender the weapon that he had just

16   purchased, Investigator Whitehead placed a telephone call to

17   Deputy Marshall Hughes to see if he could stop the vehicle.

18            MR. HOGUE:  Your Honor, I'm going to object if this

19   is hearsay what some other witness may have said.  I don't

20   know if he can say what Whitehead said and who he talked to.

21   This witness has to answer what he personally did or said or

22   knows.

23            MR. CALHOUN:  I don't have any argument with that,

24   Your Honor.  I think my question may not have been responsive

25   by the witness.

```
1              THE COURT:  All right, restate your question.

2    BY MR. CALHOUN:

3    Q.    Do you know Officer Marshall Hughes?

4    A.    Yes, sir.

5    Q.    And who does he work for?

6    A.    He's a Bibb -- was previously a Bibb County deputy

7    sheriff.

8    Q.    How was he employed back in July 3rd, 2003?

9    A.    At that time he was a Bibb County deputy.

10   Q.    Now, did you personally contact Officer Hughes after

11   Jordan had provided you with that firearm?

12   A.    No, sir.

13   Q.    Do you have exhibit number 17 in front of you?

14   A.    Yes, sir.

15   Q.    I want you to look at exhibit number 17 for me.  What do

16   you recognize that to be?

17   A.    I recognize that to be Mr. Glawson and the white truck in

18   the background and what appears to be Mr. Jordan right beside

19   him.

20   Q.    Does that photograph fairly reflect how the scene looked

21   when you observed it on July 3rd, 2003?

22   A.    Yes, sir.

23              MR. CALHOUN:  Government moves to admit number 17,

24   Your Honor.

25              MR. HOGUE:  No objection.
```

1        THE COURT:  Admitted.

2    BY MR. CALHOUN:

3    Q.    Now, that photograph is a little bit fuzzy, but drawing

4    your attention to the person on the left, do you recognize

5    that person?

6    A.    Yes, sir.

7    Q.    Who do you recognize that to be?

8    A.    Mr. Glawson.

9    Q.    And the other person on the right, who do you recognize

10   that to be?

11   A.    Mr. Jordan.

12   Q.    And is this the Chevron station that you previously

13   testified about?

14   A.    Yes, sir.

15        MR. CALHOUN:  No further questions, Your Honor.

16        THE COURT:  Let's take a short recess before we

17   begin cross.  Step back to your jury room, ladies and

18   gentlemen.

19   (Jury Excused; 11:25 a.m.)

20        THE COURT:  Before we recess, let me make an

21   observation, particularly to the security officer -- the

22   marshal.  All right, you all sit down now and be quiet.  We

23   got started an hour late.  I don't know why.  At this point it

24   really doesn't make any difference.  I at first thought Mr.

25   Hogue was responsible for it.  I've determined now that that's

1    not necessarily true.  I don't want to re-plow the ground

2    that's past, but when we recess I want the defendant taken --

3    if he needs to go to the rest room or eat or do whatever, I

4    want him to go and do that, and then I want him in his seat

5    for the rest of this trial at the time that I say.  If I say

6    we're coming back at 1:15, I want him in that chair.

7            Now, Mr. Glawson, if you want to change clothes or you

8    want to do anything else, you do that, but you be ready when

9    the marshals come for you.  If you all need to make

10   arrangements to have him fed as soon as he gets up there

11   rather than getting his food after he gets there, I wish you

12   would do that, but I don't want any more delays.

13           DEPUTY MARSHAL:  Yes, sir.

14           THE COURT:  All right, let's take 15 minutes.

15   (RECONVENED; ALL PARTIES PRESENT, JURY IN, 11:45 a.m.)

16           THE COURT:  All right, Mr. Hogue, let's proceed with

17   cross examination.

18                          CROSS EXAMINATION

19   BY MR. HOGUE:

20   Q.   Agent Ahmad, you said you have been in law enforcement

21   for 20 years or so?

22   A.   Yes, sir.

23   Q.   All right, now, you know when you work an undercover

24   operation sometimes y'all use uncover law enforcement officers

25   instead of informers, correct?

1    A.    That's correct.

2    Q.    And when you do that -- you use an undercover law

3    enforcement officer to buy drugs or a gun -- before you go

4    out, before the undercover officer goes out on the operation,

5    none of you make him submit to a search of his person, do you?

6    A.    No.   If he's an undercover officer, we don't.

7    Q.    And you don't search his car?

8    A.    No, sir.

9    Q.    And you don't search his person or his car because he's a

10   fellow law enforcement officer and presumably you trust him,

11   right?

12   A.    That's correct.

13   Q.    So when you mention in each one of these different

14   occasions that someone searched the informers, you do that

15   because you don't trust them, right?

16   A.    I'm not sure I would categorize it as such.

17   Q.    Well, we'll go through it then.   The reason you will

18   search the body of an informer in a drug deal is so that you

19   can be sure that that informer is not carrying drugs on him to

20   plant on the person that's the target, right?

21   A.    That's correct.

22   Q.    The reason you searched their car is exactly the same,

23   right?

24   A.    That's correct.

25   Q.    And you do that because you don't trust them?

1    A.    Well, I guess the technical reason why I do that is so

2    that on cross examination when I'm asked by you if we actually

3    did that, then I can say yes, I have a certain knowledge that

4    this particular informant did not have any drugs on his or her

5    person prior to us making a controlled purchase.

6    Q.    So in law enforcement, you're telling the jury, the only

7    reason y'all search snitches is because some defense lawyer

8    might ask you about it somewhere down the road?

9    A.    Well, I don't think that's what I said or implied.   I

10   said one of the reasons why we do that is to not give off the

11   impropriety that there was a possibility that this defendant

12   or so had drugs either on their person or in their vehicle.

13   So it's more of a safeguard than not trusting an informant.

14   Q.    Well, let's reverse the question then.   You're saying

15   that you trust the informers, and then, the only reason you're

16   doing the search is for this purpose right here?

17   A.    No.

18   Q.    In other words, if I wasn't up here doing this, you

19   wouldn't have had to search the informers?

20   A.    No, I don't believe -- I hope I didn't imply to the jury

21   as well.

22   Q.    You would do that anyway, right?

23   A.    Yes.

24   Q.    Unlike the other law enforcement officers, whom you would

25   not search, the reason that there's a difference is trust?

1   A.   Well, one is a law enforcement officer, and one is an

2   unknown source.

3   Q.   And the importance of that difference, of course, is one

4   you know and you work with him and you trust him, and the

5   other one you don't know, and they're snitches, they're

6   criminals, right?

7   A.   Well, one I know, and one I don't know.

8   Q.   All right.  But am I right?  One's in law enforcement and

9   one's a criminal?

10  A.   Well, not all informants are criminals, but one's in law

11  enforcement, and one is not.

12  Q.   Well, how about the ones in this case?  Criminals?

13  A.   Yes.

14  Q.   Now, you said that of these two snitches you used that

15  you had to search one of them you used because, you said, she

16  knew the defendant.  And those were your words.  Now, the

17  defendant in this case is Richard Ben Glawson.  She didn't

18  give you the name Richard Ben Glawson, did she?

19  A.   No.  You're asking me about the --

20  Q.   That's a straightforward question.  I'll rephrase it if

21  you're confused.  You used Katina Fort on June 3, 2003

22  because, you told the jury, she knew the defendant.  That's

23  what you said, right?  Let's just talk about what you said

24  today.

25  A.   Okay.  Well, I was getting confused about what you were

1    saying as my words.  I didn't refer to anybody as a snitch.  I

2    used the informant, Ms. Katina Fort because the informant, Ms.

3    Katina Fort, did say that she knew the defendant previously.

4    Q.   All right, that was my question.  Then my next question

5    was this.  Ms. Fort did not tell you that the person she knew

6    was named Richard Ben Glawson, did she?

7    A.   No, she didn't.

8    Q.   In fact, she told you that the target's name was Terry

9    Green?

10   A.   Terry Green or Terry Butler was the name that he told

11   her.

12   Q.   One or the other?

13   A.   Yes.  Well, he told her -- she said both.  He said he had

14   used the name Terry Green -- used the name Terry Butler and

15   had his name legally changed to Terry Green.

16   Q.   All right.  Now, you wrote several reports in this case,

17   right?

18   A.   Right.

19   Q.   And a series of those reports that concerned these drugs

20   and gun deal that we just went over, you wrote somewhere,

21   looking at your report, I can see July the 9th of 2003?

22   A.   That's possible.

23   Q.   Do you have your report?

24   A.   Can you tell me which report you're referring to?

25   Q.   Well, how do you like to refer to them, by the submitted

1    by date, or what identifying mark do you use, and I'll use it?

2    A.    You can use the report number.

3    Q.    Report number?

4    A.    Yes.  It would be in the upper right-hand corner of the

5    report.

6    Q.    All right, report 001.

7    A.    Yes, sir.

8    Q.    That says submitted by and in parentheses, date, and the

9    date I'm reading is 07/09/2003?

10   A.    That's correct.

11   Q.    Now, that date indicates that's the date on which you

12   wrote the report?

13   A.    That's correct.

14   Q.    Now, this first one, report 001 -- and, of course, just

15   to back up for a moment with a couple of foundational

16   questions -- when y'all write reports -- and you've been doing

17   this a long time -- the idea is to be complete; you want to

18   get in all the important information, right?

19   A.    Yes.

20   Q.    And, of course, you want the report to be accurate.

21   You're not going to be sloppy.  You want it to be dead on,

22   right?

23   A.    Well, that's what we strive for.

24   Q.    And you certainly strive to be truthful; you don't make

25   up stuff, right?

1   A.   That's correct.

2   Q.   And you do that in part because you work a lot of cases,

3   you move on, I mean, here it is 2007, and we're reading and

4   talking about stuff that happened in 2003.  So you gotta have

5   some way to remember it, right?

6   A.   That's correct.

7   Q.   And you'll review the reports in preparation for trial so

8   you can remember at least what you wrote back then, if not

9   what actually happened, right?

10   A.   That's correct.

11   Q.   Okay.  So report 001 is your report talking about a June

12   20th, 2003, one of the counts we went over, right?

13   A.   That's correct.

14   Q.   And in that one you're giving some details, most of which

15   you've testified to about what happened that day, what was

16   purchased, and how it was set up and so on.  Do you have that

17   report in front of you right now?

18   A.   Yes, sir.

19   Q.   The name Richard Ben Glawson appears nowhere in that

20   report, does it?

21   A.   That's correct.

22   Q.   Because you didn't know that name, and no one had spoken

23   that name to you on June 20th, 2003 or on July 9th, 2003 when

24   you wrote the report?

25   A.   That's absolutely correct.

1   Q.   Go to report 002.  It also has a submitted by date of

2   07/09/2003, correct?

3   A.   That's correct.

4   Q.   And it, again, is another of your reports, this one

5   concerning the June 23, 2003 deal, right?

6   A.   That's correct.

7   Q.   And, again, Agent Ahmad, nowhere in this two-page, single

8   spaced report does the name Richard Ben Glawson appear, right?

9   A.   That's correct.

10  Q.   Because on July 9th, 2003, you'd not been told that name

11  by anybody?

12  A.   That's correct.

13  Q.   Including Ms. Fort?

14  A.   That's correct.

15  Q.   And I'm looking at report 003.  You got that one?

16  A.   Yes, sir.

17  Q.   Also submitted by date of 07/09/2003, right?

18  A.   That's correct.

19  Q.   This one concerns the July 3rd gun deal, right?

20  A.   Yes, sir.

21  Q.   And, again, in this report of two single-spaced pages --

22  actually three pages.  It goes over to a third page -- there's

23  no mention of the name Richard Ben Glawson, right?

24  A.   That's correct.

25  Q.   And, again, because you hadn't heard that name yet?

1   A.   That's correct.

2   Q.   So it wasn't until some time after July 9 that you

3   acquired the name Richard Ben Glawson and attached it to the

4   target whom you've identified today as Richard Ben Glawson,

5   right?

6   A.   It was after July -- it was July 11th when we discovered

7   Mr. Glawson's identity, correct.

8   Q.   Well, what you discovered was information that came to

9   you from another law enforcement officer that that's who he

10  thought it was, right?

11  A.   That's correct.

12  Q.   And so when you were looking -- and, Mr. Hooper, if you

13  could put up government's eight.  So when you were looking at

14  that photo here in court this morning and you were saying to

15  the jury, that's Richard Ben Glawson, you didn't discern that

16  from the photo alone, did you?

17  A.   No, sir, not from the photo alone.

18  Q.   Nor from your observation on that date?

19  A.   No.

20  Q.   -- who it was, right?

21  A.   That's correct.

22  Q.   So these identifications have depended on information you

23  acquired from somebody else who attached a name to the person

24  that you're now obviously here to say is Richard Ben Glawson,

25  right?

1    A.    Well, there are a number of ways that we actually came

2    about to know Mr. Glawson.  But if I know Mr. Glawson --

3    Q.    Don't go into those.

4              THE WITNESS:  Your Honor, may I finish my response?

5              THE COURT:  Let him finish his answer, and then you

6    can ask him another question.  Go ahead.

7              MR. HOGUE:  Well, if he's about to give hearsay, I

8    want to stop.  We'll have those witnesses, I presume.  My

9    question was fairly straightforward.

10             THE WITNESS:  And I'd like to answer your question

11   if I'm allowed.

12             THE COURT:  Wait a minute, repeat your question.

13   BY MR. HOGUE:

14   Q.    Well, so Agent Ahmad, then when you identified these

15   photographs here today and said that's Richard Ben Glawson,

16   that's based upon information you acquired from others later

17   after the events?

18   A.    Well, as I was alluding to in answering your question,

19   there were a number of different ways that we came to find out

20   that Mr. Glawson was, in fact, Mr. Glawson.

21   Q.    But I didn't ask you those ways.

22             THE WITNESS:  Your Honor, may I finish answering?

23             MR. HOGUE:  He's not responsive.

24             THE COURT:  Wait a minute.  Don't argue with each

25   other.  The question can be answered yes or no.  Do that, and

1  then explain your answer.

2          THE WITNESS:  Yes, sir.

3          MR. HOGUE:  Yes or no.

4          THE WITNESS:  Would you repeat the question?

5  BY MR. HOGUE:

6  Q.   When you identified the person in government's

7  exhibit eight and those other photos here today, you said,

8  that's Richard Ben Glawson, he's the man sitting right next to

9  his lawyer.  And my question to you was:  You were able to do

10  that today based not on the photographs alone but on

11  information you acquired from others later?

12  A.   That's correct.

13  Q.   Okay.

14  A.   Now, may I?

15          THE COURT:  Yes, go ahead.

16          THE WITNESS:  Now, after having --

17          MR. HOGUE:  Your Honor, I haven't asked him another

18  question.  He just answered my question.

19          THE COURT:  He wants to explain his answer, and I'm

20  going to let him explain his answer.  Let's go ahead.

21          MR. HOGUE:  Your Honor, I suspect what he's going to

22  start doing though is telling us who told him what, and I

23  didn't ask him that.

24          THE COURT:  You can't do that.  That would be

25  hearsay.  Go ahead.

1          THE WITNESS:  What I was going to say, Your Honor,

2     is that upon obtaining Mr. Glawson's identity when the

3     question was asked, who do you recognize on the photo, I'm not

4     going to identify an individual as Mr. Green or Mr. Butler if

5     I know his name to be Mr. Glawson.  So the question I was

6     asked was who does that depict on that photo.  That's Mr.

7     Glawson.  And regardless of what Mr. Glawson said his name was

8     at the time, his name was Mr. Glawson at that time.  And at

9     the time I reviewed the photo, the photo was the same, it's

10    Mr. Glawson.

11         THE COURT:  All right, we'll stop for lunch.

12         MR. HOGUE:  We'll take that.

13         THE COURT:  All right, we're going to stop for

14    lunch.  We'll be in recess for an hour and 15 minutes.  Please

15    be back in the jury room not later than 1:15.  I ask you not

16    to discuss the case among yourselves nor with other people

17    outside of the jury room.  One second, one second.  When I

18    excuse you, go and have your lunch if you want to have lunch.

19    When you are finished and come back the courthouse, go

20    directly to the jury room.  Wait there.  Do not stand

21    downstairs or on this floor in the halls of the courthouse.

22    Wait for me in the jury room.  Thank you.  You are excused for

23    lunch.

24    *(Jury Excused, 12:02)*

25         THE COURT:  Anything before we break, Mr. Calhoun?

1          MR. CALHOUN:  No, Your Honor.

2          THE COURT:  Mr. Hogue?

3          MR. HOGUE:  No, Your Honor.

4          THE COURT:  We'll be in recess.

5     *(RECONVENED; ALL PARTIES PRESENT, 1:15 p.m.)*

6          THE COURT:  Is the government ready to proceed?

7          MR. CALHOUN:  Mr. Hogue has --

8          THE COURT:  Are you ready otherwise?

9          MR. CALHOUN:  Ready, Your Honor.

10         THE COURT:  Are you ready?

11         MR. HOGUE:  Ready, Your Honor.

12         THE COURT:  Ask the jury to come in please.

13    *(Jury In)*

14         THE COURT:  All right, you may proceed.

15              CONTINUED CROSS EXAMINATION

16    BY MR. HOGUE:

17    Q.   Agent Ahmad, let's talk for just a minute about this gun

18    that's been introduced into evidence.  You're not a

19    fingerprint expert at all, are you?

20    A.   No, sir, I'm not.

21    Q.   And the gun was not sent to anyone for the purpose of

22    trying to lift fingerprints from it, was it?

23    A.   No, sir, it was not.

24    Q.   All right, now, you testified earlier this morning about

25    some phone conversations that were recorded, remember?

1    A.    Yes, sir.

2    Q.    And you talked about how those calls were placed to the

3    target, and as I understood it, it was the informers who

4    placed telephone calls to a phone number and spoke to a

5    person, and that was all taped; is that right?

6    A.    That's correct.  Well, actually they would hold on the

7    conversation.  It would have been either myself or

8    Investigator Whitehead who actually dialed the phone number.

9    Q.    Okay, so you dialed the phone number?

10   A.    Not necessarily all the time.  It was either myself or

11   Investigator Whitehead who would dial.

12   Q.    And I'm looking in the same reports that we went over

13   earlier this morning, no phone numbers in there that I can

14   see; is that correct?

15   A.    That's correct.  It's not in that report.  It's another

16   report.

17   Q.    By you?

18   A.    No.

19   Q.    Okay.  So I'm just talking to you about your report.

20   A.    I understand that.

21   Q.    So somebody recorded phone numbers that you or the other

22   investigator were dialing for the informers?

23   A.    Are you saying if someone wrote down the number in the

24   report?  Is that what you're asking me?

25   Q.    Yes.

1    A.    Yes.

2    Q.    You did not do that?

3    A.    No.

4    Q.    And you did not do anything to track down by getting a

5    telephone person to tell you where those numbers traced to,

6    did you?

7    A.    No.

8    Q.    And to your knowledge nobody did that, did they?

9    A.    Not to my knowledge.  I know that I didn't.  I can't

10   speak for what anyone else did.

11   Q.    Well, you're the case agent, and you're familiar with the

12   whole case, right?

13   A.    I'm familiar with what I did and what I was present for.

14   Q.    Okay, so you're not familiar with the whole case.  There

15   are parts of this case you don't know about?

16   A.    I'm responding to your specific question.  You asked me

17   if I knew if anyone else had tracked down the phone number,

18   and the answer to that is, no, I don't know if anyone else

19   tracked down the phone number.

20   Q.    Okay, you're unaware of that.  All right.

21           MR. HOGUE:  That's all I have, Your Honor.

22           THE COURT:  Anything else from the government?

23           MR. CALHOUN:  No redirect, Your Honor.

24           THE COURT:  All right, sir, you may go down, please.

25   Call your next witness.

1      MS. COLVIN:  Your Honor, at this time the government

2  will call Lieutenant Billy Johnson.

3      DEPUTY CLERK:  Do you solemnly swear that your

4  testimony in this case shall be the truth, the whole truth,

5  and nothing but the truth, so help you God?

6      THE WITNESS:  I do.

7      DEPUTY CLERK:  Please spell your name for the jury,

8  first and last.

9      THE WITNESS:  Billy, B-i-l-l-y.  Johnson,

10  J-o-h-n-s-o-n.

11                       **BILLY JOHNSON**

12    Witness, having first been duly sworn, testified on

13                    DIRECT EXAMINATION

14  BY MS. COLVIN:

15  Q.   Could you please tell the jury your position currently

16  and where you're employed?

17  A.   I'm employed by the Bibb County Sheriff's Office.  I'm

18  presently assigned to the Middle Georgia Drug Task Force as a

19  deputy commander.

20  Q.   And your rank is lieutenant; is that correct?

21  A.   Yes, ma'am.

22  Q.   Back on -- back in June of 2003, what were you duties at

23  that time?

24  A.   I was the deputy commander of the task force.

25  Q.   And in that capacity were you also considered the

1   technical person?

2   A.   Yes, ma'am.

3   Q.   Could you please relate to the jury what the technical

4   person of the drug task force responsibilities are?

5   A.   I wire people up for electronic listening device, I make

6   recordings, and do other tasks that's related to electronic

7   surveillance.

8   Q.   Did you have an occasion to be asked to participate in an

9   investigation regarding a target who you knew at the time was

10  Terry Butler or Terry Green?

11  A.   Yes, ma'am.

12  Q.   And could you tell the jury who that agent was who asked

13  for your participation?

14  A.   Investigator Joseph Whitehead.

15  Q.   And at that time what was his position with the Sheriff's

16  Department?

17  A.   Investigator.

18  Q.   And was he the lead investigator on this particular case?

19  A.   Yes, ma'am.

20  Q.   Now, did there come a time in June of 2003 that you were

21  asked to actually help with the surveillance of this

22  particular transaction?

23  A.   Yes, ma'am.

24  Q.   Could you please relate to the jury how you became

25  involved in that and what you did?

1    A.    Investigator Whitehead needed someone -- needed a CI to

2    be wired up so that person could go and make a buy.

3    Q.    And did you do that on June 3rd?

4    A.    Yes, ma'am.

5    Q.    Specifically, did that involve -- the June 3rd, 2003

6    incident, did that involve a Katina Fort?

7    A.    Yes, ma'am, it did.

8    Q.    Could you please relate to the jury what you did when

9    you -- quote-unquote -- wired her up?

10   A.    I put a listening device in -- I believe in her purse, so

11   that the conversation between her and the target could be

12   recorded.

13   Q.    And when you say the conversation, was this for the

14   purpose of making the controlled buy?

15   A.    Yes, ma'am.

16   Q.    Now, prior to the controlled buy, was there a telephone

17   call that you helped wire her up for?

18   A.    On this --

19   Q.    Or was that handled by Whitehead?

20   A.    That was handled by Whitehead, yes.

21   Q.    Now, this device that you put into her purse, how would

22   that transmit the audio portion of what was occurring?

23   A.    The transmitter would transmit over radio frequency to

24   the receiver that I had inside the vehicle.

25   Q.    And on this particular date, were you able to hear the

1    transaction as it occurred, namely on June 3rd, 2003 when Ms.

2    Fort met with the target?

3    A.   Yes, ma'am.

4    Q.   Now, have you had an occasion since that time to actually

5    listen to that recording?

6    A.   Yes, ma'am, I have.

7    Q.   What was the quality of that recording?

8    A.   It was pretty fair.  It had a little problems, but it was

9    pretty good.

10   Q.   Was it somewhat garbled on the original?

11   A.   Yes, ma'am.

12   Q.   Let me show you what's been marked as government exhibit

13   18, and inside government's exhibit 18 is 18A, B, C, D, and E

14   for the purpose of identification.  Could you please take a

15   moment and look at those?

16   *(Pause)*

17   Q.   First, regarding exhibit 18A, could you tell the jury

18   what that represents?

19   A.   It's a recorded conversations of the controlled buys.

20   Q.   And have you had a chance since the controlled buys to

21   review that tape?

22   A.   Yes, ma'am, I have.

23   Q.   Does it accurately reflect what occurred on the dates of

24   these particular incidents, namely, June 3rd, June 4th,

25   June 20th, June 23rd, 2003?

1    A.    Yes, ma'am, it does.

2    Q.    As well as July 3rd, 2003?

3    A.    Yes, ma'am.

4    Q.    And has it been any alterations or any additions or

5    deletions from that particular recording?

6    A.    No, ma'am, it haven't.

7    Q.    If can you look now at government 18B.

8    A.    Okay.

9    Q.    Could you please relate to the jury what 18B represents?

10   A.    It's a video cassette of the videos of the controlled

11   buy.

12   Q.    And did you have an opportunity to observe those as they

13   were being recorded?

14   A.    Yes, ma'am, I did.  I did the recording.

15   Q.    Do they accurately reflect what you remember occurring on

16   the dates of all the incidents in question?

17   A.    Yes, ma'am, it does.

18   Q.    The 3rd, 4th -- excuse me, the 4th, which is the buy, the

19   23rd, the 20th, and the 3rd of July?

20   A.    Correct.

21   Q.    Regarding government's exhibit 18C, do you recognize

22   that?

23   A.    Yes, ma'am.

24   Q.    And what is that?

25   A.    This is pictures that I pulled from the video recording,

1    still photos of the subject that the controlled buys were made

2    from.

3    Q.   And does that accurately represent what you pulled from

4    the recording on the date in question?

5    A.   Yes, ma'am.

6    Q.   And have there been any changes, deletions, or

7    alterations whatsoever?

8    A.   No, ma'am.

9    Q.   Regarding government's exhibit 18D, could you tell the

10   jury what that is?

11   A.   This is a copy of the audio of the controlled buy that I

12   made to give to the U.S. Attorney's Office.

13   Q.   And is it accurate and correct without any additions or

14   deletions?

15   A.   Yes, ma'am.

16   Q.   Regarding government's exhibit 18E, could you please

17   identify for the jury what that represents?

18   A.   This is the original audio recording of the -- excuse me

19   -- yes, the audio recordings of the buy.

20   Q.   And when you said the buy, is that all the buys involved

21   in this case regarding the person who you knew to be Terry

22   Butler?

23   A.   Yes, ma'am.

24            MS. COLVIN:   Your Honor, at this time the government

25   -- excuse me, strike that.

1   Q.    Government's exhibit number 18, what does that represent?

2   A.    This is the evidence bag that all the items was inside

3   of.

4         MS. COLVIN:  At this time the government would seek

5   to introduce what's been marked as government's exhibit 18, 18

6   A through 18 E.

7         MR. HOGUE:  I'm sorry, did you say 18A through E?

8         MS. COLVIN:  Yes, as well as government's

9   exhibit 18.

10        MR. HOGUE:  I don't have any objections to 18B, 18C,

11  and 18D, but I'm not clear what 18A and 18E are, and I may

12  have an objection if I understand what they are.

13  BY MS. COLVIN:

14  Q.    Okay.  Going back to government's exhibit 18A, Lieutenant

15  Johnson, could you please tell the jury again what that

16  represents?

17  A.    These are the audio conversations of the CI calling the

18  target to set up the buys.

19        MR. HOGUE:  All right, Your Honor, I object to 18A.

20  As I have heard it from two witnesses now, neither of those

21  witnesses made those recordings.

22        MS. COLVIN:  And we can do this through the next

23  witness, Your Honor.  The government will wait and admit 18A.

24        MR. HOGUE:  And I understand 18E is the original of

25  18A?  If so, the same objection.

```
 1                   THE COURT:  Say that again, Mr. Hogue?  You
 2      understand --
 3                   MR. HOGUE:  If 18E is the original audio of 18A,
 4      then I make the same objection that I just made on 18A.
 5                   THE COURT:  And your objection is what?
 6                   MR. HOGUE:  The foundation has not been laid yet
 7      with the proper witnesses, and I think the government said --
 8                   THE COURT:  Are you going to have another witness?
 9                   MS. COLVIN:  Yes, Your Honor, we can introduce those
10      once we call Ms. Fort as well as Mr. Jordan.
11                   THE COURT:  All right, why don't you reserve your
12      tender.
13                   MS. COLVIN:  Okay.  Your Honor, at this time the
14      government will for clarity purposes again state the exhibits
15      that are being admitted:  Government exhibit 18, government
16      exhibit 18B, 18D, and 18C.
17                   THE COURT:  All right, you have no objection to
18      those?
19                   MR. HOGUE:  Well, if I may just look at 18.
20                   MS. COLVIN:  Oh, that's just the bag.
21                   MR. HOGUE:  May I look at it quickly before I say
22      whether I have an objection or not.
23      (Pause)
24                   MR. HOGUE:  Your Honor, I do have an objection
25      because of the hearsay that's contained on it.
```

1    *(Aside)*

2              MS. COLVIN:  Judge, in light of Mr. Hogue's

3    objection, I understand it says Mr. Whitehead, who is now

4    deceased, wrote this, despite it being the same target name as

5    what we've identified that he can't attest to this since it's

6    Mr. Whitehead's writing.  Since it's just the bag, we will

7    withdraw this exhibit and just have the individual exhibits.

8              THE COURT:  All right, 18B, C, and D are admitted.

9              MR. HOGUE:  Your Honor, may we approach for a moment

10   on this exhibit?

11             THE COURT:  Which one?

12             MR. HOGUE:  18.

13             THE COURT:  She's withdrawn that.

14             MR. HOGUE:  I know, but I want to make a different

15   observation concerning that.

16             THE COURT:  All right.

17   *(SIDEBAR)*

18             MR. HOGUE:  I'm going to make a motion for mistrial

19   because I objected to that bag because it contains the hearsay

20   of a witness who is not present and presumably will not be

21   present in this trial.  In response to that objection, the

22   government's attorney announced in open court what the bag

23   contained, that it was the writing of Joseph Whitehead, who is

24   now deceased that identifies the suspect that we've identified

25   in this trial.  Well, that's the very reason I objected to it.

1    So his confrontation rights under the U.S. Constitution have

2    been violated, and I move for a mistrial.

3            THE COURT:  All right, your motion is denied.

4    *(BENCH CONFERENCE CONCLUDED)*

5            THE COURT:  In connection with that motion, Mr.

6    Hogue, are there any curative instructions that you would like

7    the court to give to the jury at some point?

8            MR. HOGUE:  Well, I could only answer that once I

9    know what the instructions would consist of.

10           THE COURT:  Well, I'm asking you if you have any

11   suggested instructions.  I'm not asking you to approve any

12   that I propose to give.  I'm asking you if you have any that

13   you would propose I give.

14           MR. HOGUE:  Certainly given enough time, I could

15   write one out for the court that I would like to have.

16           THE COURT:  Anything that you would like for me to

17   say now?

18           MR. HOGUE:  Not right off the cuff, but if given

19   some time, I could draft one for the court to give that might

20   cure the --

21           THE COURT:  All right.  Well, you know, sand is

22   running through the glass, but you think about it and work on

23   it, and when you have it ready, if you would like for me to

24   consider it, I'll be glad to do so.

25           MR. HOGUE:  All right, I'll do that.

1          THE COURT:  Very good.  Go ahead.

2          MS. COLVIN:  Thank you, Your Honor.

3    BY MS. COLVIN:

4    Q.   Regarding the June -- each of the incidents, specifically

5    the June 3rd, you mentioned you had the transmitter in Ms.

6    Fort's purse?

7    A.   Correct.

8    Q.   Let me direct your attention to -- excuse me, that would

9    be June -- yes, June 3rd.  Let me direct your attention to

10   June 4th, 2003.  Did you also work as the surveillance person

11   on that particular date regarding the transaction that

12   occurred with Mr. Jordan?

13   A.   Yes, ma'am, I did.

14   Q.   Could you please relate to the jurors how you put the

15   transmitter on his person for that particular transaction?

16   A.   On that particular date the transmitter was placed on the

17   subject's body, on Mr. Jordan's body.

18   Q.   And were you able to listen to the transaction as it

19   occurred?

20   A.   Yes, ma'am, I was.

21   Q.   And you recorded the same in the items that you

22   previously identified?

23   A.   Yes, ma'am.

24   Q.   Regarding June 20th, 2003 again, that involved Mr.

25   Jordan?

1    A.   Yes, ma'am, it did.

2    Q.   And did you use the same type of transmitter that

3    particular day?

4    A.   Yes, ma'am.

5    Q.   And the information that occurred during that day, were

6    you able to record it?

7    A.   Yes, ma'am.

8    Q.   The quality of all of these, is it the same?  Each of

9    these transactions?

10   A.   Yes, ma'am.

11   Q.   Okay, would you say some of the transactions are better

12   quality as far as audio than others?

13   A.   Yes, ma'am, some of them.

14   Q.   Could you tell the jury what occurs on some occasion to

15   make the quality less audible than other times?

16   A.   It could be interference from, you know, cell phones,

17   vehicles, and the distance that you're away from the receiver

18   and the transmitter.

19   Q.   Where were you at the time of, say, the June 20th, 2003

20   transaction?

21   A.   We was across the street, and there was a lot of traffic

22   that night.

23   Q.   And that's across Riverside Drive?

24   A.   No.  The incident occurred at the corner of Riverside

25   Drive and Tom Hill.

1  Q.   Okay.

2  A.   We was across the street from -- we was across the street

3  on Tom Hill, and the incident was on Tom Hill as well.

4  Q.   July 3rd, 2003, regarding the transaction between Jordan

5  and the target, where was the transmitter placed that day?

6  A.   What was that day?

7  Q.   July 3rd, 2003.

8  A.   It was placed on Mr. Jordan's body as well.

9  Q.   And, again, was that particular incident captured on

10  video?

11  A.   Yes, ma'am.

12  Q.   In connection with your capacity as surveillance

13  technician in this case as well as the technician who helped

14  prepare this case for trial, did you have an occasion to take

15  the exhibits that we previously mentioned today regarding

16  exhibit 18A, B -- the ones that were admitted within the

17  packet -- were you able to take those exhibits and then

18  transfer them onto another recording device?

19  A.   Yes, ma'am.

20  Q.   Could you please relate to the jurors what you did and

21  why you did this?

22  A.   When I did, I took the audio and separated each one and

23  put it on an individual CD.

24  Q.   And was that for trial purposes?

25  A.   Yes, ma'am.

1   Q.   Let me show you what's been marked as government's

2   exhibit 24 and 26 for the purpose of identification.  Do you

3   recognize those?

4   A.   Yes, ma'am.

5   Q.   And what are those?

6   A.   These are phone conversations -- phone calls between the

7   target and the CI and the video.

8   Q.   And which one is the phone call?  Could you refer to the

9   exhibit number?

10  A.   24.

11  Q.   And which one is the video?

12  A.   26.

13  Q.   And have you had an opportunity to review those?

14  A.   Yes, ma'am.

15  Q.   Do they accurately contain the information that you

16  observed on the date in question, namely regarding exhibit 26?

17  A.   Yes, ma'am, it does.

18  Q.   Regarding June 20th, 2003, did you have an occasion to

19  create government's exhibit 27, 29 and 29A?

20  A.   Yes, ma'am, I did.

21  Q.   Could you please relate to the jurors what government's

22  exhibit 27 is?

23  A.   27 is the phone conversation between the CI and the

24  target.

25  Q.   And was that conversation on June 20th, 2003?

1    A.    Yes, ma'am.

2    Q.    Regarding government's exhibit 29, could you please

3    relate to the jury what that is?

4    A.    This is the video of the purchase -- well, the sale case

5    between the CI and the target.

6    Q.    And is that also June 20th?

7    A.    June 20th, yes, ma'am.

8    Q.    2003.  And government's exhibit 29A?

9    A.    This the audio of the drug transaction for June 20th,

10   2003.

11   Q.    Regarding June 23rd, 2003, let me show you what's been

12   marked previously as government exhibit 33 and government

13   exhibit 33A.  Could you take a moment and for identification

14   purposes let the jury know what government exhibit 33

15   represents?

16   A.    It's a video of the sale case on June 23rd, 2003.

17   Q.    And government exhibit 33A?

18   A.    A, is the drug transaction audio conversation on

19   June 23rd, 2003.

20   Q.    Let me show you now what's been marked as government

21   exhibit 31 for the purpose of identification.  Could you tell

22   the jury what that represents?

23   A.    It's a phone call between the CI and the target on June

24   23rd, 2003.

25   Q.    Let me show you finally, government exhibit 35 for

1   identification.  Could you tell the jury what that represents?

2   A.   It's a phone call between the CI and the target on July

3   3rd, 2003.

4   Q.   And government exhibit 37?

5   A.   It's a video recording of the sale case on July 3rd,

6   2003.

7   Q.   Thank you, Lieutenant Johnson, that's all I have.

8            MR. HOGUE:  No questions, Your Honor.

9            THE COURT:  All right, sir, you may go down.  Thank

10  you.

11           MS. COLVIN:  Your Honor, at this time the government

12  would call Katina Fort.  Judge, and if we may have just a

13  moment to bring her down.  Thank you.

14  (Pause)

15           THE COURT:  Be seated.  Tell us your name, please.

16           THE WITNESS:  Katina Rochelle Fort.

17           THE COURT:  Swear the witness.

18           DEPUTY CLERK:  Do you solemnly swear that your

19  testimony in this case shall be the truth, the whole truth,

20  and nothing but the truth, so help you God?

21           THE WITNESS:  Yes.

22           DEPUTY CLERK:  Would you please spell your name,

23  first and last for the jury, please.

24

25

```
 1              THE WITNESS:  K-a-t-i-n-a, F-o-r-t.

 2                      KATINA ROCHELLE FORT

 3       Witness, having first been duly sworn, testified on

 4                      DIRECT EXAMINATION

 5  BY MS. COLVIN:

 6  Q.    Good afternoon, Ms. Fort.

 7  A.    Good afternoon.

 8  Q.    Could you please state your full name for the jury?

 9  A.    Katina Rochelle Fort.

10  Q.    Where are you currently residing?

11  A.    In federal prison in Tallahassee.

12  Q.    Let me show you what has been marked as government's

13  exhibit number 19.  If you can take a moment to look at that,

14  each page (handing to witness).  Do you recognize that

15  document?

16  A.    Yes, ma'am.

17  Q.    Could you please tell the jury what that is?

18  A.    The plea agreement.

19  Q.    Does it accurately reflect the plea agreement that you

20  remember executing back on April 10th, 2003?

21  A.    Yes, ma'am.

22              MS. COLVIN:  At this time, Your Honor, the

23  government would seek to introduce what's been marked as

24  government exhibit 19.

25              MR. HOGUE:  No objection.
```

1              THE COURT:   It is admitted.

2              MS. COLVIN:   Thank you, Your Honor.

3    BY MS. COLVIN:

4    Q.   Ms. Fort, let me ask you, on that date, namely,

5    April 10th, 2003, what did you plead guilty to?

6    A.   Possession of a firearm by a convicted felon.

7    Q.   And what sentence did you receive?

8    A.   Five years.

9    Q.   Let me ask you, as a part of your plea agreement, was

10   there anything promised or offered to you in exchange for your

11   cooperation or assistance with the government?

12   A.   No, ma'am.

13   Q.   Did you seek out federal officials regarding attempting

14   to help yourself after your entry of your guilty plea?

15   A.   Yes, ma'am.

16   Q.   Let me ask you, your plea itself, possession of a firearm

17   by a convicted felon, suggests you have underlying felonies;

18   is that correct?

19   A.   Yes, ma'am.

20   Q.   Could you please relate to the jury your underlying

21   felonies outside of this federal conviction?

22   A.   Robbery by intimidation and possession of a firearm and

23   possession with the intent to distribute.

24   Q.   And intent to distribute what narcotic?

25   A.   Crack.

1  Q.   Did you plead -- were you in prison for those particular

2  offenses?

3  A.   Yes, ma'am.

4  Q.   Did you -- after seeking out federal officials for the

5  purpose of attempting to assist yourself, who were those

6  officials that you came to come in contact with?

7  A.   Investigator Whitehead and Rafiq Ahmad.

8  Q.   And what, if anything, did you tell them that you would

9  be prepared to do?

10 A.   Provide information.

11 Q.   Did you, in fact, provide information regarding a person

12 who you knew as Terry Green or Terry Butler?

13 A.   Yes, ma'am.

14 Q.   Which name did you tell them of the person you knew of?

15 A.   Terry Green.

16 Q.   Was that the name that you had been introduced to the

17 individual as?

18 A.   Yes, ma'am.

19 Q.   Do recognize that individual in the courtroom today?

20 A.   Yes, ma'am.

21 Q.   Could you please tell the jury what that individual is

22 wearing and where he's seated?

23 A.   A gray shirt.

24 Q.   Which table?  First or second table?

25 A.   Right there.

1    Q.   I understand what you're saying and the jury can see you,

2    but for the record for the purposes of the court reporter, I

3    have to have you identify where the person is located.

4    A.   The second table.

5         MS. COLVIN:  Let the record reflect the witness has

6    identified the defendant in the case, Mr. Glawson, as the

7    person she knew as Terry Green.

8    Q.   Did you have an occasion to have a conversation with this

9    person back on June 3rd, 2003?

10   A.   Yes, ma'am.

11   Q.   Could you please relate to the jury how you came to have

12   this conversation and where you were at the time?

13   A.   I was behind Cox Cable, the old Cox Cable building off of

14   Holt Avenue with Agent Whitehead.

15   Q.   And was Agent Rafiq Ahmad there as well?

16   A.   Yes, ma'am.

17   Q.   What did you do?

18   A.   I made a phone call to Mr. Green, he answered, and I told

19   him I wanted to purchase some crack cocaine from him.

20   Q.   Did you tell him the quantity of crack cocaine you wanted

21   to purchase?

22   A.   Yes, ma'am.

23   Q.   Now, let me ask you, prior to June 3rd, 2003, how long

24   had you known this person that you knew as Terry Green?

25   A.   Well, a couple of months.

1    Q.    And when you told the person that you knew to be Terry

2    Green what you wanted, did you get a positive response?

3    A.    Yes, but he told me it would be a minute.

4              MS. COLVIN:  Your Honor, may I approach?

5    Q.    Let me show what's been previously marked as government

6    exhibit 20 for the purpose of identification.  Do you

7    recognize that?

8    A.    Yes, ma'am.

9    Q.    And those initials at the bottom of the page, whose

10   initials are those?

11   A.    Mine.

12   Q.    How did you come to put those initials on that particular

13   page?

14   A.    I was spoken to by -- when I was spoken to by Agent Rafiq

15   Ahmad and Charles Calhoun.

16   Q.    And was I present as well?

17   A.    Yes, ma'am.

18   Q.    And does that accurately reflect what you -- what was

19   said on that tape that day when you heard it, namely June 3rd,

20   2003?

21   A.    Yes, ma'am.

22             MS. COLVIN:  Your Honor, at this time the government

23   would seek to introduce what's been marked as government's

24   exhibit 20.

25             MR. HOGUE:  As I understand it, Your Honor, 20 is a

1  single page of transcribed tape?

2          MS. COLVIN:  That's correct.

3          MR. HOGUE:  Well, it's been authenticated

4  sufficiently, Your Honor, but I think it would only come in

5  with limited admissibility and some kind limiting instruction

6  as to its use.

7          THE COURT:  Are you offering the tape itself?

8          MS. COLVIN:  I am, and I'm going to show her that

9  next, the tape and transcript.

10          MR. HOGUE:  My position is, Your Honor, the tape

11  would be evidence once admitted, and the transcript would be

12  an aid for the jury, perhaps, but should be limited.

13          THE COURT:  Well, that's consistent with my

14  understanding.  Is there something here that I don't see, Ms.

15  Colvin?  I mean, is this a transcript?

16          MS. COLVIN:  That's fine, Your Honor.  We can just

17  use it to aid the jury and not introduce it into evidence so

18  it won't be continuing testimony.

19          THE COURT:  All right, so that leaves us with

20  government's 21, the cassette of the phone call -- or the

21  disk?

22          MS. COLVIN:  Just one minute, Your Honor.  The

23  cassette tape, Your Honor.

24          THE COURT:  But that's number 21?

25          MS. COLVIN:  If you refer back to 18, it's 18A.

 1    It's inside the packet.  Our exhibit list has some things on

 2    it that we anticipated, but we decided to use another witness.

 3              THE COURT:  So we're now talking about 18A?

 4              MS. COLVIN:  Yes, Your Honor.

 5              THE COURT:  And you have tendered that?

 6              MS. COLVIN:  No, I'm going to show it to her and ask

 7    her about it.

 8              THE COURT:  Very good.

 9    BY MS. COLVIN:

10    Q.   Ms. Fort, let me show you now what's been marked as

11    government's exhibit 18A for the purpose of identification.

12    Do you recognize that tape?

13    A.   Yes, ma'am.

14    Q.   Do you remember listening to that tape, which was --

15    which encompassed the conversation, the telephone conversation

16    that you had on June 3rd, 2003 with the target, Mr. Green?

17    A.   Yes, ma'am.

18    Q.   And have you listened to that conversation?

19    A.   Yes, ma'am.

20    Q.   Does it accurately reflect what you remember occurring on

21    that particular day?

22    A.   Yes, ma'am.

23    Q.   And this particular exhibit, namely government exhibit

24    20, does it accurately reflect what you heard, which was the

25    conversation that you had with the target on June 3rd, 2003?

1    A.    Yes, ma'am.

2    Q.    Any alterations whatsoever to that conversation?

3    A.    No, ma'am.

4         MS. COLVIN:  At this time the government would seek

5    to introduce what's been marked as government's exhibit 18A.

6         MR. HOGUE:  Your Honor, my only remaining objection

7    to it will be the missing link in the chain of custody that

8    the government has pointed out through two previous witnesses,

9    so I object on that basis.

10        MS. COLVIN:  Your Honor, if I can respond.  The

11   missing link, of course, is Agent Whitehead, who is deceased.

12   This witness has identified this tape recorded conversation as

13   being the exact conversation that she had with the target

14   Mr. Green with no additions, no deletions.  She was the person

15   there.  Additional to that we had Lieutenant Johnson who

16   testified that -- strike that, because he wasn't involved in

17   that.  But she has identified the recording and the

18   conversation as being accurate and that is sufficient in and

19   of itself.

20        THE COURT:  All right, the objection is overruled.

21   18A is admitted.

22        MS. COLVIN:  Thank you, Your Honor.  If we could at

23   this time, Your Honor, pass outside the relevant transcript

24   and play that tape.

25        THE COURT:  All right.  Have you showed that

1    transcript to Mr. Hogue?

2            MS. COLVIN:  Yes.  Mr. Hogue has a copy of that.

3    Now, Your Honor, I would suspect the next thing he's going to

4    say -- we have transcribed many transactions from this tape,

5    and the first tab strictly deals with this phone call,

6    however, for convenience's sake we put them in one folder.  If

7    the jury could be instructed to only turn to that tab one.

8    Hopefully that would cure any objection Mr. Hogue would have

9    to the fact that all of these transactions are --

10           THE COURT:  Is that agreeable to the defense?

11           MR. HOGUE:  Yes.  I trust the jury on that, Your

12   Honor.  My objection -- my reason for standing was to have the

13   court give a limiting instruction as to the use of this

14   transcript.

15           THE COURT:  I'm going to do that.

16           MR. HOGUE:  Thank you, Your Honor.

17           THE COURT:  All right, pass out the transcript

18   booklets.

19   (Pause)

20           THE COURT:  Do all jurors have one?  Does any juror

21   not have one?  Now, ladies and gentlemen of the jury, listen

22   carefully to what I am about to say.  The government has

23   tendered into evidence for your consideration and the

24   consideration of the court a certain tape recording that they

25   contend reflects a certain transaction as Ms. Colvin and the

1   witness have described.

2          Whether or not the contents of that tape which you are

3   about to hear is, as contended by the government, is one of

4   the questions which you will have to decide in deciding this

5   case.  And as I understand, Ms. Colvin, there will be other

6   tapes as well?

7          MS. COLVIN:  That's correct, Your Honor.

8          THE COURT:  And what I'm saying to you applies to

9   all of these tapes.  It's not just a matter of you accepting

10  what the government says about the tapes.  It's a matter that

11  you've got to decide based on the testimony and the evidence

12  that you hear about this particular evidence.

13         The government has also prepared what they contend to

14  be an accurate transcript of the contents of this tape, as

15  well as the others which you will hear.  Whether or not this

16  is an accurate transcript of the tape is a matter which you

17  must decide.

18         The transcript itself is not the evidence.  It has

19  been prepared by the government in an effort to aid you in

20  understanding that the tape says, but the paper itself is not

21  evidence.  The only evidence is the tape.  And I've said,

22  you've got to decide whether the tape contains what the

23  government contends.

24         You've also got to decide whether this document that

25  you are about to look at is accurate -- is as the government

1    contends -- and actually corresponds with what is said on the

2    tape.  So, you need to bear those things in mind when you

3    consider what you are about to hear.  Now, I don't have a copy

4    of that booklet.  I suppose you have one?

5                MS. COLVIN:  Yes, we do.

6                THE COURT:  But we are dealing now with the document

7    under tab one in that little booklet, and all of these things

8    are bound up together, but I want you to turn first to tab

9    one, and that's the only thing that we are to consider.  Don't

10   turn to the other tabs until you are instructed to do so.  Is

11   that satisfactory, Mr. Hogue?

12               MR. HOGUE:  Yes, Your Honor.  Thank you.

13               THE COURT:  All right, let's go forward.

14               MS. COLVIN:  Thank you, Your Honor.  Mr. Hooper, if

15   we could play the June 3rd, 2003 telephone conversation.

16   (Tape played for the jury)

17   BY MS. COLVIN:

18   Q.   Ms. Fort, having heard that conversation, when you said

19   "a half," what were you referring to?

20   A.   Crack cocaine.

21   Q.   And at the end of that call when you were at the Cox

22   Communication area you talked about on Holt Road, what

23   happened?

24   A.   I left from there and went to Hooters on Arkwright.

25   Q.   Was that after you were prompted to come to that location

1    by the target, the person who you knew as Terry Green?

2    A.   Yes, ma'am.

3    Q.   Now, tell the jury what happened immediately prior to you

4    leaving to go to that area where you were meeting the target?

5    A.   Agent Whitehead and Rafiq Ahmad, they searched my car,

6    and they searched me and my bag, and then they put the wire in

7    my bag.

8    Q.   Was there another agent that you remember at the scene,

9    namely a Lieutenant Johnson who did the transmitter?  Do you

10   remember?

11   A.   Yes, ma'am.

12   Q.   And that transmitter was put in your bag?

13   A.   Yes, ma'am.

14           MR. HOGUE:  Your Honor, I'm going to object to all

15   the leading questions of this witness.  She needs to remember

16   this or not.

17           MS. COLVIN:  I'll rephrase, Your Honor.

18           THE COURT:  All right.

19   BY MS. COLVIN:

20   Q.   Where did you place your bag once you left the area?

21   A.   With Cox Cable?

22   Q.   Yes.

23   A.   It was in the car with me.

24   Q.   And when you arrived at Cox Cable, what did you do?  I'm

25   sorry, when you arrived -- excuse me -- to Hooters, what did

1  you do?

2  A.   I sat in my car and waited for Mr. Green to come.

3  Q.   Let me show you what's previously been introduced as

4  government's exhibit number three.

5        MS. COLVIN:   Mr. Hooper, if we can show that on the

6  screen.

7  Q.   Do you recognize this photograph?

8  A.   Yes.

9  Q.   And could you please tell the jury which one of those

10  vehicles was your vehicle?

11  A.   The black car.

12  Q.   And are you seated inside that vehicle?

13  A.   Yes, ma'am.

14  Q.   After you were seated there, did the target then arrive

15  to that area?

16  A.   Yes, ma'am.

17  Q.   And which vehicle is the target's vehicle?

18  A.   The white Chevy truck.

19  Q.   And was anyone else in the vehicle with the target at the

20  time?

21  A.   No, ma'am.

22  Q.   Now, when that truck arrived, what did you do?

23  A.   I got in my car and got in on the passenger side of his

24  truck.

25  Q.   Let me show you what's previously been introduced into

1    evidence as government's exhibit number four.  Who is that

2    beside -- in between your vehicle and the vehicle you've

3    identified as the target's vehicle?

4    A.    That's me getting in the passenger side of his truck.

5    Q.    Now, why is it that you were getting in the passenger

6    side of the truck?

7    A.    He told me to get out the car and get in the truck with

8    him.

9    Q.    Did he call you on your phone?

10   A.    No.

11   Q.    If I could show you government exhibit number five -- and

12   did you actually enter the truck?

13   A.    Yes, ma'am.

14   Q.    Now, when you entered the truck, what did you observe?

15   A.    He told me to look in the cigarette pack that was on the

16   seat.

17   Q.    I'm sorry?

18   A.    A Newport cigarette pack, he told me to look in it, it

19   was on the seat.

20   Q.    And did you, in fact, look into that pack?

21   A.    Yes, ma'am.

22   Q.    Now, when did you do that -- when you were outside the

23   vehicle or once you entered the vehicle?

24   A.    Once I got in and closed the door.

25   Q.    And why did you want to get in and close the door?

1    A.    Because I didn't want to have the door open with us doing

2    the transaction right there in the open.

3    Q.    And did you, in fact, look at the substance inside the

4    cigarette pack?

5    A.    Yes, ma'am.

6    Q.    Did it appear to be what you thought you were purchasing,

7    namely crack cocaine?

8    A.    Yes, ma'am.

9    Q.    What did you do with it?

10   A.    I put it in my purse, and I took the money out of my bag,

11   and I put it on the seat.

12   Q.    Do you recall now how much that may have been?

13   A.    No, ma'am.

14   Q.    Where did you get those monies from to pay the target?

15   A.    Agent Whitehead.

16   Q.    And what did you do after you put the substance inside

17   your pocket?

18   A.    With the crack?

19   Q.    Yes.

20   A.    I got out of the car and got back -- I got out of his

21   truck and got back in my car.

22   Q.    And where did you come upon leaving that area?

23   A.    Back to Cox Cable on Holt Avenue.

24   Q.    Let me ask you, prior to your leaving Cox Cable to meet

25   the target, what was done with your vehicle?  Did anyone do

1   anything with your vehicle prior to you leaving that area?

2   A.   No, ma'am.

3   Q.   Was your vehicle ever searched?

4   A.   When I got back to Cox Cable.

5   Q.   And were you searched before you left Cox Cable?

6   A.   Yes, ma'am.

7   Q.   Let me show you what's been previously identified as

8   government exhibit 22 for the purpose of identification.  Do

9   you recognize that?

10  A.   Yes, ma'am.

11  Q.   Do you see your initials on that particular exhibit?

12  A.   Yes, ma'am.

13  Q.   Who wrote those initials there?

14  A.   I did.

15  Q.   Have you had an opportunity to view that particular

16  video?

17  A.   Yes, ma'am.

18  Q.   And what is it a video of?

19  A.   Of me and Mr. Green in a drug transaction.

20  Q.   And does it accurately reflect what occurred on the date

21  of June 3, 2003?

22  A.   Yes, ma'am.

23          MS. COLVIN:  Your Honor, at this time the government

24  would seek to introduce what's been marked as government

25  exhibit 22.

```
 1                    MR. HOGUE:  I apologize, I missed what it was.  It
 2        was the tape of the June --
 3                    MS. COLVIN:  -- drug transaction.  That's what she
 4        just said.
 5                    MR. HOGUE:  No objection.
 6                    THE COURT:  It is admitted.
 7                    MS. COLVIN:  Thank you, Your Honor.  At this time,
 8        Your Honor, the government would seek to display that
 9        particular video with the volume turned down.
10                    THE COURT:  Very well.
11                    MS. COLVIN:  If I can just ask one question before
12        we look at that.
13                    THE COURT:  Sure.
14        BY MS. COLVIN:
15        Q.   Ms. Fort, when you were given the opportunity to view
16        this video, could you hear any of the conversation when you
17        viewed the video?  Could you make out what was being said?
18        A.   Not really.
19        Q.   Was it unclear?
20        A.   Yes.
21        Q.   Okay.  In fact, for this particular transaction, did we
22        even give you a transcript for it?
23        A.   No.
24        Q.   Thank you.
25                    MS. COLVIN:  Your Honor, if we may show that video?
```

1          THE COURT:  So we're going to see the --

2          MS. COLVIN:  Exactly.

3          THE COURT:  -- the viewable part, but we're not

4    going to listen to any sound?

5          MS. COLVIN:  We won't listen to any sound because

6    the sound is inaudible, but we will see the transaction as it

7    occurred.

8          THE COURT:  All right, proceed.

9          MS. COLVIN:  And Mr. Calhoun has suggested that we

10   dim the lights some and maybe make the video a better quality.

11         THE COURT:  All right.

12         MS. COLVIN:  Is that possible?

13         THE COURT:  It's right there by the door.

14         MS. COLVIN:  Thank you.

15   *(Tape Playing)*

16   BY MS. COLVIN:

17   Q.   And which vehicle is your vehicle, Ms. Fort?

18   A.   The black convertible.

19   Q.   At what point does he tell you to get in the vehicle?

20   A.   When he had leaned over and opened the door.

21   Q.   Do you see the person today in the courtroom who was that

22   target who you met that day on June 3rd, 2003?

23   A.   Yes, ma'am.

24   Q.   And is it the previous person you identified?

25   A.   Yes, ma'am.

1    Q.   What are you doing at this point?

2    A.   He's waiting on that man to leave.

3    Q.   Did you know that man?

4    A.   No.  He just came up from out of nowhere.

5    Q.   Now, after he gets in the car, what's happening at this

6    point?

7    A.   I'm picking up the Newport cigarette pack and taking the

8    money out of my bag.  That's why I'm leaning over.

9    Q.   So you had your purse with you?

10   A.   Yes, ma'am.

11   Q.   Did you see where the person who you've identified in

12   courtroom today -- Mr. Glawson -- did you see where he put the

13   money that you gave him?

14   A.   No, ma'am.

15   Q.   Do you remember any -- do you remember any of the

16   conversation you had inside the truck that day specifically?

17   A.   No, ma'am.

18   Q.   Was there anyone else with you that day when you arrived

19   at that area?

20   A.   Yes.

21   Q.   Who was with you?

22   A.   James Jordan.

23   Q.   And what are you still doing at this point?

24   A.   Just talking.

25   Q.   Had you seen this truck and the person who you've

1    identified in court inside this truck prior to that date, June

2    3rd, 2003?

3    A.    Yes.

4    Q.    And at this point, has the transaction ended?

5    A.    Yes, ma'am.

6    Q.    And where did you go after the transaction was completed?

7    A.    I waited on Mr. Jordan to come out of Hooters, and we

8    went back to Cox Cable.

9    Q.    And who, if anyone, was following you to that area?

10   A.    Agent Whitehead and the rest of the agents from Bibb

11   County Drug Task Force.

12   Q.    And did they -- who was the person who followed you from

13   that particular location, namely the Hooters, back to the Cox

14   area that you've mentioned?

15   A.    All the agents that was on duty that day.

16   Q.    Just one moment.

17          MS. COLVIN:   That's all I have at this time, Ms.

18   Fort.  Mr. Hogue will probably have some questions for you.

19                         CROSS EXAMINATION

20   BY MR. HOGUE:

21   Q.    Now, Ms. Fort, when you first got in trouble in this

22   case, the case that you pled guilty to in federal court, you

23   had already been convicted three times before, you said?

24   A.    Yes, sir.

25   Q.    And that was for robbery by intimidation that was back in

1    1992?

2    A.    Yes, sir.

3    Q.    And for sale of cocaine in 2001?

4    A.    Yes.

5    Q.    And you said there was another cocaine case?

6    A.    Yes.  But they did a nol pros.  I wasn't charged for it.

7    Q.    All right, so when you got caught in this case, you were

8    with James Jordan at the time?

9    A.    Yes, sir.

10   Q.    And you two are married, or what?

11   A.    Yes, sir.

12   Q.    All right, and so both of you were arrested in this case?

13   A.    Yes, sir.

14   Q.    And as I understand it, the two of you were indicted by a

15   federal grand jury on a number of different charges; is that

16   right?

17   A.    Yes, sir.

18   Q.    Including drugs?

19   A.    Yes.

20   Q.    And guns?

21   A.    Yes.

22   Q.    Anything else?

23   A.    No, sir.

24   Q.    Now, after you got indicted, you got a lawyer in this

25   case?

```
 1    A.    Yes, sir.

 2    Q.    A guy named Alan Wheeler?

 3    A.    Yes, sir.

 4    Q.    And Mr. Wheeler, did he get involved with your case here

 5    after you already started working for Agent Ahmad and others?

 6    A.    No, sir.

 7    Q.    So he got involved before you started working with the

 8    agent to make the case you just talked about; is that right?

 9    A.    Yes, sir.

10    Q.    All right, so after Mr. Wheeler got involved to represent

11    you, you agreed to become a informer and help the agent set up

12    drug deals.  Is that how it worked?

13    A.    Yes, sir.

14    Q.    And isn't this how it worked?  You were told by someone,

15    I presume your lawyer, that that was a good thing for you to

16    do because it could cut your time down, right?

17    A.    Yes, sir.

18    Q.    In fact, you were facing some pretty serious federal

19    prison time, weren't you?

20    A.    Yes, sir.

21    Q.    Do you remember how much?

22    A.    No, sir.

23    Q.    A lot of years?

24    A.    Yes, sir.

25    Q.    You knew, in fact, that on only one of the charges, just
```

1    one of the gun charges you were facing up to ten years in

2    federal prison?

3    A.    I can't remember.

4    Q.    Well, do you still have your plea agreement up there with

5    you?

6    A.    No, sir.

7              MR. HOGUE:  Ms. Colvin's got it for you.

8              MS. COLVIN:  You want me to direct her to that page?

9              MR. HOGUE:  Sure.  Page two, paragraph two B.

10   BY MR. HOGUE:

11   Q.    Go to page two, you'll see, middle of the page, the

12   number three, and then down the page, the letter B.  Do you

13   see that?

14   A.    Yes, sir.

15   Q.    Do you see where it says that if you plead guilty it

16   subjects you to a maximum sentence of ten years imprisonment?

17   Right?

18   A.    Yes, sir.

19   Q.    You with me?  The maximum fine of $250,000.  Do you see

20   that?

21   A.    Yes, sir.

22   Q.    Or both.  And a term of supervised release of three

23   years.  And you understand that to be sort of like parole, but

24   it's not really parole, right?

25   A.    Yes, sir.

1    Q.   So just on the one gun charge that you pled guilty to you

2    knew it could carry up to ten years in prison, right?

3    A.   Yes, sir.

4    Q.   Now, all the drug charges -- and there were other guns

5    that were against you -- were all dismissed by the government?

6    A.   Yes, sir.

7    Q.   But you had understood enough about your case, Ms. Fort,

8    to know that you could also have been sentenced to lengthy

9    sentences on those charges, too, if you had been convicted for

10   them, right?

11   A.   Yes, sir.

12   Q.   So your lawyer worked out a plea deal for you in which

13   all those other charges got dismissed if you just pled to the

14   one gun charge, right?

15   A.   Yes, sir.

16   Q.   And he did all of that before you started cooperating

17   with the agents in this case?

18   A.   Yes, sir.

19   Q.   Okay.  And then let's talk about a couple other things

20   that he got for you that you then went to do.  If you'll go

21   over to page six of your plea agreement.  Now, that's a long

22   paragraph, and you can take a look at it.  It starts on page

23   five.  It's the one that talks about what the government will

24   do for you if you cooperate with them.  Do you remember that

25   one?

1    A.    Yes, sir.

2    Q.    I'm sorry, did you say yes or no?

3    A.    Yes, sir.

4    Q.    Yes.  Okay, and without reading every word of that long

5    paragraph, and the plea agreement is in evidence anyway, you

6    understood, didn't you, Ms. Fort, that if you qualified for

7    what's called substantial assistance to the government, they

8    could file a motion and that motion could ask the court to

9    reduce your sentence as low as the court wants to?

10   A.    Yes, sir.

11   Q.    Is that how you understood it?

12   A.    Yes, sir.

13   Q.    In fact, they could file a couple different motions.   Do

14   you remember the word "5K motion?"  You heard of that?

15   A.    Yes, sir.

16   Q.    You understood that to be a motion that the government

17   could file for you if you cooperated with them, right?

18   A.    Yes, sir.

19   Q.    And you knew what that meant; you knew that meant it

20   could cut your time way down?

21   A.    Yes, sir.

22   Q.    And then they also could file what's called a Rule 35

23   motion.  Do you remember that too?

24   A.    Yes, sir.

25   Q.    And you understood, Ms. Fort, that it too could cut your

1    time down even more on top of the 5K, right?

2    A.   Yes, sir.

3    Q.   And you remember this line right in the middle of the

4    page, and I'm looking at the sentence begins "in either case."

5    You go ahead and get with me there for a minute.  It's right

6    in the middle.  You see it?

7    A.   Yes, sir.

8    Q.   It says "in either case the defendant understands that

9    the determination as to whether the defendant has provided

10   substantial assistance rests solely with the government."

11   Right?

12   A.   Yes, sir.

13   Q.   You understood that, didn't you, Ms. Fort, to mean that

14   they had to be pleased with what you produced before they

15   would file these two different motions to get your time cut

16   down, right?

17   A.   Yes, sir.

18   Q.   So, is this the way it went down -- after your lawyer

19   worked all this out for you, and you hoped that you would get

20   significantly less than whatever it was, 40 years or life, or

21   however long your sentence could have been, then you had to go

22   to work for them, right?

23   A.   Yes.

24   Q.   And the way it worked is they pretty much asked you,

25   okay, who can do you, what kind of drug deals can you do?

1  A.   Yes.

2  Q.   Is that how it worked?

3  A.   Yes, sir.

4  Q.   And so you would give them a name and a phone number, and

5  then they'd say, okay, let's set it all up and get you ready

6  to call them and tape it and do the whole thing we've been

7  talking about here, right?

8  A.   Yes, sir.

9  Q.   And so you gave them the name Terry Green?

10  A.   Yes, sir.

11  Q.   As somebody you said you knew a couple months?

12  A.   Yes.

13  Q.   By that name?

14  A.   Yes, sir.

15  Q.   Now, the phone number you used to contact Terry Green in

16  the phone call you talked about here and that we heard, you

17  dialed that number?

18  A.   Yes, sir.

19  Q.   No agent dialed that for you?

20  A.   No, sir.

21  Q.   When you dialed it, do you remember, Ms. Fort, was

22  anybody looking at you dial it and writing down the number you

23  dialed?

24  A.   I had already wrote down the number and stuff, and then

25  Agent Whitehead, he stood there and put the recorder on the

1   phone, and then I dialed the number.

2   Q.   Okay.  And you dialed this from some other phone beside

3   your Cricket phone you said, right?

4   A.   I used my Cricket phone.

5   Q.   Oh, okay.  So that part on the tape we heard where you

6   said you were using somebody's else phone, that wasn't true,

7   you were using your Cricket phone?

8   A.   Yes, I was using the Cricket phone.

9   Q.   So you knew this number already; they didn't give it to

10  you, and that's the number you used to call?

11  A.   Yes, sir.

12  Q.   Now, the government did eventually file a 5K motion for

13  you, didn't they?

14  A.   Yes, sir.

15  Q.   And do you remember, Ms. Fort, how much time off of that

16  ten years that cut your sentence?

17  A.   I guess to five years.

18  Q.   Cut it in half?

19  A.   Yes.

20  Q.   And then after they filed that 5K motion, they filed a

21  Rule 35 motion for you too, didn't they?

22  A.   No, sir.

23  Q.   You hadn't seen that one yet?

24  A.   No, sir.

25  Q.   You're not familiar with the Rule 35 motion that was

1   filed for you in August of 2006?

2   A.   No, sir.

3   Q.   You don't know anything about that?

4   A.   No, sir.

5   Q.   Well, how many times has your sentence been reduced?

6   A.   Just one.

7   Q.   Down to five years.  And that's what you understand

8   you're doing now is five years?

9   A.   Yes, sir.

10   Q.   And how much of that five years do you have left?

11   A.   About a year left.

12   Q.   Now, you understand, don't you, from that plea agreement

13   you've just reviewed that they can ask the court to rule again

14   on your sentence; they can come back to the court any number

15   of times and ask them to cut Katina Fort's sentence even

16   lower, right?

17   A.   Yes, sir.

18   Q.   Low enough even that maybe Katina Fort could go home

19   after this trial if the judge wanted to let you, right?

20   A.   I guess.

21   Q.   Okay.

22           MR. HOGUE:   I have no further questions.

23           THE COURT:   Anything else of this witness?

24           MS. COLVIN:   Just one moment, Your Honor.

25                     REDIRECT EXAMINATION

1    BY MS. COLVIN:

2    Q.   Let me ask you, Ms. Fort, defense counsel asked you about

3    your and your husband both being charged in the underlying

4    indictment that's the subject of that plea agreement.  Do you

5    remember that?

6    A.   Yes, ma'am.

7    Q.   Who, to your understanding, took responsibility for the

8    drug charges related to that particular indictment?

9    A.   James Jordan.

10   Q.   And you took responsibility for the weapon that was

11   involved?

12   A.   Yes, ma'am.

13   Q.   And could you tell the jury what your reason is for

14   testifying and assisting the government for this trial, what

15   do you expect to gain or what do you expect to give someone

16   else?

17   A.   I don't expect to gain nothing out of it.  I'm on my way

18   home.

19   Q.   So why is it that you're cooperating with the government

20   in testifying in this trial today?

21   A.   Because I assisted them on June of 2003 against

22   Mr. Green.

23   Q.   Thank you.

24           MR. HOGUE:  No questions.

25           THE COURT:  All right, call your next witness,

1    please.

2              MR. CALHOUN:  The government calls James Jordan.

3              MS. COLVIN:  And, Your Honor, they're bringing him

4    down as well, if we can have one moment.

5    *(Pause)*

6              DEPUTY CLERK:  Do you solemnly swear that your

7    testimony in this case shall be the truth, the whole truth,

8    and nothing but the truth, so help you God?

9              THE WITNESS:  Yes.

10             THE COURT:  State your name for the jury, please.

11             THE WITNESS:  My name is James Jordan.

12             DEPUTY CLERK:  Would you spell your name, first and

13   last.

14             THE WITNESS:  J-a-m-e-s, J-o-r-d-a-n.

15             MR. CALHOUN:  May I proceed, Your Honor?

16             THE COURT:  Please.

17                        **JAMES JORDAN**

18     Witness, having first been duly sworn, testified on

19                    DIRECT EXAMINATION

20   BY MR. CALHOUN:

21   Q.   Mr. Jordan, are you currently in custody?

22   A.   Yes, I am.

23   Q.   Are you in state or federal custody?

24   A.   Federal custody.

25   Q.   Did you enter a guilty plea?

1   A.   Yes, I did.

2   Q.   What charge did you enter your guilty plea to?

3   A.   Possession of a weapon and possession of crack cocaine.

4   Q.   Have you been sentenced based on those charges?

5   A.   Yes, I have.

6   Q.   What sentence did you receive?

7   A.   I received 170 months.

8   Q.   If you'll speak a little bit louder.

9   A.   170 months.

10  Q.   Now, do you expect or anticipate another reduction in

11  that sentence based on your cooperation today?

12  A.   Yes, sir.

13  Q.   Now, has anyone promised you that your sentence would be

14  reduced by a certain amount?

15  A.   No, sir.

16  Q.   Mr. Jordan, let me show you what's been marked as exhibit

17  number 23.  Do you recognize that document?

18  A.   Yes, I do.

19  Q.   What do you recognize that to be?

20  A.   This is my plea agreement.

21  Q.   Does that plea agreement contain all the promises between

22  you and the government about your cooperation?

23  A.   Yes, it does.

24          MR. CALHOUN:  Government moves to admit number 23,

25  Your Honor.

```
 1                   MR. HOGUE:  No objection.

 2                   THE COURT:  Admitted.

 3      BY MR. CALHOUN:

 4      Q.   Mr. Jordan, aside from your federal conviction that you

 5      just talked about, do you have any state felony convictions

 6      within the last ten years?

 7      A.   I have, yeah, some state convictions.

 8      Q.   And what was the first state conviction, felony

 9      conviction for?

10      A.   Felony conviction was obstruction, felony obstruction.

11      Q.   Obstruction?

12      A.   Yes, obstruction of justice.

13      Q.   And when did you receive the obstruction conviction?

14      A.   I received it May 3rd, 2000.

15      Q.   And what sentence did you receive?

16      A.   I received 485 days detention center.

17      Q.   Now, and aside from that obstruction conviction, did you

18      receive another conviction after that one?

19      A.   Yes.  I had two obstruction convictions that had ran

20      concurrent at that same time on May 3rd, 2000.

21      Q.   When did you receive the second obstruction charge, what

22      year?

23      A.   2000.

24      Q.   You said those two convictions ran together?  Is that

25      what you're saying?
```

1   A.   Yes.

2   Q.   Now, do you know or are you familiar with a Richard

3   Glawson?

4   A.   Yes.

5   Q.   Is he in court today?

6   A.   Yes, he is.

7   Q.   Can you please point to him and describe what he has on?

8   A.   The gentleman sitting in the back next to the guy with

9   the suit with the gray shirt on.

10   Q.   Is that the gentleman to my left?

11   A.   To your left, to my right.

12   Q.   Now, do you know this person by another name?

13   A.   Yes.

14   Q.   What name is that?

15   A.   Terry Green.

16   Q.   Do you recall when you first met this Terry Green, what

17   year?

18   A.   Yes, I do.

19   Q.   What year was that?

20   A.   It was -- I met him 2003.

21   Q.   Who introduced you to this Terry Green person?

22   A.   Katina Fort.

23   Q.   Now, Mr. Jordan, as part of that plea agreement that you

24   just identified, did you agree to cooperate in the

25   investigation of this Glawson or Terry Green?

 1 | A.   Yes, I did.

 2 | Q.   As part of your cooperation, what were you asked to do?

 3 | A.   To make controlled buys, if possible.

 4 | Q.   Do you recall the name of the agents that you worked with

 5 | during the course of your cooperation?

 6 | A.   Yes.

 7 | Q.   Who was that?

 8 | A.   Investigator Whitehead and Agent Rafiq Ahmad.

 9 | Q.   Now, drawing your attention to June 4th, 2003, did you

10 | meet with Special Agent Ahmad?

11 | A.   Yes, I did.

12 | Q.   Did you also meet with other law enforcement officers?

13 | A.   Yes, I did.

14 | Q.   Do you recall the purpose of that meeting on June 4th,

15 | 2003?

16 | A.   Yes.  It was to make a controlled buy from Terry Green.

17 | Q.   The same person you identified as Mr. Glawson?

18 | A.   Yes.

19 | Q.   And what were you supposed to buy in this controlled

20 | purchase?

21 | A.   At that time I'm supposed to buy an ounce of marijuana.

22 | Q.   And when you met with the agent, did you make a phone

23 | call?

24 | A.   Yes, I did.

25 | Q.   And whom did you call?

1    A.    I called Mr. Glawson.

2    Q.    And who gave you that number to use to make that phone

3    call?

4    A.    Katina Fort.

5    Q.    Do you recall what you discussed with Mr. Glawson during

6    the course of that phone call?

7    A.    Yeah, we discussed the price of --

8    Q.    Was that call recorded?

9    A.    Yes, it was.

10   Q.    When you say price, the price of what?

11   A.    The price of the marijuana.

12   Q.    Was that call recorded with your permission?

13   A.    Yes, it was.

14   Q.    Mr. Jordan, let me show what's been marked as

15   government's exhibit 24 and ask you to look at that.  Do

16   recognize that?

17   A.    Yes, I do.

18   Q.    What is that?

19   A.    This is the disk of the phone call that we made.

20   Q.    On June 4th?

21   A.    On June 4th.

22   Q.    Did you have occasion to listen to that phone

23   conversation prior to coming to court today?

24   A.    Yes, I did.

25   Q.    When you listened to that phone conversation, did you

1    notice any alterations or deletions to that phone call, sir?

2    A.    No, I didn't.

3    Q.    Did you initial that disk prior to coming to court?

4    A.    Yes, I did.

5    Q.    Where are your initials on that tape?

6    A.    Right here.

7              MR. CALHOUN:   The government moves to admit number

8    24, Your Honor.

9              MR. HOGUE:   Your Honor, the only objection I'll make

10   is the one I've made before regarding the chain of evidence

11   for these tapes.

12             THE COURT:   All right, that objection is overruled,

13   and 24 is admitted.

14   BY MR. CALHOUN:

15   Q.    Now, Mr. Jordan, at the time you listened to government's

16   exhibit number 24, what were you looking at?

17   A.    What was I looking?

18   Q.    Yes, sir.

19   A.    What do you mean?

20   Q.    Were you looking at a transcript?

21   A.    Oh, yes, sir, I was looking at a transcript.

22   Q.    Let me show you government's exhibit number 25.  Do you

23   recognize that as the exhibit?

24   A.    Yes, sir.  It's the same exhibit I looked at.

25   Q.    Do your initials appear on that exhibit?

1   A.   Yes, it does.

2           MR. CALHOUN:  Your Honor, at this time the

3   government would like to play exhibit number 24 and ask the

4   jurors to direct their attention to the transcript, I believe,

5   is two.  Is that correct, Ms.  Colvin?

6           MS. COLVIN:  That's correct.

7   *(Tape played for the jury)*

8           MR. CALHOUN:  Can you turn that up a little bit?

9           THE COURT:  Wait a minute, that's not loud enough.

10  It has to be loud enough.  Start over.

11  *(Tape played)*

12  BY MR. CALHOUN:

13  Q.   Mr. Jordan, do you recognize the female voice on that

14  tape?

15  A.   Yes.

16  Q.   And who is that?

17  A.   Katina Fort.

18  Q.   Let me ask you a couple follow-up questions about the

19  contents of that recording.  On page one where it says "I'm

20  talking about a whole one this time, not the half--"

21  A.   Yeah.

22  Q.   -- what are you referring to?

23  A.   Referring to the marijuana.

24  Q.   When you say -- when you refer to the whole -- when

25  Mr. Glawson referred to the "whole O" --

1    A.    Uh-huh.

2    Q.    -- did you understand what he was talking about?

3    A.    Yes.

4    Q.    What did you interpret that to be?

5    A.    An ounce of marijuana.

6    Q.    And on that same page where Mr. Glawson appears to say

7    "all right, you know it's 125, right?"  Did you understand

8    what he was talking about?

9    A.    Yes, I did.

10   Q.    And what did you interpret that to mean?

11   A.    The price for the ounce of marijuana.

12   Q.    On the second page there seems to be some discussion,

13   particularly at the top of the transcript, or top of the tape,

14   with Mr. Glawson referring to "that wasn't no mid."  Do you

15   recall that conversation?

16   A.    Yes.

17   Q.    What exactly was it he referring to?

18   A.    He's referring to the grade of the marijuana.

19   Q.    And what does "mid" refer to?

20   A.    It's a different type of the marijuana that -- street

21   name, mid.

22   Q.    Now, after that phone conversation, were you searched?

23   A.    Yes.

24   Q.    Do you remember what type of vehicle you were operating?

25   A.    Yes.

1    Q.   Was your vehicle searched?

2    A.   Yes, it was.

3    Q.   Were you provided with some money?

4    A.   Yes, I was.

5    Q.   Where did you go after you had been searched and you made

6    that phone call and you had been provided with the money?

7    Where did you go?

8    A.   Proceeded to the meeting place.

9    Q.   And where was the meeting place?

10   A.   The meeting place was initially to be at Hooters, but

11   between on the way there, he made a phone call and asked me to

12   meet him at McDonald's.

13   Q.   Now, when you were on route to Hooters --

14   A.   Yes.

15   Q.   -- you received a phone call?

16   A.   Yes.

17   Q.   Who called you?

18   A.   Mr. Glawson.

19   Q.   What did he relate to you?

20   A.   He related that he wanted to meet him at McDonald's on

21   Riverside Drive.

22   Q.   So he had changed the location; is that correct?

23   A.   He changed the location, yes.

24   Q.   Now, did you go to the alternate location?

25   A.   No, I didn't.

1    Q.    Where did you go?

2    A.    I went to McDonald's on Riverside Drive.

3    Q.    When you arrived there do you recall whether Mr. Glawson

4    was there before you, or whether you were there before him?

5    A.    Mr. Glawson was there first.

6    Q.    Do you recall where he was parked when you first saw him?

7    A.    Yes, in the rear of McDonald's.

8    Q.    Do you recall what Mr. Glawson was driving?

9    A.    A white pickup truck.

10   Q.    Did you notice anything uncharacteristic about the bed of

11   that truck?

12   A.    It was like a red or orange color.

13   Q.    Describe for the jury what happened after you met

14   Mr. Glawson at that location?

15   A.    We both proceeded and went inside the bathroom at

16   McDonald's, and I gave him the money, and he got the marijuana

17   out of his pocket and gave it to me.

18   Q.    Okay, let me back up here a moment.  So the transaction

19   took place inside the bathroom?

20   A.    Yes, it did.

21   Q.    Now, were you in a position to see where Mr. Glawson

22   obtained the marijuana from before he sold it to you?

23   A.    Yes.

24   Q.    Where was that?

25   A.    Out of his pocket.

1    Q.    Now, he gave you -- did he give you the marijuana?

2    A.    Yes, he did.

3    Q.    Did you give him the money?

4    A.    Yes, I did.

5    Q.    Did you leave McDonald's at that point?

6    A.    Yes, I did.

7    Q.    And where did you go?

8    A.    I went to the meeting place with the agent.

9    Q.    And what, if anything, did you do with the suspected

10   marijuana that Mr. Glawson had sold to you?

11   A.    I gave it to Investigator Whitehead.

12   Q.    Who was present at the time?

13   A.    Also Rafiq Ahmad.

14   Q.    Mr. Jordan, let me show you exhibit number 26 and ask you

15   to look at that, please.

16   A.    Yes.

17   Q.    Do you recognize that?

18   A.    Yes, I do.

19   Q.    What do you recognize that to be?

20   A.    This is the video that I watched.

21   Q.    Is that the video of the transaction that you just

22   described?

23   A.    Yes, it is.

24   Q.    And did you have occasion to look at that video prior to

25   coming to court today?

```
 1    A.    Yes, I did.

 2    Q.    When you looked it, did you initial the video?

 3    A.    Yes, I did.

 4              MR. CALHOUN:   The government moves to admit number

 5    26, Your Honor.

 6              MR. HOGUE:   No objection.

 7              THE COURT:   26 is admitted.

 8              MR. CALHOUN:   We'd like to lower the lights, Your

 9    Honor, and play the videotape.

10              THE COURT:   Very good.

11              MR. CALHOUN:   And for the jury's benefit, Your

12    Honor, I believe there is no transcript with this transaction.

13    What we would like to do is turn the sound down when we play

14    the tape.

15              THE COURT:   All right.

16    (Videotape playing)

17              MR. CALHOUN:   Milton, can you pause it right there a

18    minute.

19    BY MR. CALHOUN:

20    Q.    Mr. Jordan, do you recognize that truck?

21    A.    Yes, I do.

22    Q.    Is that that the truck that you just referred to?

23    A.    Yes, it is.

24    Q.    And you see the person in court today that was driving

25    that truck?
```

1    A.    Yes, I do.

2    Q.    Who was that person?

3    A.    Richard Glawson.

4          MR. CALHOUN:  Go ahead, Milton.  Can you pause

5    again, Milton.

6    BY MR. CALHOUN:

7    Q.    Now, Mr. Jordan, at this particular point in the video,

8    where are you?

9    A.    We -- I'm on the inside of McDonald's.

10   Q.    With whom?

11   A.    With Mr. Glawson.

12         MR. CALHOUN:  Go ahead, Milton.  Can you pause it

13   again, Milton.

14   Q.    Mr. Jordan, do you recognize the person who is sitting in

15   the passenger side of the vehicle?

16   A.    I recognize him by only being with Mr. Glawson.

17   Q.    And who identified this person to you?

18   A.    Mr. Glawson did.

19   Q.    And who did he say it was?

20   A.    He said it was his uncle.

21         MR. CALHOUN:  Go ahead Milton.  Pause right there,

22   Milton.

23   Q.    Do you recognize this person in the video?

24   A.    Yes, I do.

25   Q.    Who do you recognize that person to be?

1    A.    I recognize it as Terry Green, Mr. Glawson.

2    Q.    Now, do you notice anything that's different about

3    Mr. Glawson on the video, as opposed to the person seated in

4    court today in reference to his appearance?

5    A.    Yes, only one thing.

6    Q.    What's that?

7    A.    His hair is longer on that video than it is now.

8    Q.    Do you notice any discrepancies in his size?

9    A.    His size is a little smaller too.

10   Q.    Today?

11   A.    Today.

12              MR. CALHOUN:  Go ahead, Milton.

13   Q.    Mr. Jordan, drawing your attention to June 20th, 2003,

14   were you still cooperating with Special Agent Ahmad?

15   A.    Yes, I was.

16   Q.    Did you have an occasion to meet with the officers on

17   that particular day?

18   A.    Yes, I did.

19   Q.    And did you meet at the same location you had met prior?

20   A.    Yes, I did.

21   Q.    When you met with the officers, did you make a phone

22   call?

23   A.    Yes, I did.

24   Q.    This would have been your third phone call?

25   A.    No, this is my second phone call.

1    Q.    Second phone call?

2    A.    Second phone call.

3    Q.    And whom did you call?

4    A.    I called Mr. Glawson.

5    Q.    Were you able to speak to him?

6    A.    Yes, I did.

7    Q.    And do you recall the conversation that you had with

8    Mr. Glawson?

9    A.    Yes, I did.

10   Q.    Describe to the jury what that conversation was?

11   A.    The conversation was brief, but we conversated about this

12   time I would buy some cocaine, crack cocaine.

13   Q.    And based on that conversation, did Mr. Glawson agree to

14   sell you the crack cocaine?

15   A.    Yes.

16   Q.    Where did you and Mr. Glawson agree to meet during the

17   course of that phone conversation?

18   A.    We agreed to meet at the same location we met the last

19   time.

20   Q.    Was that call recorded?

21   A.    Yes, it was.

22   Q.    Was it recorded with your permission?

23   A.    Yes, it was.

24   Q.    And who was present at the time the recording was made?

25   A.    Rafiq Ahmad and Investigator Whitehead.

1    Q.   And have you had occasion to listen to that recording

2    prior to coming to court?

3    A.   Yes, I have.

4         MR. CALHOUN:    Could I have a moment, Your Honor.

5    Q.   Let me show you what's been marked as government exhibit

6    number 27 and ask you to look at that, Mr. Jordan.  Do you

7    recognize that tape?

8    A.   Yes, I do.

9    Q.   What do you recognize that to be?

10   A.   This is the phone conversation, June 20th.

11   Q.   That's the conversation you just testified about?

12   A.   Yes, I did.

13   Q.   And have you had occasion to listen to that tape prior to

14   coming to court today?

15   A.   Yes, I did.

16   Q.   When you listened to that tape, did you notice any

17   alterations or deletions to that tape?

18   A.   No, I didn't.

19   Q.   And did you initial that tape after you heard it?

20   A.   Yes, I did.

21   Q.   And do your initials appear on that tape?

22   A.   Yes, they do.

23        MR. CALHOUN:   The government moves to admit number

24   27, Your Honor.

25        MR. HOGUE:   Your Honor, I object again on the

1    grounds of the chain of custody that has not been shown.

2              THE COURT:  All right, the objection is overruled.

3    The tape is admitted.  Let's take a break at this point.

4              MR. CALHOUN:  Yes, sir.

5              THE COURT:  Step back to your jury room, ladies and

6    gentlemen.

7    *(Jury Excused; 2:55 p.m.)*

8              THE COURT:  All right, we'll take 15 minutes.

9    *(RECONVENED; ALL PARTIES PRESENT, 3:15 p.m.)*

10             THE COURT:  Is the government ready?

11             MR. CALHOUN:   Yes, Your Honor.

12             THE COURT:  Is the defense?

13             MR. HOGUE:  Yes, Your Honor.

14             THE COURT:  Ask the jury to come in, please.

15   *(Jury In)*

16             THE COURT:  All right, let's proceed.

17   BY MR. CALHOUN:

18   Q.   Mr. Jordan, let me show you what's been marked as

19   government's exhibit number 28 and ask you if you recognize

20   that?

21   A.   Yes, I do.

22   Q.   What do you recognize that to be?

23   A.   This is the phone conversation made between myself and

24   Mr. Glawson.

25   Q.   On what day?

1  A.   June 20th, 2003.

2       MR. CALHOUN:  Your Honor, at this time the

3  government would like to play government exhibit 27, and for

4  the benefit of the jury, this will be transmittal number

5  three.  Is that correct, Ms. Colvin?

6       MS. COLVIN:  I don't have a copy of --

7  *(Aside)*

8       THE COURT:  This is the third one we've heard.

9       MR. CALHOUN:  This is number three, Your Honor, tab

10 three, ladies and gentlemen.  Okay, Milton.

11 *(Tape played for the jury)*

12 BY MR. CALHOUN:

13 Q.   Mr. Jordan, at the beginning of the tape, you refer to

14 "I want to see about getting a 0?"

15 A.   Yes.

16 Q.   What you were referring to?

17 A.   An ounce of crack cocaine.

18 Q.   And you also in response to a question from Mr. Glawson

19 when you say "of hard," what are you referring to?

20 A.   An ounce of crack cocaine.

21 Q.   You also mentioned during the course of the tape "a whole

22 one of hard."  What were you referring to?

23 A.   An ounce of crack cocaine.

24 Q.   And when Mr. Glawson mentioned a whole ounce, did you

25 understand what he was referring to?

1    A.    Yes, he was referring to crack cocaine.

2    Q.    Mr. Jordan, after that phone conversation, where did you

3    go?

4    A.    We proceeded to the meeting place.

5    Q.    Speak a little bit louder.

6    A.    We proceeded to the meeting place.

7    Q.    And what meeting place was that?

8    A.    It initially was supposed to be Hooters on Riverside

9    Drive, but we started to the location, and he called and said,

10   why don't we meet at the same location we met last time at the

11   McDonald's on Riverside.

12   Q.    And did you proceed to that location?

13   A.    Yes, I did.

14   Q.    And whom did you meet there?

15   A.    I met Mr. Glawson.

16   Q.    Do you recall what Mr. Glawson was driving when you met

17   him?

18   A.    A white pickup truck.

19   Q.    Is that the same white pickup truck that you had seen in

20   those two prior occasions?

21   A.    Yes, it was.

22   Q.    Was Mr. Glawson by himself at this time?

23   A.    No, he wasn't.

24   Q.    Who was with him?

25   A.    He had a little girl that he said it was his.

1   Q.   Describe what took place after you met Mr. Glawson who

2   was in the company of this young child?

3   A.   He immediately said he was ready to get the cocaine out

4   of his pocket and get this over with.  So he sat his little

5   girl down in the back of his truck while Katina talked with

6   her, and I went around to the right side of his truck on the

7   passenger side, and that's where we made the transaction.

8   Q.   You say you made the transaction.  Describe exactly what

9   took place on the side of the truck?

10  A.   Okay.  He sat his little girl inside in a car seat, and

11  he put the crack cocaine on the seat, I gave him the money and

12  reached in and got it.

13  Q.   So the crack cocaine was on the seat with the child; is

14  that correct?

15  A.   Yes.

16  Q.   And you reached down and got it?

17  A.   Yes.

18  Q.   And what did you do with the money?

19  A.   I gave it to him in his hand.

20  Q.   How much money did you give to Mr. Glawson?

21  A.   I gave him a thousand dollars.

22  Q.   And where did you go after you had purchased the crack

23  cocaine from Mr. Glawson?

24  A.   To meet with the agent and the investigator at our

25  location.

1  Q.   What, if anything, did you do with the crack cocaine that

2  had been sold to you by Mr. Glawson?

3  A.   I immediately gave it to Rafiq Ahmad and Investigator

4  Whitehead.

5  Q.   Let me show you what's been marked as government's

6  exhibit number 29 and ask you to look at that, please.

7  A.   Yes.

8  Q.   Do you recognize that exhibit?

9  A.   Yes.

10  Q.   Do you recognize that exhibit?

11  A.   Yes, I do.

12  Q.   What do you recognize that to be?

13  A.   This is the video I viewed previously.

14  Q.   And is that the video of the event that you just

15  testified to?

16  A.   Yes, it is.

17  Q.   Did you have occasion to look at that videotape prior to

18  coming to court?

19  A.   Yes, I did.

20  Q.   And did you initial that videotape?

21  A.   Yes, I did.

22  Q.   And the initials "JJ" depicted there, are those your

23  initials?

24  A.   Those are my initials.

25            MR. CALHOUN:   The government moves to admit number

1    29, Your Honor.

2              THE COURT:  It is admitted.

3              MR. CALHOUN:  At this time, Your Honor, we would

4    like to play the video, and due to the lack of intelligible

5    conversation, we are going to turn the sound down.

6              THE COURT:  Very good.

7    *(Tape Playing)*

8              MR. CALHOUN:  Milton, can you stop it right there,

9    please.

10   BY MR. CALHOUN:

11   Q.   Mr. Jordan, do you recognize the people depicted in this

12   scene?

13   A.   Yes, I do.

14   Q.   And who are they?

15   A.   Myself, Katina Fort, Richard Glawson, and the child that

16   he said was his.

17             MR. CALHOUN:  Go ahead, Milton.  Can you stop it

18   right there, Milton?

19   Q.   Mr. Jordan, do you recall what's taking place at this

20   particular point?

21   A.   At this particular time he had the windows rolled up and

22   that particular day it was hot, so he was rolling down the

23   windows before he put child in.

24             MR. CALHOUN:  Go ahead Milton.  Pause it there,

25   Milton.  Back it up a couple frames, Milton.  Okay, right

1  there, Milton, hold it.

2  Q.   Mr. Jordan, can you describe what's taking place here?

3  A.   He had just sat his little girl down, and he was getting

4  ready to open the passenger's side of the door and roll the

5  window down, and that's when he sat her in the car seat.

6         MR. CALHOUN:  Go ahead Milton.  Stop it right there.

7  Q.   Now, you mentioned earlier that the crack cocaine was on

8  the same seat as the infant?

9  A.   Not the same seat as the infant's, but on the seat.

10  Q.   On the seat?

11  A.   Uh-huh.

12  Q.   What's taking place here?

13  A.   He's putting her in the car seat now.

14         MR. CALHOUN:  Go ahead Milton.  Stop right there,

15  Milton.

16  Q.   What's taking place here, Mr. Jordan?

17  A.   After he put her in the car seat, he took the crack

18  cocaine out of his pocket and sat it on the seat.

19         MR. CALHOUN:  Go ahead, Milton.  Stop it there,

20  Milton.

21  Q.   Mr. Jordan, do you recall what you all were talking about

22  at that particular time?

23  A.   At that point we had made the transaction, and we were

24  discussing me purchasing a firearm from him.

25         MR. CALHOUN:  Go ahead Milton.

1    Q.    Mr. Jordan, after you had made that purchase from

2    Mr. Glawson, where did you go?

3    A.    I proceeded to the location with the agents and the

4    investigator.

5    Q.    What, if anything, did you do with the suspected crack

6    cocaine?

7    A.    I immediately gave it to Rafiq and Investigator

8    Whitehead.

9    Q.    Now, I noticed that that videotape that was introduced

10   did not have audio.  Have you had occasion to listen to an

11   audiotape of that transaction?

12   A.    Yes, I have.

13   Q.    Let me show you what's been marked as exhibit 29A and ask

14   you to look at that.  Do you recognize that exhibit?

15   A.    Yes, I do.

16   Q.    What do you recognize that to be?

17   A.    The same exhibit that I viewed for the drug transaction.

18   Q.    That you just testified about?

19   A.    That I just testified about.

20   Q.    Is this an audiotape of that transaction?

21   A.    Yes.

22   Q.    When you listened to the tape, did you notice any

23   alterations to the tape?

24   A.    No alterations.

25   Q.    Now, let me show you exhibit number 30 and ask you to

 1    look at that.  Do you recognize that transcript?

 2    A.    Yes, I do.

 3    Q.    What do you recognize that to be?

 4    A.    This is the transcript from the actual buy that I made.

 5    Q.    Is that a transcript of exhibit number 29A?

 6    A.    Yes.

 7    Q.    Did you look at that transcript prior to coming to come

 8    to court?

 9    A.    Yes, I did.

10    Q.    Did you initial that transcript?

11    A.    Yes, I did.

12          MR. CALHOUN:  The government moves to admit exhibit

13    number 29A.

14          MR. HOGUE:  No objection.

15          THE COURT:  Admitted.

16          MR. CALHOUN:  Your Honor, the government at this

17    time would like to play 29A, and for the benefit of the jury

18    that would be tab number four.  Is that correct -- tab number

19    four, Your Honor.

20    (Tape played)

21    BY MR. CALHOUN:

22    Q.    Mr. Jordan, on the tape when you said "hey, pretty lady,"

23    what are you referring to?

24    A.    I was referring to the little girl.

25    Q.    Also on the tape when you said -- when Mr. Glawson said,

1  I'm ready to get this blankety-blank out of my pocket," did

2  you know what he was referring to?

3  A.   Yes, he was referring to the ounce of cocaine.

4  Q.   And when Mr. Glawson asked you, "did you say 0, right,"

5  did you know what he was talking about?

6  A.   Yes, I did.

7  Q.   What was that?

8  A.   The cocaine.

9  Q.   Now, on the tape when you referred to -- you appeared to

10  ask Mr. Glawson where can you get a 380 or a nine, what were

11  you talking about?

12  A.   I was talking about a pistol, a weapon.

13  Q.   A portion of the conversation where Mr. Glawson said

14  "there ain't no bodies or nothing on it," did you know what

15  Mr. Glawson was talking about?

16  A.   Yes, I knew he was talking about.  He was talking about

17  the gun was clean.

18  Q.   What do you mean clean?

19  A.   I mean, that it hadn't been used for anything illegal.

20  Q.   Mr. Jordan, drawing your attention to June 23rd, 2003,

21  were you still cooperating with the authorities?

22  A.   Yes, I was.

23  Q.   Did you have occasion to meet with them on June 23rd,

24  2003?

25  A.   Yes, I did.

1    Q.   And what was the purpose of that meeting?

2    A.   To buy some more crack cocaine from Mr. Glawson.

3    Q.   How much did you intend to buy on June 23rd, 2003?

4    A.   A half an ounce.

5    Q.   And when you met with the agents, did you have occasion

6    to place a phone call?

7    A.   Yes, I did.

8    Q.   And whom did you call?

9    A.   I called Mr. Glawson.

10   Q.   And were you able to speak to Mr. Glawson?

11   A.   Yes, I did.

12   Q.   And will you describe to the jury what took place between

13   you and Mr. Glawson during that phone call?

14   A.   During that phone call we discussed the price of the

15   cocaine and where the location would be for us to meet.

16   Q.   And where did you and Mr. Glawson agree to meet as a

17   result of that phone conversation?

18   A.   We agreed to meet at McDonald's on Riverside Drive.

19   Q.   Is that the same location that you had met Mr. Glawson

20   previously?

21   A.   Yes, it was.

22   Q.   Now, was that phone call recorded?

23   A.   Yes, it was.

24   Q.   Was it recorded with your permission?

25   A.   Yes.

1    Q.   Do you recall who recorded that phone conversation?

2    A.   Yes.  Investigator Whitehead.

3    Q.   Now, after you had made that phone call, were you

4    searched?

5    A.   Yes, I was.

6    Q.   Do you recall what vehicle you were using at the time?

7    A.   Yes, I do.

8    Q.   What was that?

9    A.   It was a green Chevrolet, hardtop Cavalier.

10   Q.   And was your car searched?

11   A.   Yes, it was.

12   Q.   Was any contraband found on you or inside your vehicle?

13   A.   No, it wasn't.

14   Q.   Were you also supplied with a transmitter?

15   A.   Yes, I was.

16   Q.   Now, after you'd been supplied with the -- were you

17   supplied with some money?

18   A.   Yes.

19   Q.   How much?

20   A.   $500.

21   Q.   And after you had been supplied with all that, including

22   the money and the transmitter, where did you go?

23   A.   I proceeded to McDonald's on Riverside.

24   Q.   And whom did you meet there?

25   A.   Mr. Glawson.

1   Q.   And what was Mr. Glawson driving at the time you met him?

2   A.   He was driving the white pickup truck.

3   Q.   Was that the same pickup truck that you had seen on those

4   prior occasions?

5   A.   Yes, it was.

6   Q.   Was Mr. Glawson alone on this occasion?

7   A.   No, he wasn't.

8   Q.   Who was with him?

9   A.   He had -- uh, uh -- his uncle with him then too.

10   Q.   And where did you park once you got to the McDonald's?

11   A.   In the rear of McDonald's.

12   Q.   And do you recall whether Mr. Glawson was there before

13   you or whether you arrived before him?

14   A.   I was there before him -- no, he was there before me,

15   excuse me.

16   Q.   Okay.  Describe to the jury what happened once you met

17   Mr. Glawson at the McDonald's.

18   A.   Once I parked, he made an additional phone call to let me

19   know to come on in.

20   Q.   Did you go inside?

21   A.   Yes.

22   Q.   Where inside McDonald's did you go?

23   A.   We proceeded to the bathroom.

24   Q.   And what took place inside the bathroom?

25   A.   He took the cocaine out of his pocket and gave me the

1   money, and we made the transaction, and I left out.

2   Q.   You said made the transaction, what exactly are you

3   talking about?

4   A.   I bought the cocaine from him.  I gave him the money, and

5   he gave me the crack cocaine.

6   Q.   Were you in a position to see where Mr. Glawson obtained

7   the cocaine prior to selling it to you in terms of his person?

8   A.   Yes.

9   Q.   Where was that?

10  A.   It's out of his pocket.

11  Q.   Okay.  And what did you do once Mr. Glawson sold you the

12  cocaine?

13  A.   I left.

14  Q.   What did you do with the five hundred dollars that had

15  been given to you?

16  A.   I gave it to Mr. Glawson.

17  Q.   And after you left, where did you go?

18  A.   I proceeded to the location, the meeting place, with

19  Rafiq Ahmad and Investigator Whitehead.

20  Q.   And what did you do with the suspected cocaine that had

21  been sold to you by Mr. Glawson?

22  A.   I gave it to Mr. Ahmad and Investigator Whitehead.

23  Q.   Mr. Jordan, let me show you what's been marked as

24  exhibit number 31.  Do you know what that is?

25  A.   Yes.

1    Q.    What is that?

2    A.    It is the phone call of the transaction made on June

3    23rd.

4    Q.    The transaction you just testified about?

5    A.    The transaction I just testified.

6    Q.    Did you have an occasion to listen to the contents of

7    that CD prior to coming to court?

8    A.    Yes, I did.

9    Q.    When you listened to it, did you notice any alterations

10   or changes to the phone call?

11   A.    No, I didn't.

12   Q.    And do your initials appear on that CD?

13   A.    Yes, they do.

14        MR. CALHOUN:   The government moves to admit number

15   31, Your Honor.

16        MR. HOGUE:   Your Honor, I object based on the chain

17   of custody that has not been proven sufficient to admit that

18   in.

19        THE COURT:   Overruled.   31 is admitted.

20   BY MR. CALHOUN:

21   Q.    Now, Mr. Jordan, let me show you exhibit number 32 and

22   ask you to look at that.   Do you recognize that?

23   A.    Yes.

24   Q.    And have you had occasion prior to coming to court to

25   today to compare 32 with 31?

1   A.   Yes, I did.

2   Q.   And is 32 a transcript of 31?

3   A.   Yes, it is.

4   Q.   And did you initial that transcript prior to coming to

5   court?

6   A.   Yes, I did.

7          MR. CALHOUN:  Your Honor, at this time the

8   government would like to play exhibit number 31, the phone

9   call.

10         THE COURT:  Very well.

11         MR. CALHOUN:  For the benefit of the jury, it should

12   be tab five.

13   *(Tape Played)*

14   BY MR. CALHOUN:

15   Q.   Mr. Jordan, in the opening portion of that conversation,

16   it appears that you were arguing with Mr. Glawson about

17   something.  Do you recall that?  You were complaining about

18   something?

19   A.   Yes.  We was speaking about the first time I bought with

20   him, the weight of the crack cocaine.

21   Q.   And another portion of that conversation, Mr. Glawson

22   tells you that "that's for that green, man."  Did you know

23   what he was talking about?

24   A.   Yes.  He was meaning a scale that weighs marijuana

25   instead of crack cocaine.

1    Q.   And another portion of that conversation you told

2    Mr. Glawson, "you hook me up with a half."  What were you

3    talking about?

4    A.   Would he hook me up with a half.  That what I was going

5    to purchase, a half a cocaine -- crack cocaine.

6    Q.   And as the conversation progressed, you told Mr. Glawson

7    or at least referred to "that other thing."  What were you

8    talking about when you said "that other thing?"

9    A.   I was talking about a gun.

10   Q.   Mr. Jordan, let me show you what's been marked as exhibit

11   number 33 and ask you to look at that, please.

12   A.   Yes.

13   Q.   Do you recognize government's exhibit number 33?

14   A.   Yes, I do.

15   Q.   What do you recognize that to be?

16   A.   That's the video that I viewed.

17   Q.   Was that the video of that transaction that you just

18   described?

19   A.   Yes, it was.

20   Q.   And have you had occasion to look at that video prior to

21   coming to trial?

22   A.   Yes.

23   Q.   Did you initial that video?

24   A.   Yes.

25              MR. CALHOUN:   The government moves to admit number

1    33, Your Honor.

2              MR. HOGUE:  No objection.

3              THE COURT:  Admitted.

4              MR. CALHOUN:  At this time we'd like to play this

5    and due to the audio, we'd like to turn the audio on the

6    videotape down, Your Honor.

7              THE COURT:  Very good.

8    (Videotape is played for the jury)

9              MR. CALHOUN:  Can you stop it right there, Milton?

10   BY MR. CALHOUN:

11   Q.   Mr. Jordan, do you recognize this truck?

12   A.   Yes, I do.

13   Q.   Do you recall who was driving the truck?

14   A.   Yes.

15   Q.   Who was that?

16   A.   Richard Glawson.

17             MR. CALHOUN:  Go ahead, Milton.  Stop it there.

18   Q.   Do you recognize this person?

19   A.   Yes, I do.

20   Q.   Who was that?

21   A.   Myself.

22   Q.   And where are you going?

23   A.   I'm going to -- on the inside of McDonald's now.

24             MR. CALHOUN:  Go ahead, Milton.  Stop it right

25   there, Milton.

1   Q.   Mr. Jordan, is there a difference between your appearance

2   now and compared to what it was June 23rd, '03?

3   A.   Yes, it is.

4   Q.   And what difference is that?

5   A.   It's about 40 pounds difference.

6        MR. CALHOUN:  Go ahead, Milton.

7   Q.   At this point, Mr. Jordan, what's taking place?

8   A.   We're inside the restroom at McDonald's, and we're making

9   the transaction.

10  Q.   And describe what took place inside that bathroom.

11  A.   We went in, he proceeded to get the cocaine out of his

12  pocket, I got the money out of my pocket, handed it to him, he

13  handed me the crack cocaine, and I left out.

14  Q.   When you say "he," who are you referring to?

15  A.   I'm talking about Mr. Glawson.

16  Q.   How much money did you give Mr. Glawson for that cocaine?

17  A.   $500.

18  Q.   Now, these people who are coming in and out, they're not

19  involved in the transaction, are they?

20  A.   No, they're not.

21       MR. CALHOUN:  Stop it right there, Milton.

22  Q.   Do you recognize this person, Mr. Jordan?

23  A.   Yes, I do.

24  Q.   And at this point had the transaction been completed?

25  A.   Yes, it had.

1        MR. CALHOUN:  Go ahead, Milton.  Stop it there,

2   Milton.

3   Q.   Mr. Jordan, did you see the shadowy figure in the door

4   there?

5   A.   Yes, I do.

6   Q.   Do you recognize who that is?

7   A.   Yes.

8   Q.   Who was that?

9   A.   That's Richard Glawson.

10       MR. CALHOUN:  Go ahead, Milton.  Stop it there.

11  Q.   Mr. Jordan, do you recognize the person in this truck?

12  A.   Yes, I do.

13  Q.   And who do you recognize that person to be?

14  A.   Richard Glawson.

15       MR. CALHOUN:  Go ahead Milton.  Stop it there.

16  Q.   And, again, do you see this person in court today?

17  A.   Yes, I do.

18       MR. CALHOUN:  Go ahead, Milton.

19  Q.   Mr. Jordan, after you had made the purchase from Mr.

20  Glawson, where did you go?

21  A.   I proceeded to the location to meet with Rafiq Ahmad and

22  Investigator Whitehead.

23  Q.   And what did you do with the suspected crack cocaine that

24  you had purchased from Mr. Glawson?

25  A.   I gave it to Rafiq Ahmad and Investigator Whitehead.

1    Q.    Now, Mr. Jordan, prior to coming to court, did you have

2    an occasion to listen to a separate audiotape prepared by a

3    Deputy Johnson?

4    A.    Yes.

5    Q.    Let me show you what's been marked as government's

6    exhibit number 33 and ask you to look at that.

7    A.    Yes.

8    Q.    And do you recognize exhibit number 33?

9    A.    Yes, I do.

10   Q.    And what do you recognize it to be?

11   A.    The actual drug transaction.

12   Q.    Is that the audiotape of that transaction?

13   A.    Audiotape, yes.

14   Q.    Did you have an occasion to listen to that tape prior to

15   coming to court?

16   A.    Yes, I did.

17   Q.    When you listened to that tape, did you notice any

18   alterations or changes to that tape?

19   A.    No, I didn't.

20   Q.    Did you initial the tape prior to coming to court?

21   A.    Yes, I did.

22   Q.    And do your initials appear on that CD?

23   A.    Yes, it does.

24           MR. CALHOUN:   The government moves to admit number

25   33A, Your Honor.

1           MR. HOGUE:  No objection.

2           THE COURT:  Admitted.

3     BY MR. CALHOUN:

4     Q.   Let me show you what's been marked as exhibit 34 and ask

5     you to look at that, please.  Have you had occasion to review

6     that prior to coming to court?

7     A.   Yes, I did.

8     Q.   And what do recognize that to be?

9     A.   The drug transaction.

10    Q.   Is that a transcript of government's exhibit number 33A?

11    A.   Yes, it is.

12    Q.   Did you review that transcript prior to coming to court?

13    A.   Yes, I did.

14    Q.   Do your initials appear on that transcript?

15    A.   Yes, it does.

16          MR. CALHOUN:  At this time the government would like

17    to play 33A, and for the benefit of the jury --

18          THE COURT:  Is this going to be an audio or a video?

19          STAFF:  Audio.

20          MR. CALHOUN:  For the benefit of the jury, Your

21    Honor, that would be tab six.

22    *(Tape played for the jury)*

23    Q.   Mr. Jordan, when Mr. Glawson told you that "I keep mine

24    around on me," did you know what he was talking about?

25    A.   Yes, I did.

1    Q.    And what was that?

2    A.    He was talking about his pistol.

3    Q.    And what was all this conversation about anyway?

4    A.    The conversation was about me buying a pistol.

5    Q.    Now, drawing your attention to July 3rd of 2003, were you

6    still cooperating with the Special Agent Ahmad and other law

7    enforcement officers?

8    A.    Yes, I was.

9    Q.    Did you have occasion to meet with those officers on July

10   3rd, 2003?

11   A.    Yes, I did.

12   Q.    And what was purpose of that meeting?

13   A.    The purpose of that meeting was to buy a firearm from Mr.

14   Glawson.

15   Q.    Is that the same firearm that you had alluded to on June

16   23rd, 2003?

17   A.    Yes.

18   Q.    Now, when you met with the agents, were you searched?

19   A.    Yes, I was.

20   Q.    What kind of car were you using at the time?

21   A.    I was using a black convertible Cavalier.

22   Q.    And was your Cavalier searched?

23   A.    Yes, it was.

24   Q.    And was any contraband found either on you or inside your

25   Cavalier?

1    A.    No, it wasn't.

2    Q.    Now, when you met with the agents, did you make a phone

3    call?

4    A.    Yes.

5    Q.    And whom did you call?

6    A.    I called Mr. Glawson.

7    Q.    And were you able to speak with Mr. Glawson?

8    A.    Yes, I was.

9    Q.    And was that phone call recorded?

10   A.    Yes, it was.

11   Q.    Was it recorded with your permission?

12   A.    Yes.

13   Q.    Now, in essence, what did you discuss with Mr. Glawson

14   during that phone call on July 3rd, 2003?

15   A.    I discussed purchasing a firearm from him.

16   Q.    Now, at the end of that conversation, where did you go?

17   A.    We proceeded to the location to meet Mr. Glawson.

18   Q.    Let me show you what's been marked as government's

19   exhibit number 35 and ask to you look at that please.  Do you

20   recognize government exhibit number 35?

21   A.    Yes, I do.

22   Q.    And what do you recognize that to be?

23   A.    The phone call conversation between myself and

24   Mr. Glawson.

25   Q.    On what day?

1   A.   July 3rd.

2   Q.   And did you have occasion to listen to that tape prior to

3   coming to court?

4   A.   Yes, I did.

5   Q.   When you listened to that tape, did you notice any

6   alterations or changes to that tape based on your conversation

7   with Mr. Glawson?

8   A.   No, it wasn't.

9   Q.   Now, did you initial that tape?

10  A.   Yes, I did.

11          MR. CALHOUN:   The government moves to admit exhibit

12  number 35, Your Honor.

13          MR. HOGUE:   I object on the basis of the failure to

14  establish a chain of custody to authenticate the tape.

15          THE COURT:   Overruled.   35 is admitted.

16  BY MR. CALHOUN:

17  Q.   Let me show you exhibit number 36, Mr. Jordan, and ask

18  you to look at that, please.

19  A.   Yes.

20  Q.   Do you recognize exhibit number 36?

21  A.   Yes, I do.

22  Q.   And did you help prepare that transcript?

23  A.   Yes, I did.

24  Q.   Did you initial that transcript?

25  A.   Yes, I did.

1   Q.   And is 36 a transcript of 35?

2   A.   Yes, it is.

3          MR. CALHOUN:  Your Honor, at this time the

4   government would like to play the phone call designated as

5   government's exhibit number 35.  For the benefit of the jury,

6   that would be number seven, Your Honor.

7          THE COURT:  All right.

8   *(TAPE PLAYED)*

9   Q.   Mr. Jordan, following that conversation with Mr. Glawson,

10  where did you go?

11  A.   I went to wait on him at the location we was going to

12  meet at.

13  Q.   What location is that?

14  A.   The Chevron on Riverside Drive.

15  Q.   Do you recall whether you arrived first or Mr. Glawson

16  arrived there first?

17  A.   I arrived first.  It took him a while to get there, so we

18  sat somewhere and waited on him.

19  Q.   When you say "we sat," who are you talking about?

20  A.   Myself and Katina Fort.

21  Q.   And did Mr. Glawson eventually arrive at your location?

22  A.   Yes.

23  Q.   Do you recall what Mr. Glawson was driving when he

24  arrived?

25  A.   He was driving a white pickup truck.

1    Q.   Was that the same white pickup truck that you had seen

2    him in on those prior occasions?

3    A.   Yes.

4    Q.   On this occasion was he alone?

5    A.   Yes, he was alone.

6    Q.   And what took place when you met Mr. Glawson at that

7    location?

8    A.   Mr. Glawson was on the outside of his truck, and I

9    proceeded to him with his hood up on his truck, and I went to

10   the driver's side, and he had the pistol wrapped up in some

11   newspaper, and I gave him the money, reached in and got it,

12   and we said a brief few words, and I got in my car and left.

13   Q.   How long do you think you might have stayed at the

14   Chevron station before leaving?

15   A.   Approximately three to five minutes.

16   Q.   And you mentioned the firearm was wrapped in what?   I

17   missed what you said?

18   A.   Newspaper, something like that.

19   Q.   What did you do with that firearm after you had purchased

20   it from Mr. Glawson?

21   A.   I proceeded to the location and met with Rafiq Ahmad and

22   Richard Glawson -- and Investigator Whitehead, I'm sorry.

23   Q.   Let me show you what's been marked as government

24   exhibit number 37, Mr. Jordan, and ask you to look at that

25   please.  Do you recognize that?

1   A.   Yes, I do.

2   Q.   And what do you recognize that to be?

3   A.   This is would be the video of the actual transaction.

4   Q.   And the transaction, is that the one that you just

5   referred to involving the firearm?

6   A.   Yes, it is.

7   Q.   Did you have an occasion to look at that CD prior to

8   coming to court today?

9   A.   Yes, I did.

10  Q.   Did you initial that CD?

11  A.   Yes, I did.

12          MR. CALHOUN:  The government moves to admit number

13  37, Your Honor.

14          MR. HOGUE:  No objection.

15          THE COURT:  Admitted.

16          MR. CALHOUN:  We ask that the videotape, exhibit

17  number 37 be played, and we ask Milton to turn the sound down

18  due to the quality of the tape.

19  (Tape played)

20          MR. CALHOUN:  Stop it right there, Milton.

21  BY MR. CALHOUN:

22  Q.   Mr. Jordan, do you recognize the two people depicted on

23  the screen?

24  A.   Yes, I do.

25  Q.   Could you identify both of those figures?

1   A.   Myself and Richard Glawson.

2   Q.   And which figure is you?

3   A.   That's me with the dark colored shirt on.

4   Q.   On the right of the screen?

5   A.   Yes.

6   Q.   And who's on the left of the screen?

7   A.   Mr. Glawson.

8   Q.   Does Mr. Glawson appear to be standing beside a vehicle?

9   A.   Yes.

10  Q.   Do you see the vehicle?

11  A.   Yes, I do.

12  Q.   And what vehicle is that?

13  A.   The white pickup truck.

14  Q.   Is that the same white pickup truck you had seen on prior

15  occasions?

16  A.   Yes, it is.

17       MR. CALHOUN:  Go ahead Milton.  Stop it there.

18  Q.   Do you recognize the figure standing by this truck?

19  A.   Yes, I do.

20  Q.   Who do you recognize that to be?

21  A.   Richard Glawson.

22       MR. CALHOUN:  Go ahead, Milton.

23  Q.   Mr. Jordan, prior to coming to court, did you listen to

24  audiotape of the transaction that you just witnessed, you just

25  looked at?

1    A.   Yes, I did.

2    Q.   Let me show you what's been marked as government

3    exhibit number 18E.  Do you recognize that?

4    A.   Yes, I do.

5    Q.   Is the conversation I just asked you about on that

6    particular tape?

7    A.   Yes.

8    Q.   And when you listened to that tape, did you notice any

9    alterations or deletions to that tape?

10   A.   No, I didn't.

11   Q.   Were you able to identify the voices on that particular

12   portion of the tape?

13   A.   Yes, I was.

14   Q.   And whose voices are on that particular portion?

15   A.   Myself and Richard Glawson.

16   Q.   And let me show you exhibit number 38.  Do you recognize

17   that?

18   A.   Yes.

19   Q.   Is that a transcript of the conversation that you just

20   alluded to?

21   A.   Yes, it is.

22   Q.   Did you have a chance to review that transcript prior to

23   coming to court?

24   A.   Yes, I did.

25   Q.   And did you initial that transcript?

1    A.   Yes, I did.

2              MR. CALHOUN:   The government moves to admit

3    government number 18E, Your Honor.

4              MR. HOGUE:   No objection.

5              THE COURT:   Admitted.

6              MR. CALHOUN:   For the benefit of the jury, I believe

7    this one is number eight.

8    *(Tape is played for the jury)*

9    BY MR. CALHOUN:

10   Q.   Mr. Jordan, let me show you government exhibit number 52

11   and ask you to examine that, please.   Do you recognize

12   exhibit number 52?

13   A.   Yes, I do.

14   Q.   What do you recognize that to be?

15   A.   The firearm I purchased from Richard Glawson.

16   Q.   Was that the purchase made on June 3rd, 2003?

17   A.   Yes, it was.

18   Q.   And what did you do with that firearm after you had

19   purchased it from Richard Glawson?

20   A.   I took it to Rafiq Ahmad.

21             MR. CALHOUN:   That's all I have for Mr. Jordan, Your

22   Honor.

23                        CROSS EXAMINATION

24   BY MR. HOGUE:

25   Q.   Mr. Jordan, you began direct exam earlier today by

1    telling the jury that you had been introduced to a person in

2    2003 whose name you had been told was Terry Green, right?  And

3    it was Katina Fort who told you that this person's name was

4    Terry Green, correct?

5    A.    Yes.

6    Q.    And I noticed in one of the tapes that we heard,

7    specifically, the tape of the fourth phone call, dated June

8    23, 2003, where you were on the telephone speaking, you said

9    at one point "don't worry about that, you doing good business,

10   Terry."  Do you remember that?

11   A.    Right.

12   Q.    And you said Terry because you thought that the name of

13   the person you were dealing with was Terry, right?

14   A.    Right.

15   Q.    Now, obviously we're four years and some months later and

16   just about every question Mr. Calhoun asked you about this

17   person that you knew then as Terry began with Mr. Glawson this

18   or Mr. Glawson that, and you used Mr. Glawson too, right?

19   A.    Right.

20   Q.    And, of course, you're aware no doubt from your

21   conversations with the government that the man sitting over

22   here next to me is named Richard Ben Glawson, right?

23   A.    Right.

24   Q.    Okay.  And Mr. Calhoun also asked you whether anyone had

25   promised you a certain amount -- and those were his words --

1    of reduction in your sentence, and you said, no.  And that's

2    true, no one has told you a specific amount you will get your

3    sentence reduced, right?

4    A.    Right.

5    Q.    But even though that hasn't occurred, you got a 170 month

6    sentence, right?

7    A.    Right.

8    Q.    On two counts, one count of drugs and one gun?

9    A.    Uh-huh.

10   Q.    Yes?

11   A.    Yes.

12   Q.    110 months on the drugs and 70 months on the gun -- or

13   60 months on the gun, for a total of 170 months, right?

14   A.    Right.

15   Q.    And you had other charges that were dismissed, correct,

16   by the government?

17   A.    Yes.

18   Q.    And you knew when you made this deal with the government,

19   because you had a lawyer, and your lawyer and you discussed

20   it, that you were facing the possibility of a life sentence if

21   convicted, right?

22   A.    No.

23   Q.    Have you got your plea agreement there with you?

24   A.    No, I don't.

25   Q.    All right, we'll get one for you.  *(Handing to witness).*

1    Now, I noticed on your plea agreement at the end of it it has

2    your signature, right?  The very last page, page 11?

3    A.    Yes.

4    Q.    Above your signature it says:  "I, James Albertus Jordan,

5    have read this agreement and had this agreement read to me by

6    my attorney, William Paul Christian.  I have discussed this

7    agreement with my attorney, and I fully understand it and

8    agree to its terms."  And then you sign it, right?

9    A.    Right.

10   Q.    And that's true?

11   A.    That's true.

12   Q.    And then he has another paragraph that I won't read that

13   he signed that says:  I explained the whole thing to him, and

14   I think he gets it; he understands what it says.  Is that

15   pretty much what his paragraph says?

16   A.    Yes.

17   Q.    And then each page of the entire 11-page plea agreement,

18   minus the last page where y'all signed, it has your initials

19   and your lawyer's initials on it, right?

20   A.    Right.

21   Q.    Indicating that, in fact, the two of you did read it

22   together and discuss it, right?

23   A.    Right.

24   Q.    Am I right?

25   A.    You're right.

1    Q.   Now, go to page two, paragraph three, subparagraph B

2    toward the bottom of page two.  Are you with me?

3    A.   Uh-huh.

4    Q.   It says that "the defendant fully understands that the

5    defendant's plea of guilty as set forth in subparagraph A

6    above -- and that's the one that says you're pleading to the

7    one count of drugs and one count of guns, right?

8    A.   Right.

9    Q.   -- "will subject defendant on Count One to a minimum

10   mandatory sentence of five years imprisonment, up to a maximum

11   of 40 years imprisonment."  With me?

12   A.   Right.

13   Q.   A maximum fine of $2 million or both, right?

14   A.   Right.

15   Q.   And a term of supervised release of at least four years.

16   And on Count Two -- and Count Two is the gun and possession

17   during a drug crime -- and I'm reading now, again "to a

18   mandatory consecutive sentence --" and you understood that to

19   be mean on top of the drug sentence, right?

20   A.   Right.

21   Q.   "--of at least five years imprisonment, up to a maximum

22   sentence of life imprisonment?"

23   A.   Uh-huh.

24   Q.   Right?

25   A.   Right.

1  Q.   And you read that and signed it and understood it, right?

2  A.   Right.

3  Q.   Okay.  So, when you cut your plea deal, you expected that

4  you would not get a life sentence, you'd get something less

5  than that, right, that's part of the deal?

6  A.   I was going by what the district attorney told me at the

7  time we signed this plea agreement.

8  Q.   Okay, when you say district attorney, you mean the

9  Assistant United States Attorney Charles Calhoun, right here?

10  A.   No, I don't.

11  Q.   District attorney.  Some other prosecuting lawyer?

12  A.   Yes.  Paul Solis, I think is his name.

13  Q.   Michael Solis?

14  A.   Michael Solis.

15  Q.   One of Charles Calhoun's colleagues, another assistant

16  United States attorney?

17  A.   Right.

18  Q.   Well, at any rate a prosecuting attorney for the

19  government was explaining that to you?

20  A.   Right.

21  Q.   Was your lawyer there?

22  A.   Yes, he was.

23  Q.   So you and your lawyer were talking to the government

24  lawyer about all these sentences, and then you understood my

25  question was that by entering your plea right off the bat, you

1  would get rid of the possibility of a life sentence, you were

2  going to get something less than that, right?

3  A.    Right.

4  Q.    In fact, you had some fair idea when you signed the plea

5  agreement and even before you started cooperating with the

6  government what sort of range your sentence could be in,

7  right?

8  A.    Uh-huh.

9  Q.    And it turned out pretty much in that range that you

10  expected -- 170 months is roughly what you thought you were

11  going to get when you entered the plea deal, right?

12  A.    Right.

13  Q.    Well, then, there's that other part of the plea deal

14  where you agree to cooperate with the government.  Are you

15  familiar with that part?

16  A.    Yes.

17  Q.    Over on page six.  And you'll see in that long paragraph

18  on page six some references to some United States Code

19  Sections and some rules under the sentencing guidelines, and

20  I'll use numbers, you tell me, you're familiar with, Section

21  5K1.1, a 5K motion.  Are you familiar with that?

22  A.    Yes.

23  Q.    And then you'll see down there a Rule 35 motion, right?

24  A.    Right.

25  Q.    And you understood -- you read this and understood that

1    those meant these are motions that the government lawyer will

2    file for you after you go out and cooperate and do some drug

3    deals and the gun deal and that sort of thing, right?

4    A.    Right.

5    Q.    And your understanding then, and even today as you sit

6    here and testify is that the judge can take those motions that

7    the government files and reduce your sentence, cut your time

8    off?

9    A.    Right.

10   Q.    Even more than it already got cut off, right?

11   A.    Right.

12   Q.    So you caught a sentence of around 14 years, and after

13   today you'll hope and expect that the government will follow

14   through on that, file a motion or have a motion decided by a

15   judge, that reduces your sentence even further, right?

16   A.    Right.

17   Q.    And when Mr. Calhoun said no certain amount, he just

18   didn't say how much because that's up to judge based on what

19   he tells the judge about how much you helped them, right?

20   A.    Right.

21   Q.    And you said you made some phone calls to this person

22   named Terry.  You got the number from Katina Fort?

23   A.    Yes.

24   Q.    And you didn't already know that number yourself.  She's

25   the one who introduced you, and she's the one that had the

1    phone number, right?

2    A.   Right.

3             MR. HOGUE:   That's all I have, Your Honor.

4             MR. CALHOUN:   Just one question, Your Honor.

5                      REDIRECT EXAMINATION

6    BY MR. CALHOUN:

7    Q.   Mr. Jordan, let me show you 52A again.   What, if

8    anything, did Mr. Glawson do with that firearm before giving

9    it to you?

10   A.   What did he do?

11   Q.   Yes.

12   A.   At the time he didn't do anything except let me know that

13   it was in proper place for me to get it, and I put the money

14   in the ashtray, and it was loaded, though, at the time when I

15   purchased it.

16   Q.   Did you wipe that firearm down?

17   A.   No, I didn't wipe it down.

18   Q.   Do you recall if Mr. Glawson wiped it down?

19   A.   I recall Mr. Glawson did wipe it down.

20   Q.   What did he wipe it down with?

21   A.   He had a rag or something.

22            MR. CALHOUN:   Nothing further, Your Honor.

23            MR. HOGUE:   No questions.

24            THE COURT:   All right, sir, you may go down.

25            THE COURT:   Ladies and gentlemen, we'll stop here

1    for^ here for the day.  We'll resume the trial tomorrow

2    morning at 9 o'clock.  Please be back in your jury room a few

3    minutes before that hour.

4         Let me give you some instructions to govern your

5    conduct as jurors tonight, and these instructions will remain

6    in effect for as long as you are members of this jury, that is

7    to say for the duration of the trial.

8         Don't discuss the case among yourselves outside of the

9    jury room.  Don't discuss the case with other people.  Don't

10   let other people discuss the case with you.  All of the

11   information on which your verdict must be based must come to

12   you only as evidence during the trial and from no other

13   source.

14        I don't know that there will be any media accounts of

15   this trial, but if there are any television broadcasts or

16   radio broadcasts or newspaper stories, I ask you not to read

17   any of those things until the conclusion of the trial.  When

18   the trial is over, you can read all of them.

19        The members of your family will want to know what

20   you're doing at the courthouse.  Tell them that you've been

21   selected to serve on this jury and that you are hearing the

22   trial of this case.  Tell them also that you have been

23   instructed not to discuss the case, and you ask them not to

24   question you about what's going on in the trial, and you

25   refrain from saying anything about what is going on in the

1   trial until the trial is over.

2        When it is concluded, you will be free to discuss the

3   case with anyone to whatever extent you may wish, but until

4   that time, please keep your own counsel.  Do any of counsel

5   have any other instructions or requests to the jury?

6             MR. CALHOUN:  Not by the government, Your Honor.

7             THE COURT:  Mr. Hogue?

8             MR. HOGUE:  No, Your Honor.

9             THE COURT:  All right, you're excused until

10   9 o'clock tomorrow morning.  Leave all of your things in the

11   jury room your notes and notebooks and those booklets.

12   (Jury excused; 4:50 p.m.)

13             THE COURT:  Anything else from the government?

14             MR. CALHOUN:  No, Your Honor.

15             THE COURT:  From the defense?

16             MR. HOGUE:  Yes, Your Honor.  First, just so I can

17   make sure the record is clear about a series of objections

18   I've been making, and I've tried to be consistent about it,

19   but there was testimony from Lieutenant Billy Johnson

20   regarding all of the taped phone conversations, and I may have

21   lost track of each number, but my intention has been -- and

22   I'm not sure if I achieved this yet, so I want to do this now

23   -- to make an objection to each one of the phone conversations

24   that were taped because of the chain of custody issue

25   concerning Whitehead.  Lieutenant Johnson's testimony was all

1   of the phone calls were, in his words, were handled by

2   Whitehead.  So just to clarify the record, I think I may have

3   done it, but I just want to make sure.

4        The second thing is this, Your Honor, the court asked

5   in the presence of the jury that I offer a curative

6   instruction after I made a motion for mistrial at side bar

7   concerning government counsel's comments on a piece of

8   evidence I objected to, which essentially amounted to her

9   recounting what the evidence consisted of, and I refrained

10   from giving the answer to the court's question then that I'll

11   give now because the jury was present, and I didn't think it

12   would be fair to the trial, but I don't have a curative

13   instruction to offer because I don't think any instruction

14   would cure the error, and I didn't want to say that with the

15   jury here in the box, but I say that now, I offer no curative

16   instructions from the defense, I merely stand by the motion

17   for mistrial.

18        THE COURT:  Very good, thank you.  Anything else

19   from anyone?

20        MR. CALHOUN:  Not by the government Your Honor.

21        THE COURT:  All right, we'll be in recess until nine

22   o'clock tomorrow morning.

23   *(JURY TRIAL PROCEEDINGS ADJOURNED OCTOBER 29, 2007)*

24   **I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER THIS 7th DAY OF MAY, 2008.**

25   **S/SALLY L. GRAY, USCR,U.S. DISTRICT COURT, GAMD**