1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF GEORGIA

3                   MACON DIVISION

4          _____

5

6    THE UNITED STATES OF AMERICA,    :
                                      : Case No. 5:05-CR-13(HL)
7    VS                               :
                                      :  October 30, 2007
8                                     :   Macon, Georgia
     RICHARD BEN GLAWSON, DEFENDANT.  :
9    _____    :   Volume II of III

10                 CRIMINAL JURY TRIAL

11        BEFORE THE HONORABLE JUDGE HUGH LAWSON
          UNITED STATES DISTRICT JUDGE, PRESIDING
12
     APPEARANCES:
13
     FOR THE GOVERNMENT:        CHARLES CALHOUN
14                              VERDA COLVIN
                                UNITED STATES ATTORNEY'S OFFICE
15                              P.O. BOX 1702
                                MACON, GA 31202-1702
16
     FOR THE DEFENDANT:         FRANKLIN J. HOGUE
17                              HOGUE & HOGUE, LLP
                                P.O. BOX 1795
18                              MACON, GA 31202

19

20

21

22
     _____
23
                        *SALLY L. GRAY, USCR*
24                        *P.O. BOX 875*
                        *MACON, GA 31202-0875*
25
                        *(478-752-3497)*

<pre>
 1                        INDEX TO PROCEEDINGS

 2                        OCTOBER 30, 2007

 3                        VOLUME II of III

 4
      GOVERNMENT'S WITNESSES:
 5
     MARSHALL HUGHES
 6          DIRECT EXAMINATION BY MR. CALHOUN          5
            CROSS EXAMINATION BY MR. HOGUE             7
 7
     MELONEE EARLY
 8          DIRECT EXAMINATION BY MS. COLVIN          10
            CROSS EXAMINATION BY MR. HOGUE            14
 9
     FALECIA FULLER
10          DIRECT EXAMINATION BY MS. COLVIN          16

11   CHARLES WESTFAUL
            DIRECT EXAMINATION BY MR. CALHOUN         20
12          CROSS EXAMINATION BY MR. HOGUE            26

13   TED DARLEY
            DIRECT EXAMINATION BY MS. COLVIN          28
14          CROSS EXAMINATION BY MR. HOGUE            43

15   CHRIS PATTERSON
            DIRECT EXAMINATION BY MR. CALHOUN         47
16
     WS ROBERTSON
17          DIRECT EXAMINATION BY MR. CALHOUN         49

18   FREDERICK CARD
            DIRECT EXAMINATION BY MR. CALHOUN         59
19          CROSS EXAMINATION BY MR. HOGUE            67

20   AGINA JOHNSON
            DIRECT EXAMINATION BY MR. CALHOUN         68
21
     JANICE CARSWELL
22          DIRECT EXAMINATION BY MS. COLVIN          75

23   JACQUELINE RIDLEY
            DIRECT EXAMINATION BY MS. COLVIN          82
24
     CORA MATTOX
25          DIRECT EXAMINATION BY MR. CALHOUN         87
            CROSS EXAMINATION BY MR. HOGUE            92
</pre>

SEAN STORY
          DIRECT EXAMINATION BY MS. COLVIN              96

LEO FRAZIER
          DIRECT EXAMINATION BY MR. CALHOUN            99
          CROSS EXAMINATION BY MR. HOGUE              103
          REDIRECT EXAMINATION BY MR. CALHOUN        104
          RECROSS EXAMINATION BY MR. HOGUE            105

ROBERT HENDRICKS MCCOMB
          DIRECT EXAMINATION BY MR. CALHOUN           106
          CROSS EXAMINATION BY MR. HOGUE              115

MICHAEL HOLT
DIRECT EXAMINATION BY MR. CALHOUN                      118

BILLY JOHNSON
          DIRECT EXAMINATION BY MR. CALHOUN           122

RANDY COLLINS
          DIRECT EXAMINATION BY MR. CALHOUN           125

DUSTIN COLLINS
          DIRECT EXAMINATION BY MR. COLLINS           128
          CROSS EXAMINATION BY MR. HOGUE              136

JEANNE GIBBS
          DIRECT EXAMINATION BY MS. COLVIN            151
          CROSS EXAMINATION BY MR. HOGUE              155
          REDIRECT EXAMINATION BY MS. COLVIN          158

JAY BAGWELL
          DIRECT EXAMINATION BY MS. COLVIN            161

DEFENDANT'S MOTION RULE 29                             167

CERTIFICATE OF REPORTER                               173

```
 1                  P R O C E E D I N G S
 2   OCTOBER 30, 2007
 3             THE COURT:  Is the government ready to proceed?
 4             MR. CALHOUN:  It is, Your Honor.
 5             THE COURT:  Defense?
 6             MR. HOGUE:  Ready.
 7             THE COURT:  Ask the jury to come in, please.  You
 8   can be getting your next witness, please.
 9             MR. CALHOUN:  Marshall Hughes.
10   (Jury In, 9:20 a.m.)
11             THE COURT:  Good morning, ladies and gentlemen.
12             JURORS:  Good morning.
13             THE COURT:  Everyone is here.  We're ready to begin.
14             DEPUTY CLERK:  Do you solemnly swear that your
15   testimony in this case shall be the truth, the whole truth,
16   and nothing but the truth, so help you God?
17             THE WITNESS:  I do.
18             DEPUTY CLERK:  State your name for the jury, please.
19             THE WITNESS:  Marshall Hughes.
20             DEPUTY CLERK:  Please spell you name, first and
21   last.
22             THE WITNESS:  M-a-r-s-h-a-l-l, H-u-g-h-e-s.
23             MR. CALHOUN:   May I proceed, Your Honor?
24             THE COURT:  Please.
25                        MARSHALL HUGHES
```

```
 1          Witness, having first been duly sworn, testified on

 2                         DIRECT EXAMINATION

 3     BY MR. CALHOUN:

 4     Q.    Mr. Hughes, how are you employed?

 5     A.    I'm self employed.

 6     Q.    In what capacity?

 7     A.    I'm the owner, the owner of three business.

 8     Q.    How were you employed back on July 3rd, 2003?

 9     A.    I was a Bibb County deputy sheriff.

10     Q.    And what were your duties as deputy sheriff during that

11     time frame?

12     A.    I was a patrolman.

13     Q.    What particular area did you patrol?

14     A.    The east side, the north side and east side area.

15     Q.    Macon, Georgia?

16     A.    Macon, Georgia.

17     Q.    Did you know Deputy Joseph Whitehead?

18     A.    Yes, sir, I did.

19     Q.    Drawing your attention to July 3rd, 2003, particularly

20     around 9 p.m., did you receive a call from Deputy Whitehead?

21     A.    Yes, sir.

22     Q.    What, if anything, did Deputy Whitehead tell you?

23     A.    He asked me what area was I working on, and I told I was

24     on the north side and east side area, and he asked me --

25               MR. HOGUE:   Your Honor, I object to the hearsay,
```

1  although I presume it's to explain some actions he's about to

2  take, but it should be limited to what he did in response to

3  the hearsay.

4        MR. CALHOUN:  And that's the purpose for which it's

5  being elicited, Your Honor.

6        THE COURT:  All right, let's move in that direction.

7  BY MR. CALHOUN:

8  Q.   And did he give you a description of the vehicle -- a

9  vehicle?

10 A.   Yes, sir, he did.

11 Q.   And what description did he give to you?

12 A.   A white Chevy pickup truck with an orange bed liner.

13 Q.   Did you have an occasion to see a vehicle matching that

14 description?

15 A.   Yes, sir, I did.

16 Q.   And where was that vehicle when you saw it?

17 A.   It was heading southbound, I-75 southbound.

18 Q.   What did you do once you saw that vehicle?

19 A.   I got behind it and proceeded to pull it over, and I made

20 a traffic stop on Spring Street in the east side of Macon at

21 the gas station -- that's where he pulled over at.

22 Q.   Did you approach the driver of that vehicle?

23 A.   Yes, sir, I did.

24 Q.   Did you ask the driver for registration?

25 A.   Yes, sir.

1    Q.    Do you see the driver of that vehicle in court this

2    morning?

3    A.    Yes, sir, I do.

4    Q.    Would you please point to that individual and tell me

5    what he has on?

6    A.    The young man right here with the blue shirt on.

7              MR. CALHOUN:  Mr. Hooper, can you put up Exhibit 9,

8    please.

9    Q.    Mr. Hughes, I'm going to direct your attention to

10   Exhibit number 9, which is being displayed on the TV screen.

11   Do you recognize that vehicle?

12   A.    Yes, sir.

13   Q.    What do you recognize that to be?

14   A.    That'd be the white pickup truck that I pulled over.

15             MR. CALHOUN:  Thank you, Milton.

16   Q.    Now, did the driver give you a name when you made the

17   traffic stop?

18   A.    Well, on his driver's license his name was Ricky Odom.

19             MR. CALHOUN:  May I have a moment, Your Honor?

20   That's all, Your Honor.

21                        CROSS EXAMINATION

22   BY MR. HOGUE:

23   Q.    Deputy Hughes, when did you leave law enforcement?

24   A.    I resigned January 21st of 2004.

25   Q.    All right, about six months or so after this.  Why did

1  you leave law enforcement?

2  A.   The Lord blessed me to step out on faith and open my own

3  business, and that's what I done.

4  Q.   How long were you in law enforcement?

5  A.   Nine years.

6  Q.   Now, when you make a traffic stop, are you taught to

7  write a report about that?

8  A.   Well, we make a traffic stop, I wrote a citation, a

9  warning to Mr. Odom at that time.  We don't have to write a

10  actual report about making a traffic stop unless we arrest the

11  person or whatever.

12  Q.   So in this case you wrote no report about what you're

13  testifying about today, four years later?

14  A.   No report.  Only thing I wrote was a warning citation.

15  Q.   All right, and your patrol car was a marked Bibb County

16  patrol car?

17  A.   Yes, sir.

18  Q.   Equipped with a video camera?

19  A.   Yes, sir.

20  Q.   That you can manually operate or that can come on

21  automatically when you turn on the blue lights?

22  A.   Yeah, the lights come on automatically when you turn the

23  blue lights on.

24  Q.   And that video camera would videotape whatever vehicle

25  you're pulling over, right?

```
 1    A.    Yes, sir.

 2    Q.    Including the occupant?

 3    A.    Yes, sir.

 4    Q.    Do you have that videotape to show us?

 5    A.    No, sir.

 6    Q.    Do you know what happened to it?

 7    A.    Once I resigned, sir, I don't know what they did with all

 8    the video equipment that was in my vehicle, I don't know.

 9    Q.    And since July 3rd, 2003, some four-plus years ago,

10    you've not been asked at any prior occasion to pick out the

11    person you pulled over, say, in a photo lineup or anywhere

12    else, have you?

13    A.    No, sir, I haven't.

14    Q.    Except here today just a minutes ago?

15    A.    Yes, sir.

16              MR. HOGUE:  All right, nothing further.

17              THE COURT:  Anything else?

18              MR. CALHOUN:  One moment, Your Honor.  Nothing

19    further, Your Honor.

20              THE COURT:  You may go down.

21              MS. COLVIN:  Your Honor, at this time the government

22    would call Melonee Early.

23              DEPUTY CLERK:  Do you solemnly swear that your

24    testimony in this case shall be the truth, the whole truth,

25    and nothing but the truth, so help you God?
```

```
 1                     THE WITNESS:  Yes.

 2                     DEPUTY CLERK:  State your name for the jury,

 3      please.

 4                     THE WITNESS:  Melonee Early.

 5                     DEPUTY CLERK:  Please Spell your name, first and

 6      last.

 7                     THE WITNESS:  M-e-l-o-n-e-e, E-a-r-l-y.

 8                              MELONEE EARLY

 9        Witness, having first been duly sworn, testified on

10                          DIRECT EXAMINATION

11      BY MS. COLVIN:

12      Q.    Ms. Early, do you reside in the state of Georgia?

13      A.    No.

14      Q.    Where do you reside?

15      A.    Miami, Florida.

16      Q.    And are you here today subject to a subpoena?

17      A.    Yes.

18      Q.    Let me ask you, Ms. Early, at some point did you meet a

19      person who was identified to you as Terry Glawson?

20      A.    Yes.

21      Q.    Could you please relate to the jury when you met this

22      person?

23      A.    Early 90's.

24      Q.    Okay.  Do you see that person in the courtroom today?

25      A.    Kind of, sort of.  I think so.  I'm trying to see --
```

1   yeah, I guess.

2   Q.   Okay, tell me how that person looked back then in the

3   early 90's?

4   A.   Real big, real big guy.

5   Q.   And when was the last time you've seen him?

6   A.   2003.

7   Q.   And what was the occasion then?

8        MR. HOGUE:   I'm sorry, I didn't hear the last

9   answer.

10        MS. COLVIN:   2003.

11        MR. HOGUE:   2003, okay.

12   BY MS. COLVIN:

13   Q.   I think the jury is having a hard time hearing you, so if

14   you can make sure this microphone is right in front of you.

15   And Mr. Hogue had a hard time hearing you as well.   Let me ask

16   you, the last question again:   When was the last time you

17   remember seeing the defendant?

18   A.   I think it was 2003.

19   Q.   And in 2003, what was that occasion?

20   A.   No, it was 2004.   It was 2004, the death of my dad.

21   Q.   And how is it that you saw him again then?

22   A.   I asked him to come sing for me at my dad's funeral.

23   Q.   Now, can you tell the jury how it was that you came to

24   meet him in the early 90's?

25   A.   Through a boyfriend's daughter.

1    Q.   And did you develop a friendship with him after that, in

2    the early 90's?

3    A.   Yes.

4    Q.   And did you continue to know him throughout that time

5    period?

6    A.   Yes.

7    Q.   Did it ever come a time when there was a vehicle in

8    question that he assisted you in looking into?

9    A.   Yes.

10   Q.   Could you tell the jury what type of vehicle that was?

11   A.   A truck.

12   Q.   What color was it?

13   A.   At that time I believe it was white.

14   Q.   Do you remember the make of the vehicle?

15   A.   I'm not good with that kind of stuff.

16   Q.   I'm sorry?

17   A.   I'm not good with that kind of stuff.  Just a car or

18   truck, that's it.

19   Q.   It was a truck?  And could you explain to the jury the

20   circumstances surrounding you becoming involved with the

21   truck.  Did you buy the truck?

22   A.   Yes.

23   Q.   And could you explain his involvement with the purchase

24   of the truck?

25   A.   I didn't like it, so I gave it to him.

 1   Q.   Now, did he actually help you with the purchase of the

 2   truck?

 3   A.   No, I can't say he did, and I didn't really charge him

 4   for it because he had helped me with other things so many

 5   times, so I didn't sell it to him, I just gave it to him.

 6   Q.   And at some point when you had possession of the truck,

 7   did you, in fact, have it registered in your name?

 8   A.   Yeah.

 9   Q.   And you said you gave that to him?

10   A.   Uh-huh.

11   Q.   Do you remember when that was?

12   A.   No, honestly I don't.

13   Q.   Was it before 2003?

14   A.   Yes.

15   Q.   Let me show you what's been introduced into evidence as

16   exhibit number nine.  Does that truck resemble the truck that

17   you've testified to about today in court?

18   A.   Looks like it.

19        MS. COLVIN:   Thank you, Milton.

20   Q.   Just one moment.  Ms. Early, let me show what's been

21   marked as government exhibit number 39 for the purpose of

22   identification.  Do you recognize the person in the

23   photograph?

24   A.   Terry.

25   Q.   The person who you've identified as Terry Glawson?

1  A.    Uh-huh.

2          MS. COLVIN:  Your Honor, at this time the government

3  would seek to introduce what's been marked as government

4  exhibit number 39.

5          MR. HOGUE:  Your Honor, I object.  The basis for my

6  objection is this photo has not been authenticated by anyone

7  as to when it was made.  Just because she could look at it and

8  say it's him doesn't make it relevant or admissible.

9          THE COURT:  Well, you've jumped from one ground for

10  an objection to another.  First of all, you said it hadn't

11  been authenticated, and then you said it wasn't relevant or

12  admissible.

13          MR. HOGUE:  I object on all the grounds.  Those are

14  all the bases.

15          THE COURT:  They're all overruled.  It is admitted.

16  What number is that?

17          MS. COLVIN:  Number 39, Your Honor.

18          THE COURT:  All right, 39 is admitted.

19          MS. COLVIN:  Thank you.  That's all I have, Ms.

20  Early.  Mr. Hogue may have some questions so you have to

21  remain for a moment.

22          MR. HOGUE:  One moment, Your Honor.

23                    CROSS EXAMINATION

24  BY MR. HOGUE:

25  Q.   Ms. Early, you were located and called or interviewed or

1   someone came to visit you about this case, what, just a week

2   or two ago?

3   A.   I received a subpoena.   That's it.

4   Q.   Pardon me?   I still can't hear you, ma'am.

5   A.   I received a subpoena.

6   Q.   Okay.   When?

7   A.   Last week.

8   Q.   Last week.   And that's the first contact you had about

9   this case since 2003?

10  A.   Yes, it is.

11  Q.   And then someone talked to you about it and asked you

12  some questions like the ones you've been asked here today?

13  A.   Yes.

14  Q.   Showed you some pictures?

15  A.   No.

16  Q.   No.   So this is the first time you saw the picture of the

17  truck?

18  A.   Yes.

19  Q.   Just a few minutes ago.   All right, nothing further.

20          THE COURT:   Anything else?

21          MS. COLVIN:   Yes, Your Honor, that's it for this

22  witness.

23          THE COURT:   All right, you may go down.

24          MS. COLVIN:   Your Honor, our next witness is Felicia

25  Fuller.

1           DEPUTY CLERK:  Do you solemnly swear that your

2    testimony in this case shall be the truth, the whole truth,

3    and nothing but the truth, so help you God?

4           THE WITNESS:  Yes.

5           DEPUTY CLERK:  State your name for the jury, please.

6           THE WITNESS:  Falecia Michelle Fuller.

7           DEPUTY CLERK:  Would you please spell your name,

8    first and last.

9           THE WITNESS:  F-a-l-e-c-i-a, F-u-l-l-e-r.

10                        **FALECIA FULLER**

11      Witness, having first been duly sworn, testified on

12                      DIRECT EXAMINATION

13   BY MS. COLVIN:

14   Q.   Good morning, Ms. Fuller.

15   A.   Good morning.

16   Q.   Let me ask you, do you have a daughter?

17   A.   Yes, I do.

18   Q.   And what is her name?

19   A.   Bionca.

20   Q.   What's her last name?

21   A.   Glawson.

22   Q.   Okay.  They can't hear you.

23           THE COURT:  Sit up, please, and put your mouth close

24   to the microphone.

25           MS. COLVIN:  The jury has to hear you -- Mr.

```
 1 | Hogue -- and she's recording what you say.
 2 | BY MS. COLVIN:
 3 | Q.   I'll ask that question again, Ms. Fuller:  Do you have a
 4 | daughter?
 5 | A.   Yes, I do.
 6 | Q.   And what is her name?
 7 | A.   Bionca Glawson.
 8 | Q.   And who is her father?
 9 | A.   Kerry Glawson.
10 | Q.   Do you recognize the person in this courtroom who you
11 | know to be Kerry Glawson?
12 | A.   Yes, I do.
13 | Q.   Could you please relate for the jury and the court as
14 | well as for the record a description of that person and where
15 | he is seated?
16 | A.   Right over there, to my right.
17 | Q.   What color does he have on?
18 | A.   Blue.
19 |      MS. COLVIN:  Let the record reflect the witness has
20 | identified the defendant in this case, Richard Ben Glawson, as
21 | being the person you knew, Terry -- excuse me, Kerry Glawson.
22 | Q.   How did you spell that Kerry?
23 | A.   I think it was K E R R Y.
24 | Q.   When did you first meet the person that you knew to be
25 | Kerry Glawson?
```

```
1    A.    We used to work together.

2    Q.    Do you remember what year?

3    A.    No, not really.

4    Q.    How old is Bionca now?

5    A.    She's seven.

6    Q.    And during the year of 2003, did the person that you knew

7    to be Kerry Glawson, who you've identified as the defendant in

8    this case, exercise any regular visitation with your daughter,

9    Bionca?

10   A.    No.  He could see her whenever he wanted to.

11   Q.    And would you allow him to pick her up on occasions?

12   A.    Yes.

13   Q.    And would she have been with him during those time frames

14   when he picked her up?

15   A.    Yeah.

16   Q.    Did he have her with him?

17   A.    With him?

18   Q.    Yes, was he the person who came to pick her up?

19   A.    Yes, either him or his mom or his sister.

20   Q.    Just one moment.  Ms. Fuller, did you ever come to learn

21   of another name -- did you ever know any other name for Kerry

22   Glawson before I contacted you, anyone with the U.S.

23   Attorney's Office?

24   A.    Yes, I did.

25   Q.    Okay, when -- what name did you know him by outside of
```

1    Kerry Glawson?

2    A.    Richard.

3    Q.    And when did you learn that name?

4    A.    One time -- I guess, when he had got in trouble once

5    before.

6    Q.    Without going into that, what name did you put on your

7    daughter's birth certificate?

8    A.    Kerry.

9    Q.    And why did you put Kerry Glawson?

10   A.    That's his name.

11   Q.    That was the name --

12   A.    That's what he told me, yeah.

13   Q.    Thank you.  That's all I have.

14            MR. HOGUE:  No questions, Your Honor.

15            THE COURT:  Anything else for this witness?

16            MS. COLVIN:  Nothing further from the government,

17   Your Honor.  May she be excused?

18            THE COURT:  Yes.

19            MR. CALHOUN:  Your Honor, the government next calls

20   Chris Westfaul.

21            DEPUTY CLERK:  Do you solemnly swear that your

22   testimony in this case shall be the truth, the whole truth,

23   and nothing but the truth, so help you God?

24            THE WITNESS:  I do.

25            DEPUTY CLERK:  State your name for the jury, please.

1              THE WITNESS:  Charles Westfaul.

2              DEPUTY CLERK:  Please spell your name, first and

3     last.

4              THE WITNESS:  C-h-a-r-l-e-s.  Westfaul,

5     W-e-s-t-f-a-u-l.

6                        **CHARLES WESTFAUL**

7       Witness, having first been duly sworn, testified on

8                        DIRECT EXAMINATION

9     BY MR. CALHOUN:

10    Q.   Mr. Westfaul, what city do you currently live in?

11    A.   Fort Valley.

12    Q.   How long have you lived in Fort Valley?

13    A.   About six years.

14    Q.   And where do you currently work?

15    A.   Blue Bird.

16    Q.   Now, Mr. Westfaul, do you have any prior felony

17    convictions within the last ten years?  Ever been in trouble

18    with the law in the last ten years?

19    A.   I have, but I don't think it's been a felony.  Driving on

20    a suspended license.

21    Q.   Anything besides that?

22    A.   I think possession of marijuana.

23    Q.   When were you arrested on your possession of marijuana

24    charge?  What year was that?

25    A.   Probably 2002, 2003.

1   Q.   Okay.  And were those charges resolved, or were they

2   dropped, or did you go to court?  What was the situation?

3   A.   They were resolved.

4   Q.   You never went to court on them?

5   A.   No, sir.

6   Q.   Do you know, or are you familiar with a subject known as

7   Terry Green?

8   A.   Terry Green?

9   Q.   Yeah.

10   A.   I don't recognize that name.

11   Q.   How about Richard Glawson?

12   A.   I do that.

13   Q.   And I want you to look around the courtroom and see if

14   you see Richard Glawson in court this morning.

15   A.   Yes, sir.

16   Q.   And where is he?  Point to him and describe what he has

17   on.

18   A.   Right there.  He's got that blue shirt on.

19   Q.   Now, how long have you known this person you've

20   identified as Richard Glawson -- how many years?

21   A.   I would say less than a year.  I'd say probably six

22   months.

23   Q.   Now, where were you -- you said you've known him for six

24   months?

25   A.   I'd known him about six months total time that I had

1  known him.

2  Q.   What year did you first meet him?

3  A.   I would say probably 2003.

4  Q.   And where were you working at the time that you met him?

5  A.   Peach Auto Painting and Collision.

6  Q.   And what was your job at Peach Auto?

7  A.   Assistant manager.

8  Q.   As part of assistant manager, did you also paint cars out

9  there?

10  A.   Yes, sir, I did.

11  Q.   Now, did you actually meet Mr. Glawson at the paint shop?

12  A.   Yes, sir.

13  Q.   Do you recall what Mr. Glawson was driving when you met

14  him at the paint shop?

15  A.   What was he driving?

16  Q.   Yes, sir.

17  A.   It was a -- I believe it was a orange truck, or it was --

18  I can't remember if it was orange or white.  I want to say it

19  was orange.  But it had a bed liner in it that was really

20  messed up, one of them sprayable bed liners.

21  Q.   And why do you say it was messed up?

22  A.   Because it was all over the side of the bed.

23  Q.   And what color was that bed liner?

24  A.   Orange.

25  Q.   Now, did you perform any work on that truck?

1  A.   Yes, sir, I did.

2  Q.   What did you do?

3  A.   I painted it black.

4  Q.   What year did you paint it?

5  A.   That same year.  I'm saying about that same -- about

6  2003.  I'm not quite sure, you know, you know what I'm saying.

7  Q.   Okay.

8          MR. CALHOUN:  Can you put up exhibit number nine,

9  Milton.

10 Q.   Mr. Westfaul, drawing your attention to the TV screen,

11 exhibit number 9, I want you to look at that truck and see if

12 you recognize it.

13 A.   Yes, I do.

14 Q.   What do you recognize that to be?

15 A.   As his truck.

16 Q.   When you say his truck, who are you talking about?

17 A.   Mr. Glawson.

18 Q.   Now, you mentioned a moment ago in response to one of my

19 questions what color the truck was when you first saw it, and

20 you said black; is that correct?

21 A.   Well, I said it was -- I want to say it was like orange,

22 but I remember that orange bed liner that was in it coming

23 over the side.  See it over the bed right there?  It's got a

24 hint of that orange on it.

25 Q.   Mr. Westfaul, drawing your attention to November 30th,

1   thereabouts, of 2004, did you meet with Officer Ted Darley?

2   A.   Yes, sir, I did.

3   Q.   What was the purpose of that meeting?

4   A.   The purpose of that meeting was to get a buy.

5   Q.   Get a buy from whom?

6   A.   I mean -- how am I say --  purpose of that was to make

7   contact with Mr. Glawson.

8   Q.   And why were you going to make contact with Mr. Glawson,

9   for what purpose?

10  A.   To obtain marijuana.

11  Q.   And how much marijuana were you suppose to obtain from

12  Mr. Glawson?

13  A.   Four ounces.

14  Q.   And did you make a phone call to Mr. Glawson?

15  A.   I did.

16  Q.   And who had provided you with that phone number?

17  A.   Who provided me with the phone number?

18  Q.   Yes, sir.

19  A.   Mr. Glawson.

20  Q.   Were you able to talk to Mr. Glawson on November 30th,

21  2004?

22  A.   I was.

23  Q.   And do you recall what you discussed with him?

24  A.   That I needed him to drop off four ounces.

25  Q.   And what did Mr. Glawson say in response to your request

1  to drop off four ounces of marijuana?

2  A.   Basically, I'll be there in a little while.

3  Q.   And was Officer Darley present during that phone call?

4  A.   He was.

5  Q.   Now, did you actually meet with Mr. Glawson later that

6  day?

7  A.   What do you mean later that day?

8  Q.   After you made the phone, did you actually meet with

9  Mr. Glawson?

10  A.   No, I didn't meet with him.

11  Q.   So only thing you did was just made the phone call?

12  A.   Yes, sir.

13  Q.   Do you know whether or not that phone call was recorded?

14  A.   No, sir, I have no knowledge of that.

15       MR. CALHOUN:  Milton could you put up exhibit number

16  42, please.

17  Q.   Mr. Westfaul, look at exhibit number 42 displayed on the

18  screen, do you recognize that location?

19  A.   Peach Auto Painting and Collision.  That's the new shop

20  they have now.  That's -- it used to be Peach Auto and

21  Collision when I took over, they put that paint job on it

22  outside the building.

23  Q.   Is that the location where you met Mr. Glawson?

24  A.   Yes, sir, it is.

25  Q.   Is that location where you painted his truck?

1    A.   Yes, sir, it is.

2              MR. CALHOUN:   Nothing further, Your Honor.

3                        CROSS EXAMINATION

4    BY MR. HOGUE:

5    Q.   Mr. Westfaul, I'm not sure I understand your answers to

6    Mr. Calhoun's initial questions concerning your felonies in

7    the past ten years.  I think you told him, no, only

8    misdemeanors.  Is that what I heard?  Is that right?

9    A.   Yes, sir.

10   Q.   Okay, so the marijuana possession case in 2002 was a

11   misdemeanor case?

12   A.   Yes, sir, I believe it was.

13   Q.   You're not sure?

14   A.   Possession less than an ounce, I believe that is a

15   misdemeanor.

16   Q.   All right, and when you said it was resolved, you meant

17   you pled guilty to it or it got dismissed?

18   A.   Pled guilty.

19   Q.   All right, well, then, jump ahead to 2003 -- or rather

20   2004.  Ted Darley was then and is now and will presumably be a

21   witness in this case, a Bibb County deputy or a law

22   enforcement officer.  You knew him to be that when you met

23   with him in 2004?

24   A.   Yes, sir.

25   Q.   So at the time you were meeting with Ted Darley in 2004

1   to make a marijuana buy, had you recently been arrested and

2   had been in some kind of trouble and that's how you got hooked

3   up with Mr. Darley?

4   A.   Had I recently been arrested?

5   Q.   Yeah, I'm trying to figure out why it is you're hooked up

6   with Ted Darley to call anybody about buying marijuana.  Is it

7   because you had gotten in trouble, and it was made plain to

8   you, well, here's one way you can get out of trouble, set up a

9   buy for us?

10  A.   Yes, it is.

11  Q.   So that's what -- the picture?  That's what was going on?

12  A.   Basically, yes.

13  Q.   And as a result of your cooperation with Mr. Darley, your

14  illegal troubles disappeared?

15  A.   As far as to my knowledge.

16  Q.   You're not under any case right now; that all went away?

17  A.   So far, yes.

18  Q.   All right.  "So far" meaning depends on something else?

19  A.   I mean, I haven't seen it.  What I'm saying is I haven't

20  seen anything or heard anything about it.

21  Q.   Since '04?

22  A.   Yes, sir.

23  Q.   All right, that's clear.  Now, the phone call that you

24  made for Darley, did you -- you said you got that number from

25  Glawson, did you give that number to Darley?

1    A.    No, I did not.

2    Q.    And you made the call yourself?

3    A.    Yes, sir, I did.

4    Q.    So, so far as you know, law enforcement did not get that

5    phone number from you, keep it, and do anything with it to

6    trace it or any of that, you don't know anything about that?

7    A.    Not to my knowledge.

8    Q.    All right.  That's all I have.

9              MR. CALHOUN:  No redirect, Your Honor.

10              THE COURT:  All right, sir, you may go down.

11              MS. COLVIN:  Your Honor, at this time the government

12    would call Ted Darley.

13              DEPUTY CLERK:  Do you solemnly swear that your

14    testimony in this case shall be the truth, the whole truth,

15    and nothing but the truth, so help you God?

16              THE WITNESS:  Yes, ma'am, I do.

17              DEPUTY CLERK:  State your name for the jury, please.

18              THE WITNESS:  Ted Darley.

19              DEPUTY CLERK:  Please spell your name, first and

20    last.

21              THE WITNESS:  Ted, Ted, Darley, D-a-r-l-e-y.

22                             **TED DARLEY**

23       Witness, having first been duly sworn, testified on

24                          DIRECT EXAMINATION

25    BY MS. COLVIN:

1    Q.    Mr. Darley, where are you employed?

2    A.    I'm employed with the Bibb County Sheriff's Department.

3    Q.    And how long have you been in their employment?

4    A.    For about the past seven years.

5    Q.    And what are your current duties?

6    A.    I'm working with the warrant division with the Bibb

7    County Sheriff Department.

8    Q.    And back in 2003, what was your position then?

9    A.    I was assigned to the Middle Georgia Drug Task Force.

10   Q.    And being assigned to the Drug Task Force, what were your

11   duties on a daily basis?

12   A.    To work undercover drug operations and also search

13   warrants, marijuana ratifications, meth labs, anything

14   pertaining to drugs.

15   Q.    Mr. Darley, in 2003, did you have an occasion on

16   November 30th -- excuse me, November 30th, 2004, did you have

17   an occasion to conduct an investigation regarding the sale of

18   marijuana and a subject who you came to know as Terry --

19   excuse me, Ricky?

20   A.    Yes, ma'am.

21   Q.    Could you please relate to the jury how you became

22   involved with that November 30th, 2004 incident?

23   A.    Yes, ma'am.  On November 30th, 2004, I had received

24   information from a reliable confidential informant that he

25   could call a Mr. Odom and order up a quantity of marijuana,

```
 1    and in a short time the marijuana would be delivered.  So

 2    after talking with the informant, he placed --

 3              MR. HOGUE:  Your Honor, I'm going to have to object

 4    to the hearsay and ask that it be stricken and it not be

 5    considered.  He's telling us what a out-of-court declarant

 6    told him.

 7              THE COURT:  You can't do that.  The jury should

 8    disregard that.

 9    BY MS. COLVIN:

10    Q.   Mr. Darley, did you deal with a person by the name of the

11    Christopher Wesfaul?

12    A.   Yes, ma'am, I did.

13    Q.   Is that the confidential informant that you're speaking

14    of?

15    A.   Yes, ma'am, it is.

16    Q.   Based upon your conversation with the confidential

17    informant, did you instruct him to do anything?

18    A.   He said he could call and order up marijuana, and I told

19    him to go ahead and place the call.

20              MR. HOGUE:  Again, I'm going to object to the

21    hearsay.

22              THE COURT:  Don't repeat anything that anybody else

23    says to you.

24              THE WITNESS:  Yes, sir.

25              THE COURT:  If she asks you what somebody else says
```

1   to you, just don't answer the question.

2             THE WITNESS:  Yes, sir.

3             THE COURT:  And don't ask him those questions.

4             MS. COLVIN:  I won't ask him, Your Honor.

5             THE COURT:  Simple enough.  All right.

6   BY MS. COLVIN:

7   Q.   Mr. Darley, based upon the fact that you inquired whether

8   he could make a buy, did that actually occur?  Did he make a

9   call?  Were you present when a telephone call was made?

10  A.   I was.

11  Q.   And based upon that telephone call, what did you do?

12  A.   I had some people in line, and we waited on this Ricky

13  Odom person to show up.  This person showed up in a Cadillac.

14  Q.   Let me ask you, the names that you were given by the

15  confidential informant, namely Mr. Wesfaul, did he tell you at

16  that time what the person's name was?

17            MR. HOGUE:  Your Honor, I object to the hearsay

18  question.

19            MS. COLVIN:  I'm not going to go into what he said.

20            MR. HOGUE:  I think the answer would have to be what

21  he said.

22            THE COURT:  It would not.  The answer could be yes

23  or no.

24            MR. HOGUE:  Well, I think, if I heard her, I think

25  the government's question was:  Did the informer tell you the

1   name Ricky Odum?  Now, if he says yes to that --

2            THE COURT:  I thought she said:  Did he tell you the

3   name of the informant?  Did I misunderstand?

4            MS. COLVIN:  You're right, Your Honor.  I asked:

5   Did he tell you the name of the person who would be coming to

6   make the delivery?

7            THE COURT:  You're hearing too much, Mr. Hogue.

8            MR. HOGUE:  All right, so if I understand -- I

9   thought I heard her say Ricky Odom, but I'll wait because I

10  think it's coming again.

11           THE COURT:  Get ready.  All right, let's go forward.

12  BY MS. COLVIN:

13  Q.   Mr. Darley, who was the person that you were expecting to

14  come to the scene, or did you have a name?

15  A.   I was told Odom.  That was all.

16           MR. HOGUE:  Your Honor, I object to the hearsay.

17           THE COURT:  What's the difference there?

18           MS. COLVIN:  Your Honor, I'm trying to establish his

19  expectation when he went to the area where the actual alleged

20  narcotics that we expect to prove were shown, but I will move

21  forward.

22           THE COURT:  Well, that really doesn't meet the basis

23  of the objection.  You know, we go through all this stuff

24  about hearsay, you say you understand, I understand, and then

25  you ask him a question that calls for a hearsay answer.

1    That's makes it kind of hard to deal with.

2              MS. COLVIN:  Well, Your Honor, I'll move on to the

3    actual takedown.

4              THE COURT:  Okay.

5    BY MS. COLVIN:

6    Q.   In reference to the information that you received, where

7    did you travel?

8    A.   I was actually inside Peach Automotive Body Shop.  I

9    think it's at 883 Key Street in Macon, Georgia.  It's across

10   from Georgia Power.  I was actually inside the body shop

11   office with Mr. Wesfaul when the suspect drove up in a

12   Cadillac who had a small female toddler child in the car with

13   him.

14   Q.   Let me show you what's been introduced into evidence as

15   exhibit number 42.  Do you recognize that particular

16   photograph?

17   A.   Yes, ma'am.  That's the same building, but it's been

18   repainted and a different type name and thing on there, but

19   it's the same building.

20   Q.   And when you said you saw a person drive up in a

21   Cadillac, could you please tell the jury where -- looking at

22   that photograph -- the Cadillac drove to?

23   A.   It's kind of hard to see it.  If you'll notice from where

24   I'm sitting to your left-hand side is a bush, that is the

25   office on the other side of that.  The Cadillac pulled right

1   up to that far left corner, and I was inside the office with

2   the informant.

3   Q.   Now, were there other persons located in that vicinity,

4   namely law enforcement officers?

5   A.   Oh, yes, ma'am.  We had several law enforcement people in

6   two or three different vehicles that was instructed as soon I

7   gave the go ahead to contain the vehicle, the only vehicle

8   that pulled up to the front left of that building and contain

9   that vehicle.

10  Q.   And was that done?

11  A.   Yes, ma'am, it was.

12  Q.   What did you do after giving that command?

13  A.   I went out after the takedown began and instructed the

14  informant to stay back in the office and to lock the door.

15  Once I got out, the defendant did not want to exit the car

16  right off from the beginning, but eventually he got out, and

17  he was taken into custody.

18  Q.   And do you see that person in the courtroom who was in

19  that car who you asked to exit the vehicle?

20  A.   Yes, ma'am, I do.

21  Q.   Could you please describe for the record and identify for

22  the jury who that person is in the courtroom?

23  A.   That defendant right there is Richard Ben Glawson.  He

24  was a lot heavier at the time, but that's definitely him.

25  Q.   And what is he wearing currently, today?

1   A.   He's wearing blue shirt and blue pants.

2          MS. COLVIN:   Let the record reflect the witness has

3   identified the defendant, Richard Ben Glawson.

4   Q.   Now, after you asked him to exit that vehicle and he was

5   placed under arrest, what happened next?

6   A.   He told me that he only had --

7          MR. HOGUE:   Your Honor, I'm going to object to this

8   now.   We've not had any sort of Jackson Deno hearing at all.

9          MS. COLVIN:   Mr. Darley -- I'll move on, Your Honor.

10  I agree with Mr. Hogue.

11         THE COURT:   Very good.

12  BY MS. COLVIN:

13  Q.   Without going into any statements made by the defendant,

14  what did you do?   Did you get identification?

15  A.   Yes, ma'am, I did.

16  Q.   And what type of identification did you receive?

17  A.   Georgia drivers license.

18  Q.   And what was the name on the Georgia drivers license?

19  A.   Ricky Odom.

20  Q.   And how did you actually get this identification?   Who

21  gave it to you?

22  A.   The defendant did.

23  Q.   Let me show you what's been marked as government's

24  exhibit number 58 for the purpose of identification.   Do you

25  recognize that?

1   A.   Yes, ma'am.

2   Q.   And what is that?

3   A.   That's the drivers license that Richard Ben Glawson gave

4   me saying that he was Ricky Odom.

5        MS. COLVIN:  Your Honor, if we may publish.  We'd

6   like to introduce this into evidence.

7        MR. HOGUE:  I'm sorry, Judge, may I see it?

8        MS. COLVIN:  It's the same one I showed earlier.

9        MR. HOGUE:  Your Honor, I'll object to the

10  admissibility of this item because it's contained in an

11  evidence bag sealed by some other person whose name is not Ted

12  Darley and hasn't testified at all yet in this case.  So I

13  object to this evidence having been authenticated as the

14  evidence that this witness is now testifying about since it's

15  in this bag with somebody else's name on it.

16        THE COURT:  Go ahead.

17        MS. COLVIN:  Your Honor, prior to his objection, I

18  informed Mr. Hogue, and I have no problem with doing this, we

19  can remove the drivers license from the bag and just put the

20  exhibit number on the drivers license itself.

21        MR. HOGUE:  Well, it's not the bag I'm objecting

22  to.  It's the chain of custody of the item that's in the bag,

23  and the bag indicates that there's some other person involved

24  in the custody of this item that they purport to be original

25  evidence, unique evidence.

1          THE COURT:  Well, I don't think that you are

2     required to establish a chain of custody for a document like

3     that if the witness can identify it as the same document that

4     he took from the person from whom he got it.

5          MR. HOGUE:   I --

6          THE COURT:  You disagree with that, I understand.   I

7     disagree with you.

8          MR. HOGUE:  No, I don't disagree with what the court

9     just said, but that's not exactly what my objection was.

10         THE COURT:  Well, I sorry, I misunderstood.

11         MR. HOGUE:  Well, it's similar.  I'm objecting to

12    this item as it's been presented to this witness who can't

13    tell from it based on the bag it's in, I assume.

14         THE COURT:  Can you see the object inside the bag?

15         MR. HOGUE:  Yes, I can.

16         THE COURT:  Is there any question about -- do you

17    think it would look any different if it were outside the bag?

18         MR. HOGUE:  No.

19         THE COURT:  What's -- let's see, you -

20         MR. HOGUE:  This is how it's been tendered.

21         THE COURT:  I understand, and she said she'd take it

22    out the bag, and you said that was unnecessary.

23         MR. HOGUE:  Oh, no, let the government take it out

24    of the bag and seek to introduce it that way.  But what the

25    bag is telling me is there's some other person who's

```
 1    maintained this item and can vouch for whether it is the thing
 2    collected that day, and it's not this witness.
 3              THE COURT:  All right, remove the exhibit from the
 4    bag.  You can't get it open?
 5              MS. HATCHER:  Yes, it requires scissors.
 6              MS. COLVIN:  Thank you.
 7    BY MS. COLVIN:
 8    Q.   Let me again show you what the government has remarked as
 9    government's exhibit number 58.  Can do you recognize that?
10    A.   Yes, ma'am.
11    Q.   And could you tell the jury what that is?  Did you get
12    that from the person who you've identified as the defendant in
13    this case?
14    A.   I did.
15    Q.   And did you keep that for purposes of --
16    A.   Yes, ma'am.
17              MS. COLVIN:  Your Honor, at this time the government
18    would seek to introduce what's been marked as government
19    exhibit number 58.
20              MR. HOGUE:  I stand by the objection I previously
21    made.
22              THE COURT:  All right, 58 is admitted.
23              MS. COLVIN:  Thank you Your Honor.  May we publish?
24              THE COURT:  Yes.
25    BY MS. COLVIN:
```

1    Q.    After receiving identification from the defendant, did

2    you conduct a search of the vehicle?

3    A.    Yes, ma'am, I did.

4    Q.    And what was your purpose of conducting that search?

5    A.    The defendant was the one that was going to bring the

6    marijuana, he fit the description, he fit the time frame, and

7    once he arrived -- and I don't want to get in trouble, but I

8    spoke to the defendant, and defendant --

9    Q.    Without going into anything the defendant said, did you

10   search the vehicle?

11   A.    Yes, I did.

12   Q.    And what did you find?

13   A.    On the backseat I found four, one-ounce bags of marijuana

14   inside a yellow shopping bag.

15   Q.    Let me show you what I have marked as government's

16   exhibits 40, 41, 43, and 44.  Could you take a moment to look

17   at each of those?

18   A.    Yes, ma'am.  I recognize these pictures.

19   Q.    Okay, looking at exhibit number 40, does this -- what

20   does that display?

21   A.    That's the yellow shopping bag with the four, one-ounce

22   individually bagged of marijuana.

23            MR. HOGUE:  Your Honor, it's not in evidence yet.

24            THE COURT:  Just a moment.

25            MR. HOGUE:  It's not in evidence yet.  The question

```
 1    is:  Do you recognize -- not what is this -- what does it
 2    depict.
 3    BY MS. COLVIN:
 4    Q.    Do you recognize this photo?
 5    A.    I do.
 6    Q.    Does it accurately reflect what you've testified to thus
 7    far in this trial as to what you found in the vehicle?
 8    A.    It does.
 9    Q.    Regarding government exhibit number 41, does this
10    accurately reflect the items you found in the vehicle at the
11    time of the search?
12    A.    It does.
13    Q.    Number 43, does this accurately reflect what you found
14    when you went outside of that establishment to approach the
15    person that you've identified in this trial today?
16    A.    Yes, ma'am, it does.
17    Q.    Government exhibit number 44, does this accurately
18    reflect the back of government exhibit 43, which you found
19    when you went outside that business establishment on
20    November 30th, 2004?
21    A.    It does.
22          MS. COLVIN:  Your Honor, at this time the government
23    would seek to introduce what's been marked as government
24    exhibit 40, 41, 43, and 44.
25          MR. HOGUE:  No objection.
```

1          THE COURT:  They are admitted.

2          MS. COLVIN:  Thank you.  If we could display

3    government exhibit number 40.

4    BY MS. COLVIN:

5    Q.   On that particular exhibit, Mr. Darley, could you please

6    tell the jury what they are seeing at that time?

7    A.   They're seeing a yellow shopping bag with four clear

8    sandwich bags being about one ounce a piece, a quarter of a

9    pound of marijuana.

10   Q.   And was that the way you found it at that time?

11   A.   No, ma'am.  The bag was closed.  I pulled the bag open to

12   make that picture where it would show the marijuana.

13   Q.   And the next exhibit is, I believe, 41?

14   A.   Yes, ma'am.  That's the bag before I pulled it open to

15   take a picture of the marijuana inside.

16   Q.   And the next number, I think that -- I believe that's

17   43 -- thank you, Milton -- could you tell the jury what this

18   represents?

19   A.   That is the Cadillac that the defendant arrived in, and

20   that's the front.

21   Q.   And did you take a photograph of the back of the vehicle?

22   A.   I did, so that you could see the tag number.

23   Q.   And is that the vehicle -- the rear end of that vehicle?

24   A.   Yes, ma'am, it is.

25   Q.   And is that the same -- thank you, Milton -- is that same

1   vehicle that you've identified the defendant as well as the

2   toddler, the female toddler was in at that time?

3   A.   That's correct.

4   Q.   Were there any other occupants in that vehicle at that

5   time?

6   A.   No.

7   Q.   Let me show what I'm marking as government's exhibit

8   number 59.

9           MS. COLVIN:   This is for the purpose of

10   identification alone.

11   Q.   Let me show what I've marked as government's exhibit

12   number 59.  Do you recognize that?

13   A.   Yes, ma'am, I do.

14   Q.   And how is it that you recognize that particular exhibit?

15   A.   It has my signature on it and the date and time.  It has

16   Peach Auto Collison.

17   Q.   And did you actually fill out that property bag that

18   you're holding?

19   A.   I did.  That's my handwriting.

20   Q.   And what was the purpose of getting that bag and putting

21   that information on it?

22   A.   So they would know that I recovered it.

23   Q.   And did you actually seal it in that bag at the time?

24   A.   I did.

25   Q.   And did you turn it in to your evidence of custodian --

1    custodian of evidence?

2    A.    Yes, ma'am.

3    Q.    Who was that person during that time frame?

4    A.    Mr. McComb.

5    Q.    Thank you.  That's all I have, Mr. Darley.  Mr. Hogue may

6    have questions for you.

7                         CROSS EXAMINATION

8    BY MR. HOGUE:

9    Q.    Investigator Darley -- is that your right title now,

10   investigator?

11   A.    I'm just deputy now.  I --

12   Q.    Deputy --

13   A.    -- no, sir.

14   Q.    All right, Deputy Darley, let's talk about a controlled

15   buy.  That's a phrase we've heard here in this trial.  You

16   haven't necessarily used it, but you're familiar with that

17   phrase?

18   A.    Yes, sir.

19   Q.    And let me go through some things with you, and tell me

20   if you agree with me that these are things that happen in a

21   controlled buy, and then we'll look at the one that you did

22   here.  First, when you've got an informer as you had in the

23   instance, sometimes when you use an informer, you'll have them

24   make a phone call for you --

25   A.    Correct.

1    Q.    -- to a target, somebody that you think might be able to

2    deliver drugs, right?

3    A.    Right.

4    Q.    And in a controlled buy, you will record the number, the

5    phone number that your informer uses to call the target,

6    correct?

7    A.    Sometimes, when you can, yes, sir.

8    Q.    When you can?

9    A.    Yes, sir.

10   Q.    Like when you're not prevented from recording the number

11   by some cause outside your control, or what?

12   A.    I'm not really sure how the call went down other than me

13   standing there.

14   Q.    Okay, you were standing there when the call went down,

15   meaning that you were right next to the person holding the

16   telephone when they dialed the number?

17   A.    Yes, sir.

18   Q.    But you didn't record the number?

19   A.    No, sir, I didn't.

20   Q.    You didn't give the number to anyone else to have it

21   traced to the subscriber to that number?

22   A.    No, sir.

23   Q.    You didn't record the telephone call itself?

24   A.    No, sir.

25   Q.    All right, now, in a controlled buy sometimes what you'll

1    do is have your informer actually receive the drugs from the

2    target, correct?

3    A.   You can do it that way.

4    Q.   Of course, that's not what you've described, and that's

5    not what you did in this instance, right?

6    A.   That's correct.

7    Q.   So in this instance your informer made a phone call to a

8    number you don't have to a person that you didn't record or

9    trace, and then you just waited for somebody to show up so you

10   could do the takedown, as Ms. Colvin called it, right?

11   A.   I waited on someone to show up with the informant, yes.

12   Q.   Now, also oftentimes in controlled buys in addition to

13   audio taping phone conversations or other conversations,

14   you'll have a video set up so you can film things that are

15   happening, right?

16   A.   Yes, sir.

17   Q.   No video in this case?

18   A.   No, sir.

19   Q.   Other than the photographs we've just seen, no other

20   photographs as it was going on?

21   A.   No, sir.  Just seven or eight other drug agents there.

22   Q.   This child in the car, estimate that child's age.

23   A.   I don't know how good I'd be at that.  It's a toddler,

24   you know, two, three, four years old.

25   Q.   All right.  No name that you know of?

 1 | A.    No, sir.

 2 | Q.    That's all I have.

 3 |            MS. COLVIN:  Your Honor, may this witness be

 4 | excused?

 5 |            THE COURT:  Yes.

 6 |            MR. CALHOUN:  If we could have a moment, Your Honor.

 7 |            THE COURT:  Let's take a recess at this point.  Step

 8 | back to the jury room, ladies and gentlemen.

 9 | *(Jury Excused; 10:15 a.m.)*

10 |            THE COURT:  We'll come back in 15 minutes.

11 | *(RECONVENED; ALL PARTIES PRESENT, 10:35 a.m.)*

12 |            THE COURT:  Is the government ready?

13 |            MR. CALHOUN:  Yes, Your Honor.

14 |            THE COURT:  Defense?

15 |            MR. HOGUE:  Yes, Your Honor.

16 |            THE COURT:  Ask the jury to come in, please, and

17 | call your next witness.

18 |            MR. CALHOUN:  Chris Patterson.

19 |            THE COURT:  Proceed.

20 |            DEPUTY CLERK:  Do you solemnly swear that your

21 | testimony in this case shall be the truth, the whole truth,

22 | and nothing but the truth, so help you God?

23 |            THE WITNESS:  I do.

24 |            DEPUTY CLERK:  State your name for the jury, please.

25 |

1 **THE WITNESS:  Chris Patterson.**

2 **CHRIS PATTERSON**

3 Witness, having first been duly sworn, testified on

4 DIRECT EXAMINATION

5 BY MR. CALHOUN:

6 Q. Mr. Patterson, how are you employed?

7 A. I work with the Bibb County Sheriff's Office at the

8 narcotics unit.

9 Q. And how were you employed back on November 30th of 2003?

10 A. As an investigator for the sheriff's office, narcotics

11 unit.

12 Q. And aside from being an investigator, did you have any

13 other duties that involved examination or testing of drugs?

14 A. Yes, sir.  I was certified to do the initial testing for

15 marijuana.

16 Q. Officer Patterson, do you know Ted Darley?

17 A. Yes, sir, I do.

18 Q. And drawing your attention to November 30th of 2004, did

19 you meet with Investigator Darley?

20 A. Yes, sir, I did.

21 Q. And where were you when you met with Darley?

22 A. At our office.

23 Q. And what, if anything, did Mr. Darley give to you?

24 A. A package containing four separate packages of marijuana

25 to test for him.

1          MR. CALHOUN:  May I approach Your Honor.

2    Q.    Officer Patterson, let me show you what's been marked as

3    exhibit number 59 and ask you to look at that, please.  And

4    drawing your attention to the four bundles inside that

5    exhibit, do you recognize that?

6    A.    Yes, sir.  This is the marijuana I tested for him.

7    Q.    Is that the marijuana that Officer Darley tendered to

8    you?

9    A.    Yes, sir.

10   Q.    And how long did it take for you to perform your test?

11   A.    Approximately seven to ten minutes.

12   Q.    Without going into the results of your test, what did you

13   do with the marijuana -- suspected marijuana after you ran

14   your test?

15   A.    I immediately turned it back over to Investigator Darley.

16   Q.    And was Investigator Darley present when you ran your

17   test?

18   A.    Yes, sir.

19   Q.    Was that the last time you had seen government's exhibit

20   number 59?

21   A.    Yes, sir, it was.

22          MR. CALHOUN:  No further questions of Officer

23   Patterson, Your Honor.

24          MR. HOGUE:  No questions.

25          THE COURT:  You may go down.  Thank you.

```
 1              THE WITNESS:  Thank you, Your Honor.
 2              MR. CALHOUN:  Your Honor, at this time the
 3    government calls Deputy U.S. Marshal W.S. Robinson.
 4              DEPUTY CLERK:  Do you solemnly swear that your
 5    testimony in this case shall be the truth, the whole truth,
 6    and nothing but the truth, so help you God?
 7              THE WITNESS:  I do.
 8              DEPUTY CLERK:  State your name for the jury, please.
 9              THE WITNESS:  My name is W.S. Robertson.
10              DEPUTY CLERK:  Spell your last name for the jury.
11              THE WITNESS:  R-o-b-e-r-t-s-o-n.
12                         W.S. ROBERTSON
13       Witness, having first been duly sworn, testified on
14                       DIRECT EXAMINATION
15    BY MR. CALHOUN:
16    Q.   Deputy Robertson, how are you currently employed?
17    A.   I'm a deputy United States marshal.
18    Q.   How long have you been with the United States Marshal
19    Service?
20    A.   December will be 24 years.
21    Q.   And what are your current duties with U.S. Marshal?
22    A.   I'm supervisor over the fugitive squad in the Middle
23    District of Georgia.
24    Q.   What exactly does the fugitive squad do?
25    A.   We look for, locate, and arrest people who have
```

1   outstanding warrants on them.  We look for people who are

2   wanted on federal, state, and local charges.

3   Q.   Deputy Robertson, are you familiar with a Richard

4   Glawson?

5   A.   Yes, sir.

6   Q.   Is he in court today?

7   A.   Yes, sir.

8   Q.   Would you please point to him and describe what he has

9   on?

10  A.   Mr. Glawson is seated at the table.  He's wearing a blue

11  shirt.  He is seated to my right and the left of counselor in

12  a tan-colored jacket with a maroon tie.

13  Q.   Deputy Robertson, let me show you what's been marked as

14  government exhibit number 39 and ask you to take a look at

15  that, please.  Do you recognize that exhibit?

16  A.   Yes, sir.

17  Q.   What do you recognize that to be?

18  A.   This is a photograph of Mr. Glawson.

19  Q.   And does that photograph fairly reflect how Mr. Glawson

20  looked that last time that you had occasion to see him?

21  A.   Yes, sir.  This is Mr. Glawson.

22            MR. CALHOUN:  Government moves to admit number 39 --

23  has number 39 been admitted, Ms. Colvin?

24            DEPUTY CLERK:  Yes, it has.

25  BY MR. CALHOUN:

1   Q.   Deputy Robertson, do you recall if a federal arrest

2   warrant was issued for Mr. Glawson?

3   A.   Yes, sir, there was.

4   Q.   Let me show you a document which has been marked and a

5   copy provided to Mr. Hogue as exhibit 46.  Do you recognize

6   that document?

7   A.   Yes, I do.

8   Q.   And what do you recognize that document to be?

9   A.   This is a arrest warrant issued here in the Middle

10  District of Georgia for the arrest of Mr. Glawson.

11          MR. CALHOUN:  Your Honor, the government moves to

12  admit number 46, which is a certified copy of that arrest

13  warrant.

14          MR. HOGUE:  May I see it one more time, Your Honor?

15  (Aside)

16          MR. HOGUE:  No objection.

17          THE COURT:  It is admitted.

18  BY MR. CALHOUN:

19  Q.   Now, Deputy Robertson, does that document show which

20  judge issued that warrant?

21  A.   It does.  It says:  This is a bench warrant issued at the

22  direction of United States District Judge Wilbur D. Owens,

23  Jr., as indicated right there.

24  Q.   Now, does the warrant indicate whether or not -- upon

25  execution of that warrant whether a bond will be available to

1    the subject?

2    A.    Actually right after the sentence I just read, it has in

3    all capital letters:  No bond shall be set before a hearing is

4    held in the Middle District of Georgia.  As indicated right

5    here.

6    Q.    Would you hold on to that for a moment?

7    A.    Okay.

8    Q.    Now, Deputy Robertson, based on that warrant that you

9    just testified about, did you attempt to locate Mr. Glawson?

10   A.    Yes, I did.

11   Q.    And where was Mr. Glawson when you located him?

12   A.    When I finally located Mr. Glawson and placed him under

13   arrest, he was located at 1330 Edna Place, here in Macon.

14   Q.    Now, were you assisted in the arrest by other deputies or

15   law enforcement officers?

16   A.    That's correct.  On the day that we arrested Mr. Glawson

17   at 1330 Edna Place, I was assisted by Deputy U.S. Marshals

18   Will Hawkins and Jeff Jibboni.

19   Q.    And can you describe the circumstances of that arrest?

20   A.    Yes, I can.  Our investigation in trying to locate --

21            MR. HOGUE:  Your Honor, I would object at this

22   point.  I'm not sure where this may be going.  It could become

23   relevant, I suppose, to the government's case, but I don't see

24   how the circumstances of an arrest of Mr. Glawson could be

25   relevant to any of charges in the case.  The fact that he was

1    arrested may be relevant.  I think that's been shown.  We

2    don't dispute that.

3              MR. CALHOUN:  May I respond, Your Honor?

4              THE COURT:  Yes.

5              MR. CALHOUN:  Your Honor, the circumstances of that

6    arrest, the government intends to show that Mr. Glawson

7    attempted to flee.

8              MR. HOGUE:  May I interrupt, I'm sorry, I think in

9    answering my objection counsel for the government may be about

10   to say all of the things that I'm contending aren't relevant.

11   So I don't know that this is the best way --

12             THE COURT:  All right, the objection is overruled.

13   Go ahead, please.

14             MR. HOGUE:  All right.

15   BY MR. CALHOUN:

16   Q.   Deputy Robertson, can you for the jury please describe

17   the circumstances behind that arrest?

18   A.   Yes, I can.  Our investigation on Mr. Glawson led us to a

19   possible associate of Mr. Glawson who lived at 1330 Edna

20   Place.  We had been conducting surveillance on this location

21   to see if we could locate Mr. Glawson there.  We also had

22   information that Mr. Glawson may possibly be utilizing a green

23   Chevy Tahoe as a means of transportation.  On the afternoon of

24   December 27th of last year, myself and Deputy Hawkins and

25   Jibboni did surveillance on 1330 Edna Place.  We observed a

1    green Chevy Tahoe in the backyard of this residence, and we

2    observed a black male who we believed to be Mr. Glawson

3    standing by that Tahoe.  There were fences around this

4    residence, and it made it a little difficult to observe, but

5    we made a determination that the fellow we saw in the backyard

6    was Mr. Glawson.  At that point in time, we went to effect the

7    arrest.  I pulled my government vehicle into the driveway to

8    get access to the backyard where Mr. Glawson had been

9    observed.  Upon our pulling into the backyard, we observed

10   Mr. Glawson fleeing.  He went over the back fence of this

11   yard.  Deputies Jibboni and Hawkins exited the government

12   vehicle and pursued him on foot.  I remained in the government

13   vehicle, backed out of the driveway, went down an adjacent

14   street, in an attempt to cut off any attempts to flee by Mr.

15   Glawson on foot.  During the pursuit, Mr. Glawson went over a

16   couple of other fences.  Eventually he was caught and

17   restrained and arrested by Deputy Jibboni and Deputy Hawkins.

18   Q.   Upon Mr. Glawson's arrest, did he give you a name,

19   identify himself?

20        MR. HOGUE:  Your Honor, we've had no Jackson Deno

21   hearing on this if we're about to elicit any statement made by

22   a person in custody.

23        MR. CALHOUN:  I think Mr. Hogue is correct, Your

24   Honor.

25        THE COURT:  Pardon me?

1            MR. CALHOUN:  I think Mr. Hogue is correct.

2            THE COURT:  All right.

3  BY MR. CALHOUN:

4  Q.   Now, after you arrested Mr. Glawson, where did you take

5  him?

6  A.   We transported Mr. Glawson here to the federal building

7  to the marshal's lockup located on the fourth floor.

8  Q.   Now, did he stay there?

9  A.   No.  He was only housed there for a small amount of time

10  after which he was transported to the Bibb Law Enforcement

11  Center.

12  Q.   Did he stay there?

13  A.   For a while, yes, sir.

14  Q.   After the escape alleged in the indictment, were you

15  assigned to look for Mr. Glawson again?

16  A.   Yes, I was.

17  Q.   And were you able to locate Mr. Glawson?

18  A.   I was.  I received notification on December 31st of '06

19  right about at the stroke of midnight that Mr. Glawson had

20  escaped from the Bibb County Law Enforcement Center.

21  Q.   And what did you do based on that notification?

22  A.   Bright and early on the 1st, I came in, I made contact

23  with some investigators from Bibb County Sheriff's Department,

24  gathered up as much information as I could in regards to the

25  escape, and based upon that, I entered Mr. Glawson into the

1    national computer as being a wanted person based upon the

2    escape.  I later, through counsel with the United States

3    Attorney's Office, obtained a warrant charging Mr. Glawson

4    with escape from the Bibb County Law Enforcement Center.  I

5    began my investigation to find him again, which successfully

6    terminated at about 2 o'clock, 2:30 in the morning on January

7    11th of this year.

8    Q.   And where did you locate Mr. Glawson on January 11th?

9    A.   Mr. Glawson was located at a rural address out in Jones

10   County.  The actual address I believe is 418 Pioneer Road.

11   Pioneer Road is a dirt road that runs off of Highway 49 out in

12   Jones County.  There's a residence that you can see from the

13   dirt road, Pioneer Road, that's very close to it, however,

14   there's also another residence way in the back, maybe another

15   7500 yards down a driveway that is a trailer.  That's where

16   Mr. Glawson was eventually located.

17   Q.   And were you present during the arrest?

18   A.   Yes, I was.

19   Q.   Describe what took place at the time of that arrest.

20   A.   Again, our investigation had determined that we thought

21   Mr. Glawson to be residing there with a female associate.  It

22   was very difficult for us to do surveillance on this location.

23   It was, as I had stated earlier, 7500 yards off of a dirt road

24   down a driveway behind another residence.  Eventually under

25   the cover of darkness, myself and two other officers actually

1    began crawling through the woods to try to see if we could get

2    up close enough to this trailer to be able to actually get

3    what we call an eyeball on it where we could see what was

4    going on.   I had other marshals and task force agents

5    stationed at the top of the dirt road to come assist if we

6    needed it.   There were several dogs located at this trailer

7    that had barked at us which slowed down our progress.   We

8    would have to move a little bit and wait for the dogs to stop

9    barking, and move a little bit more and wait for the dogs to

10   stop barking.   And based upon this, we got as close as we

11   could to the trailer to be able to get a look at it.   I called

12   on the radio for our other units to come down the driveway, as

13   we were going to approach this trailer in hopes of getting Mr.

14   Glawson there.   And as it turned out, while I was doing this,

15   Mr. Glawson stepped outside the trailer to see what the dogs

16   were barking at.   And as soon as the headlights of our

17   vehicles came down the driveway, Mr. Glawson fled into the

18   woods.   I pursued him along with Deputy Jibboni was with me

19   again and Task Force Agent Wessel.   We chased him through the

20   woods in darkness.   I don't know what the distance was.   I'd

21   say maybe 50 to 100 yards through the woods, and we were able

22   to find Mr. Glawson and place him under arrest at that time.

23   Q.   Now, this location was a different location from where

24   you arrested him the first time; is that correct?

25   A.   That's correct.   When we arrested him on December 27th,

1    it was on Edna Place here in Macon.  When we arrested him on

2    the early morning hours of January 11th, it was a rural

3    address in Jones County.

4    Q.   And for the benefit of those on the jury who are not

5    familiar with Jones County, how far is the LEC from Jones

6    County?

7    A.   I'm not sure how far it is.  Jones County is one county

8    to the northeast of us.  As far as any mileage would go, it's

9    a considerable distance.  It not someplace you could walk to,

10   I don't think.  It'd take you quite awhile to get there.  I'm

11   not sure of what the actual distance is, but it's, I would

12   guess -- I don't know -- 20 miles.

13              MR. CALHOUN:  No further questions, Your Honor.

14              MR. HOGUE:  No questions.

15              THE COURT:  All right, sir, you may go down.

16              MR. CALHOUN:  Your Honor, the next witness I think

17   we need to have brought down from upstairs.  Frederick Card.

18              MS. COLVIN:  Your Honor, as a housekeeping matter,

19   at this time the government would seek to introduce what's

20   been identified and shown and displayed, government exhibit

21   number 42.  I've checked with the deputy clerk, and that was

22   not entered into evidence.

23              MR. HOGUE:  Right.

24              THE COURT:  Objection?

25              MR. HOGUE:  No objection.

```
 1              THE COURT:  It is admitted.

 2              MS. COLVIN:  Thank you Your Honor.

 3              DEPUTY CLERK:  Do you solemnly swear that your

 4    testimony in this case shall be the truth, the whole truth,

 5    and nothing but the truth, so help you God?

 6              THE WITNESS:  Yes.

 7              DEPUTY CLERK:  State your name for the jury, please.

 8              THE WITNESS:  My name is Frederick Card.

 9              DEPUTY CLERK:  Please spell your name, first and

10    last for the court reporter.

11              THE WITNESS:  F-r-e-d-e-r-i-c-k.  Last name Card,

12    C-a-r-d.

13                         FREDERICK CARD

14      Witness, having first been duly sworn, testified on

15                       DIRECT EXAMINATION

16    BY MR. CALHOUN:

17    Q.   Mr. Card, will state your full name please, and please

18    speak into that microphone so we can all hear you?

19    A.   My name is Frederick Card.

20    Q.   Mr. Card, how old are you?

21    A.   I'm 21 years of age.

22    Q.   What city did you live in, grow up in?

23    A.   Macon, Georgia.

24    Q.   Are you currently in custody?  I notice you're wearing a

25    jail uniform?
```

1   A.   Yes, sir.

2   Q.   And where are you being kept or housed?

3   A.   Bibb County.

4   Q.   What charge were you sentenced on?

5   A.   Aiding and abetting.

6   Q.   Aiding and abetting what?

7   A.   Prisoner escape.

8   Q.   Who did you aid and abet?

9   A.   Richard Glawson.

10  Q.   Do you see that person in court this morning?

11  A.   Yes, sir.

12  Q.   Would you please point to him and describe what he is

13  wearing?

14  A.   Right there in the blue suit.

15  Q.   Now, have you been sentenced on aiding and abetting

16  Mr. Glawson's escape?

17  A.   Sir, yes, sir.

18  Q.   And what sentence did you get?

19  A.   Five years probated, six months detention time.

20  Q.   And aside from that conviction, do you have any other

21  felony convictions?

22  A.   No, sir.

23  Q.   Do you have any misdemeanor convictions?

24  A.   No, sir.

25  Q.   Is that the only time you've ever been in trouble with

1  the law?

2  A.   Yes, sir.

3  Q.   Mr. Card, were you initially arrested -- I'm not talking

4  about the escape -- were you initially arrested on another

5  charge?

6  A.   Yes, sir.

7  Q.   Do you recall when you were arrested?

8  A.   It was Christmas Eve, December 24th.

9  Q.   Of what year?

10 A.   2006.

11 Q.   And what were you charged with?

12 A.   Family violence.

13 Q.   And after your arrest, where were you taken?

14 A.   Bibb County LEC.

15 Q.   Now, do you recall whether a bond was set for you on that

16 charge?

17 A.   Yes, sir.

18 Q.   How much was that bond?

19 A.   It was $3500.

20 Q.   I'm talking about on the initial arrest charge.

21 A.   $3500.

22 Q.   $3500 dollars.  Were you able to make that bond?

23 A.   No, sir.

24 Q.   Now, after you were arrested, do you recall what cell you

25 were assigned to at the Bibb LEC?

1    A.    I was in the day room at first.

2    Q.    In the day room.  And while you were at the day room, did

3    anyone approach you while you were in the dayroom?

4    A.    Yes, sir.

5    Q.    And who was that?

6    A.    Richard.

7    Q.    The same person you identified today as Richard Glawson?

8    A.    Sir, yes, sir.

9    Q.    Now, did you know this Richard Glawson before he

10   approached you in the dayroom?

11   A.    No, sir.

12   Q.    And what, if anything, did Mr. Glawson say to you when he

13   approached you in the dayroom?

14   A.    He asked me did I have a bond and could I get out on

15   bond.

16   Q.    And what did you say in response to that question?

17   A.    I told him no.

18   Q.    And did Mr. Glawson continue that conversation with you?

19   A.    Sir, yes, sir.

20   Q.    And what did he say?

21   A.    He said that he can get me out.

22   Q.    And did Mr. Glawson explain to you how he could get you

23   out?

24   A.    Sir, yes, sir.

25   Q.    What did he tell you?

1   A.   He told me that to give him my armband, and when they

2   called to get me out, let him walk out, and they would have to

3   let me go because that's not the right person.

4   Q.   All right, now, do you have an armband on today?

5   A.   Sir, yes, sir.

6   Q.   Can you please hold it up?

7   A.   *(Complies).*

8   Q.   Is that the same armband you had when you had this

9   discussion with Mr. Glawson?

10  A.   Sir, yes, sir.

11  Q.   Does that armband come off?

12  A.   No, sir.

13  Q.   You can't take it off at all?

14  A.   Yes, I can.

15  Q.   Can you remove it now?

16  A.   I can.

17  Q.   I don't want you to get in trouble now if it's going to

18  break it.

19  A.   I can take it off --

20  Q.   All right, take it off.

21  A.   That what --

22  Q.   All right, don't worry about it then.   I don't want you

23  to get in trouble.   Now, after you had this discussion with

24  Mr. Glawson about he could get you out, what information did

25  Mr. Glawson ask you for?

1   A.   He asked me for my house number and my address.

2   Q.   And what was your address at the time?

3   A.   3303 Ohara Drive South.

4   Q.   What was your phone number at the time?

5   A.   781-1824.

6   Q.   Did you give Mr. Glawson your phone number?

7   A.   Sir, yes, sir.

8   Q.   And what was your mother's name?

9   A.   Janice Carswell.

10  Q.   And did you give Mr. Glawson your mother's name?

11  A.   Sir, yes, sir.

12  Q.   Did Mr. Glawson ask you for a social security number?

13  A.   He did, but I denied it.

14  Q.   You didn't give him that?

15  A.   No, sir.

16  Q.   Did Mr. Glawson explain to you what he was going to do

17  with your house number, your phone number, and your mother's

18  name?

19  A.   Sir, yes, sir.

20  Q.   What did he tell you?

21  A.   First time he told me that, just give me my house number

22  and my address to make bond.  Then my mother's name came up

23  about where he said that his sister wasn't going to be able to

24  get me out, he would have to use my parents, and that's how I

25  gave him my --

1    Q.    Did Mr. Glawson express to you what he was going to do

2    with all the information that you had given to him?

3    A.    Yes.  He was going to bond me out.

4    Q.    Did indicate who he was going to give the information to?

5    A.    Yes, sir.

6    Q.    What did he tell you?

7    A.    His sister.

8    Q.    Do you recall when Mr. Glawson was released from the Bibb

9    LEC?

10   A.    Yes, sir.

11   Q.    Were you with him at the time at the time?

12   A.    No, sir.

13   Q.    Now, what was your cell number?  You might have answered

14   this question already.

15   A.    I was A-213.

16   Q.    And do you know what Mr. Glawson's cell was?

17   A.    He was in A-205.

18   Q.    Now, how did you learn that Mr. Glawson had been released

19   from the Bibb LEC?

20   A.    I asked the officer when I supposed to be release on my

21   bond, and they told me they had let somebody out in my place.

22   Q.    But you were under the impression that Mr. Glawson was

23   getting the bond for you, and you would, in fact, be released?

24   A.    Yes, sir.

25   Q.    Now, when the authority -- when the jail personnel came

1    to get Mr. Glawson, what cell were you in?

2    A.    I was in 213.

3    Q.    Was that your cell?

4    A.    Yes, sir.

5              MR. CALHOUN:   May approach, Your Honor.

6    Q.    Mr. Card, let me show you exhibit number 49 here.  Do you

7    recognize this top paper here?

8    A.    Yes, sir.

9    Q.    What do you recognize that to be?

10   A.    That's my initial.

11   Q.    That's your signature on the front?

12   A.    Yes, sir.

13   Q.    Now, is this the bond paperwork for which charge?

14   A.    It's for the abetting to escape.

15   Q.    And that's your signature at the bottom portion of this?

16   A.    Yes, sir.

17   Q.    Now, this is not the original, this a copy; is that

18   correct?

19   A.    Yes, sir.

20   Q.    And is this the bond you used to get out on the escape

21   charge?

22   A.    Huh-uh.  That's the one -- yeah, for when I got charged

23   with it, that's what I used.

24   Q.    Now, I'm going to draw your attention to page two of that

25   same document and ask you to look at that.  Do you recognize

1   what's depicted here?

2   A.   That's not my signature.

3   Q.   Okay.  And the signature block there, you can't make out

4   what it is, but it's not yours?

5   A.   I can't make out what it is, but it's not mine.

6   Q.   Now, which bond paperwork did this refer to?

7   A.   That's the family violence.

8   Q.   This is the first charge you got arrested on?

9   A.   Yes, sir.

10          MR. CALHOUN:  No further questions of Mr. Card, Your

11   Honor.

12                     CROSS EXAMINATION

13   BY MR. HOGUE:

14   Q.   Mr. Card, since you have been inside booking before at

15   the Bibb LEC and have just testified that you've signed on a

16   document that then got you out of jail on a bond, you know how

17   that works.  You've been in booking and had to sign to be

18   released from jail, right?

19   A.   Sir, yes, sir.

20   Q.   Now, Mr. Card, isn't it the case that when you're in

21   booking signing where they tell you to sign that you're

22   signing on one of those little plastic things like you have at

23   a Target store where the pen is attached to the little box by

24   a cord?

25   A.   Yes, sir.

1    Q.   So the whole document isn't out there in paper for you to

2    read, you're just signing in this little gray box, right?

3    A.   Sir, yes, sir.

4    Q.   Where they tell you to sign?

5    A.   Sir, yes, sir.

6            MR. HOGUE:  Nothing further.

7            MR. CALHOUN:  No redirect, Your Honor.

8            THE COURT:  You may go down.

9            MR. CALHOUN:  The government next calls Angina

10   Johnson.

11           DEPUTY CLERK:  Do you solemnly swear that your

12   testimony in this case shall be the truth, the whole truth,

13   and nothing but the truth, so help you God?

14           THE WITNESS:  Yes.

15           DEPUTY CLERK:  State your name for the jury please.

16           THE WITNESS:  Angina Johnson.

17           DEPUTY CLERK:  Please spell your name, first and

18   last.

19           THE WITNESS:  A-g-i-n-a, H-o-j-n-s-o-n.

20                           **AGINA JOHNSON**

21       Witness, having first been duly sworn, testified on

22                        DIRECT EXAMINATION

23   BY MR. CALHOUN:

24   Q.   Now, Ms. Johnson, I'm going to ask you to make sure to

25   speak into that microphone so we can all hear you.

1   A.   Okay.

2   Q.   I noticed for the last couple of days you appeared to be

3   extremely nervous.  Have you calmed down?

4   A.   Yes, sir.

5   Q.   Okay.  Ms. Johnson, what city do you live in?

6   A.   Bibb, Macon.

7   Q.   How long have you lived in Bibb County?

8   A.   34 years.

9   Q.   And are you currently employed?

10  A.   Uh-huh.

11  Q.   Where do you work?

12  A.   Happy Hour in Warner Robins.

13  Q.   Now, Ms. Johnson, did you know, or are you familiar with

14  a Richard Glawson?

15  A.   Right.

16  Q.   Is he in court today?

17  A.   Yes.

18  Q.   Can you please point to him and describe what he has on.

19  A.   A blue suit.

20  Q.   Dark blue?

21  A.   Uh-huh.

22  Q.   And do you know this Richard Glawson by another name?

23  A.   Yes.

24  Q.   What name?

25  A.   Terry.

1   Q.   Terry what?

2   A.   He told me his name was Terry Butler when I met him.

3   Q.   Do you recall what year you first came to meet this Terry

4   Butler that you've also identified as Richard Glawson?

5   A.   It was in '04.

6        MR. HOGUE:   I'm sorry, I didn't hear her.

7   BY MR. CALHOUN:

8   Q.    State that again?

9   A.   '04.

10  Q.   2004?

11  A.   Yes, sir.

12  Q.   And that was the name that was given to you in 2004?

13  A.   Correct.

14  Q.   Do you recall what type of vehicle you saw Mr. Glawson

15  driving when you first met him?

16  A.   It was a Blazer, a two-door Blazer.

17  Q.   Is that the only vehicle you ever saw him drive?

18  A.   No.

19  Q.   What other vehicle have you seen him driving?

20  A.   A Ford truck, a Honda Accord, and a Tahoe.

21  Q.   What color was that Ford truck that you saw?

22  A.   White.

23  Q.   Now, did you become involved in a relationship with Mr.

24  Glawson?

25  A.   Correct.

1    Q.    How long did that relationship last?

2    A.    A year and a half, to two.

3    Q.    Do you recall when Mr. Glawson was placed in the Bibb

4    County Law Enforcement Center?

5    A.    The last time?

6    Q.    Yes --

7    A.    Correct.

8    Q.    -- the time before then.

9    A.    Okay.

10   Q.    Okay.  And when was that?  Do you recall the month and

11   year?

12   A.    '06 December -- November.  I'm not for sure.

13   Q.    Was it around Christmas time?

14   A.    I believe so.

15   Q.    Now, were you still involved romantically with him at the

16   time?

17   A.    No.

18   Q.    You had stopped dating at the time?

19   A.    Correct.

20   Q.    Now, around the time period that you just testified

21   about, particularly around Christmas '06, were you contacted

22   by Mr. Glawson?

23   A.    Yes.

24   Q.    And how did he contact you?

25   A.    By phone.

1  Q.   And what did he tell you?

2  A.   He asked me that -- to -- if I could lend him $300

3  because he was able to post bond, and he assured me that he

4  was going to be able to pay my money back once he got out.

5  And I told him I had $300, but I had to pay on my bills.

6  Q.   And Mr. Glawson indicated to you that he needed the $300

7  for what?

8  A.   To be able to post bond.

9  Q.   Now, did you have the money with you at the time he made

10  that request?

11  A.   No.

12  Q.   Where did you get the money from?

13  A.   From my bank.  I had to go to an ATM.

14  Q.   Now, after you'd gotten the money from the bank, whom did

15  you contact?

16  A.   His sister, Melonise.

17  Q.   And what did you tell his sister?

18  A.   I told her -- he had given me a name, and I met up with

19  her at her house, and she called the lady, and we went --

20  well, she picked the lady up, and I went to my bank to get the

21  $300, and I met her at Allstate.

22  Q.   That's Allstate Bonding?

23  A.   Correct.

24  Q.   Now, let me make sure I understand this now.  Who all met

25  up with you at Allstate Bonding?

```
 1    A.    I met up with Melonise and Ms. Janice.

 2    Q.    Is that Janice Carswell?

 3    A.    Correct.

 4    Q.    And is Melonise, is that his sister?

 5    A.    Correct.

 6    Q.    What kind of car was his sister, Melonise driving that

 7    night?

 8    A.    A four Honda Accord -- a four-door Honda Accord, gold.

 9    Q.    And what kind of car was Ms. Carswell driving that night?

10    A.    She was riding with Ms. Melonise.

11    Q.    Now, did you go inside the bonding company?

12    A.    No.

13    Q.    Were you in a position to see who went inside the bonding

14    company?

15    A.    Ms. Janice went inside.

16    Q.    Did she go inside by herself?

17    A.    Correct.

18    Q.    Now, how long did Ms. Carswell stay inside the bonding

19    company?

20    A.    I guess about 30 minutes.  I'm not even for sure.

21    Q.    And what happened after Ms. Carswell came out of the

22    bonding company?

23    A.    She came out, she handed Melonise a piece of paper, and I

24    took her home -- took her to church.

25    Q.    Ms. Carswell?
```

1    A.    Uh-huh.

2    Q.    Okay.  And where did you go after you took Ms. Carswell

3    to church?

4    A.    I was going to go home, but Melonise had asked me to come

5    back down and wait with her.

6    Q.    Did you go and wait with Melonise?

7    A.    Correct.

8    Q.    And Melonise is Mr. Glawson's sister?

9    A.    Correct.

10   Q.    Where did you go to wait with Mr. Glawson's sister?

11   A.    I was going to park in front of the LEC, but Melonise

12   parked down by the church, and so I parked down there.

13   Q.    Now, that church, how far is the church from --

14   A.    Right down the street.

15   Q.    And what happened while you were parked at that location?

16   A.    Nothing.

17   Q.    Did you see anyone come out of the LEC?

18   A.    Oh, I'm sorry, Terry came out.

19   Q.    And what happened after you saw Terry, as you've also

20   identified as Glawson, come out of the LEC?

21   A.    He got in the car with me.

22   Q.    And what did you -- where did you and Mr. Glawson go?

23   A.    On Edna Place.

24   Q.    Is that your residence?

25   A.    Correct.

1   Q.   Did you actually take him to your house?

2   A.   Correct.

3   Q.   And what happened at the house?

4   A.   He got out at my driveway and left walking, and I left.

5   Q.   Is that the last time you had seen Mr. Glawson?

6   A.   Correct.

7            MR. CALHOUN:  Nothing further, Your Honor.

8            MR. HOGUE:  I have no questions, Your Honor.

9            THE COURT:  All right, you may go down.  Thank you.

10           MS. COLVIN:  Your Honor, at this time the government

11   will call Janice Carswell.

12           DEPUTY CLERK:  Do you solemnly swear that your

13   testimony in this case shall be the truth, the whole truth,

14   and nothing but the truth, so help you God?

15           THE WITNESS:  I do.

16           DEPUTY CLERK:  State your name for the jury, please.

17           THE WITNESS:  My name is Janice Denise Carswell.

18           DEPUTY CLERK:  Please spell your name, first and

19   last.

20           THE WITNESS:  J-a-n-i-c-e, C-a-r-s-w-e-l-l.

21                        **JANICE CARSWELL**

22     Witness, having first been duly sworn, testified on

23                      DIRECT EXAMINATION

24   BY MS. COLVIN:

25   Q.   Good morning, Ms. Carswell.

1    A.   Good morning.

2    Q.   Let me ask you, do you live here in Macon, Georgia?

3    A.   Yes.

4    Q.   Are you related to a person by the name of Frederick

5    Card?

6    A.   Yes.

7    Q.   Could you please tell the jury how you are related to

8    him?

9    A.   He's my son.

10   Q.   Did you have an occasion back in December of 2006 to

11   assist in his bond?

12   A.   Yes.

13   Q.   Could you please relate to the jury how you initially

14   came to do that?

15   A.   Well, my son called me that Friday, and he told me

16   that --

17   Q.   Well, without going into anything he said, based upon

18   your conversation with him, what did you then do or wait for?

19   A.   For a phone call.

20   Q.   Did you actually receive a phone call?

21   A.   Yes.

22   Q.   Did you know the person who telephoned you?

23   A.   No.

24   Q.   Had you ever heard your son mention that person's name?

25   A.   No.

1    Q.   Did you come to learn from that phone call that it was in

2    reference to your son?

3    A.   Yes.

4    Q.   And after receiving that phone call, what was the next

5    thing that occurred?

6    A.   I waited for that person to come and pick me up.

7    Q.   Now, did someone ultimately arrive at your residence?

8    A.   Yes.

9    Q.   Male or female?

10   A.   Female.

11   Q.   Do you remember age range of the person?

12   A.   I would say she was anywhere from 30 to mid-30s.

13   Q.   And what type of vehicle was she driving?

14   A.   She was in a tan, either a -- between the year of 1990-92

15   Honda Accord.

16   Q.   And how is it you're so sure about that make of car?

17   A.   Because my niece has one just like it.

18   Q.   And what happened once she arrived at your residence?

19   A.   She had to wait for me because I was waiting for my

20   sister because we were getting ready to go to Watch Night to

21   fix breakfast for after church, and I told this person that I

22   had to wait for my sister to get the food.

23   Q.   And how long were you all at your residence before you

24   could finally leave?

25   A.   Probably about ten minutes.

1   Q.   Had you ever seen this person before?

2   A.   No, ma'am.

3   Q.   Did you know this person?

4   A.   No, ma'am.

5   Q.   Had you ever heard that this person was friends with your

6   son?

7   A.   No, ma'am.

8   Q.   Did you ultimately leave your home?

9   A.   Yes.

10  Q.   And where did you travel to?

11  A.   To the Allstate Bonding Company.

12  Q.   Now, what was your understanding of why you were going to

13  that particular establishment?

14  A.   Because they had -- well, it had been already established

15  how much the bond was, and I was to post the bond.  They were

16  going to --

17  Q.   Now, who did you think you were posting this bond for?

18  A.   For my son Frederick.

19  Q.   Did you have money yourself to post the bond for him?

20  A.   No, ma'am.

21  Q.   What happened once you arrived at Allstate Bonding?

22  A.   The lady that I rode down there with, she and I sat --

23  well, we went and rang the bell, didn't pay attention that the

24  note said he was out to lunch, so we started to turn around

25  and walk when he didn't answer the door.  Then I noticed that

```
 1    there was a note saying I was gone to lunch, be back at nine.
 2    But there was a phone number, so she dialed the number and
 3    gave me the phone, and I talked to the bondsman, and he said
 4    he would be back in approximately 10 minutes.
 5    Q.    And did you wait for his return?
 6    A.    Yes.
 7    Q.    And when that person returned, what did you do?
 8    A.    Well, we had to wait for another person to come in the
 9    meantime.  But shortly after we got back in her car, another
10    person in a silver and black BMW pulled up to the side of the
11    bonding company, and this is when the lady in the car, she
12    gave me two 50s and a 20, and she told me that the person that
13    had just drove up would give me the rest of the money.
14    Q.    And did you actually approach that vehicle that drove up?
15    A.    Yes.  Well, we pulled around on the side of it.  Then I
16    got out of the passenger side of the Honda, walked to the
17    passenger side of the BMW, the lady gave me $300 in 20s.
18    Q.    And did you know that person?
19    A.    No, ma'am.
20    Q.    Had you ever seen her before?
21    A.    No, ma'am.
22    Q.    Have you ever seen her with your son, Frederick Card?
23    A.    No, ma'am.
24    Q.    What did you do once you obtained that $300 from her?
25    A.    I made a smart comment saying, y'all are trusting me with
```

1   all this money, and I was broke, and then I walked into the --

2   went into the bonding company and proceed doing the bond.

3   Q.   And did you make that statement because you didn't know

4   them?

5   A.   It was just something I said.

6   Q.   When you went inside the bonding company, what happened?

7   A.   I told the bondsman who I came to bond out, he got the

8   paperwork out, and while he was doing the paperwork, he and I

9   talked about why -- I told him I was in a hurry because I was

10  trying to get to church so that we could start cooking before

11  Watch Night service started.  And he told about he usually go

12  to Watch Night, but he had to work this particular night.

13  Q.   And did you ultimately complete the paperwork there?

14  A.   Yes, ma'am.

15  Q.   Now, what happened once you finished the paperwork?

16  A.   He asked me did I know how much the bond was, I told him

17  $420, he said, actually it's $421.  So I went in my purse and

18  got $1 out to put with the $420 I had.

19  Q.   And after you did that, did you then leave that

20  establishment?

21  A.   I paid the bond, he gave me a receipt, I came out, and I

22  started to give the receipt to the lady that I rode down there

23  with, but she told me to give it to the lady that gave me the

24  $300 which was in the BMW.

25  Q.   And did you, in fact, give that receipt to that person?

1   A.   Yes, I did.

2   Q.   And after giving her that receipt, what did you do?

3   A.   The lady that I rode with, she told me that the lady in

4   the BMW would take me back to the church, and the lady in the

5   BMW told the lady in the Honda, you go and wait for me, and

6   they drove off, and we went back to my church.

7   Q.   And that's the last time you've seen that individual?

8   A.   Yeah.  She took me to the church, she told me, I'll wait

9   for you to get in because it was dark, and I thought that that

10   was really nice of her, and she waited until I got inside the

11   building, and then she pulled off.

12   Q.   Do you know a person by the name of Richard Ben Glawson?

13   A.   No, ma'am.

14   Q.   Do you know a person by the name of Terry Butler?

15   A.   No, ma'am.

16   Q.   Do you know a person by the name of Kerry Glawson?

17   A.   No.

18   Q.   Do you know a person by the name of Ricky Odom?

19   A.   No, ma'am.

20          MS. COLVIN:  Just one moment.  That's all I have,

21   Your Honor.

22          MR. HOGUE:  No questions.

23          THE COURT:  All right, you may go down.

24          MS. COLVIN:  Your Honor, at this time the government

25   would call Jacqueline Ridley.

```
 1              DEPUTY CLERK:  Do you solemnly swear that your
 2    testimony in this case shall be the truth, the whole truth,
 3    and nothing but the truth, so help you God?
 4              THE WITNESS:  I do.
 5              DEPUTY CLERK:  State your name for the jury, please.
 6              THE WITNESS:  Jacquelyn Ridley.
 7              DEPUTY CLERK:  Please spell your name, first and
 8    last.
 9              THE WITNESS:  J-a-c-q-u-e-l-y-n, R-i-d-l-e-y.
10                        JACQUELYN RIDLEY
11      Witness, having first been duly sworn, testified on
12                       DIRECT EXAMINATION
13    BY MS. COLVIN:
14    Q.   Good morning, Ms. Ridley.
15    A.   Good morning.
16    Q.   Where are you employed?
17    A.   Bibb County Sheriff's Department.
18    Q.   And how long have you been in their employment?
19    A.   Going on five years.
20    Q.   And what is your position there?
21    A.   Corrections deputy.
22    Q.   Now, back on December 31st, 2006, what was your position
23    with the Bibb County Sheriff's Department?
24    A.   Corrections deputy.
25    Q.   And in that capacity, what were your specific duties?
```

1   A.    My specific duties were to watch the inmates.  Well, it

2   depends on wherever they put you at.  You watch the inmates,

3   bond procedures, booking.

4   Q.    Let me ask you about the bond procedures.  On that

5   particular date in question, namely December 31st, 2006, were

6   you at the service desk?

7   A.    Yes, ma'am.

8   Q.    Could you please relate to the jury what the service desk

9   is and what the duties are there back during that time period?

10  A.    The service desk is where the deputy seats people from

11  the outside to come in and do bond, either through, you know,

12  one of the bondsman companies or they come in and do a

13  property bond.  The service desk, also you do money orders

14  there, look up people's property.

15  Q.    And on that particular date and time, December 31, 2006,

16  did you have an occasion to have contact with a person by the

17  name of Charles Grant with Allstate Bonding?

18  A.    Yes, ma'am.

19  Q.    Specifically regarding bonding paperwork on Frederick

20  Card?

21  A.    Yes, ma'am.

22  Q.    Could you please relate to the jury how that came about

23  and what happened?

24  A.    Mr. Grant came in and stated that he wanted to do a bond

25  on Frederick Card, Jr.  I then went in the computer, pulled up

1   the information to look at his charges to make sure there was

2   no probation holds or no parole holds, or no holds for any

3   other counties.  Once I did that procedure, I got the

4   paperwork from Mr. Grant stating the person who he wanted to,

5   you know, bond out to make sure we were talking about the same

6   person.  Then I went on with my procedure.  I went through the

7   bond menu, did the bond, gave him the court date, gave him

8   what court he needed to be at on Frederick Broadus Card, Jr.

9   Q.   And you relayed all this information to Mr. Grant of

10  Allstate Bonding?

11  A.   Yes, ma'am.

12  Q.   Now, what is the purpose of giving him all of that

13  information?

14  A.   Because he then relates the information back to the

15  family.

16  Q.   And when Allstate Bonding in the capacity of Charles

17  Grant came over, is he basically signing to assure that that

18  person will be present for the court date that you give him?

19  A.   Yes, ma'am.

20  Q.   Now, you said you went on the computer system.  Did you

21  relay the information on that system to Mr. Grant?

22  A.   Yes, ma'am.

23  Q.   And did you record anything from Mr. Grant onto the

24  computer system?

25  A.   Yes, ma'am.  I -- the information that he gave me, which

1    is on Frederick Broadus Card, Jr., that particular day, you

2    know, what his charges that he was being bonded out on, and it

3    also has some phone numbers on there of the family members,

4    you know, that he had on there, which, once we put the bond

5    in, we always gave them back that information because, like I

6    said, it has the family members' information on there.  So

7    what I did, I just transferred that information from that

8    sheet and the information that I got from the computer and put

9    on the bond -- put it in the computer on the bond.

10   Q.   And once you record that information and return it back

11   to Mr. Grant, what happened next?

12   A.   Once I did the bond and gave Mr. Grant the information

13   that he needed to give back to the family, I then notified

14   booking to let them know there was a bond in the computer on

15   Frederick Broadus Card, Jr.

16   Q.   And what is the purpose of notifying booking that the

17   bond information has been placed in the computer system?

18   A.   Booking is where the person -- the inmate actually comes

19   down, signs the bond in booking, and then the process is they

20   walk them out.

21   Q.   Let me show you what's been marked as government exhibit

22   number 49, and the second page of this exhibit, do you

23   recognize this?

24   A.   Yes, ma'am.

25   Q.   Now, does this exhibit become relevant, what you see here

1   and what you did, what you've described to the jury?

2   A.   Yes, ma'am.

3   Q.   Why is that?  Could you explain to the jury why this

4   information is relevant?  Is this the information you actually

5   encoded?

6   A.   Yes, ma'am.  That's the information that I actually put

7   in the computer on the bond system.

8        MR. HOGUE:  Your Honor, I'm going to object.  The

9   witness is being asked to comment on an exhibit that is not in

10  evidence by talking about what it is and how she produced it

11  and so on.

12       MS. COLVIN:  Your Honor, I'm laying the foundation

13  by asking her to verify that that's information that she

14  actually input in the system so that at a later time when we

15  properly lay the foundation we can introduce it as a necessary

16  component to admission.

17       MR. HOGUE:  I assume then we're done with that,

18  because I heard her giving further information beyond the

19  foundation of what that document, talking about what it is and

20  how she produced it.

21       THE COURT:  All right, objection overruled.  Let's

22  go forward.

23       MS. COLVIN:  Thank you, Your Honor.

24  BY MS. COLVIN:

25  Q.   Now, after you made the call to booking so that they

```
1    could get the inmate, what did you do next?

2    A.   Once I made the call to booking, I was done.  Once I made

3    the call to booking, I was finished.

4    Q.   Now, when the person is finally released, do they come

5    back to the service desk to sign any forms or do any other

6    matters pertaining to your role at the service desk?

7    A.   No, ma'am.

8         MS. COLVIN:  Just one moment.  That's all I have,

9    Your Honor.

10        MR. HOGUE:  No questions.

11        THE COURT:  You may go down.

12        MR. CALHOUN:  Your Honor, the government next calls

13   Lynn Mattox.

14        DEPUTY CLERK:  Step up and have a seat, please,

15   ma'am.  Do you solemnly swear that your testimony in this case

16   shall be the truth, the whole truth, and nothing but the

17   truth, so help you God?

18        THE WITNESS:  I do.

19        DEPUTY CLERK:  State your name for the jury, please.

20        THE WITNESS:  Cora Lynn Mattox.

21        DEPUTY CLERK:  Please spell your name first and last

22   for the court reporter.

23        THE WITNESS:  C-o-r-a, M-a-t-t-o-x.

24                          CORA MATTOX

25     Witness, having first been duly sworn, testified on
```

1                          DIRECT EXAMINATION

2       BY MR. CALHOUN:

3       Q.    Deputy Mattox, I know you're wearing a uniform.  Are you

4       employed with the Bibb County Sheriff Office?

5       A.    Yes, sir.

6       Q.    How were you employed December 31st, 2006?

7       A.    I was booking sergeant for the jail.

8       Q.    What area did you work in as booking sergeant?

9       A.    Repeat that, sir.

10      Q.    What area of the jail did you work in?

11      A.    In the booking area.

12      Q.    And are you familiar with the procedures followed in the

13      booking area at the time you worked there?

14      A.    Yes I am.

15      Q.    And can you describe to the jury what happens when an

16      inmate is brought into and through the booking area?

17      A.    When the inmate is brought in, they're patted down or

18      searched for contraband or weapons.  They are then put into a

19      holding cell to wait processing.  Once they're processed --

20      which consists of booking them into the computer with all

21      their pertinent information, fingerprinting them, taking their

22      pictures, placing an armband on them -- then they are dressed

23      out in clothing for jail, a jumpsuit and clothing for them,

24      and their property is stored in the property division, and

25      then they are sent to the block.

1    Q.    Are they assigned a particular number on the block?

2    A.    On the block, yes, sir.  They're assigned a cell, but

3    whenever they're booked into the computer, they are assigned a

4    jail number.

5    Q.    Now, you mentioned a moment ago -- I think you mentioned

6    a bracelet?

7    A.    Yes, sir.

8    Q.    What information is contained on that wristband or

9    bracelet that you just referred to?

10   A.    It has a photograph, it has their full name, and it has

11   their jail number.

12   Q.    What does the -- what is that information used for on the

13   bracelet?

14   A.    Identification.

15   Q.    Are inmates required to have that wristband on at all

16   times?

17   A.    Yes, sir.

18   Q.    Now, is it possible for an inmate to take the wristband

19   off or let it come off?

20   A.    It's made not to come off, but it can be stretched and

21   pulled over the arm.

22   Q.    Now, are you familiar with the process used when a person

23   makes bond at the LEC?

24   A.    Yes, sir.

25   Q.    Describe that process.

1    A.   A person, whether they're being bonded out or released,

2    is, when they're bonded out, someone from the street -- or

3    from outside the jail, places their bond.  The bond is put

4    into the computer.  The person at the bond desk then calls

5    booking and let's us know that there is a bond in the system,

6    and we pull that person from the block, check their

7    identification, and release them.

8    Q.   What kind of information is inputted into the computer?

9    A.   At the time of release?

10   Q.   No, at the time of -- yeah, at the time of release, yeah.

11   A.   Who posted the bond, how -- you know, whether it was

12   Allstate or Anytime, or was it a property bond, and the court

13   dates and all of this is put on the computer.

14   Q.   Now, drawing your attention to on or about December 31st,

15   2006, particularly around 11:30 p.m., were you at work?

16   A.   Yes, sir, I was.

17   Q.   And were you at the booking station that you just

18   testified about?

19   A.   Yes, sir.

20   Q.   And who was working that with you on that particular

21   occasion?

22   A.   I had Sergeant Frazier working overtime with me, Deputy

23   Harris, and Deputy Moran, I think.

24   Q.   And did you receive a call from Deputy Ridley?

25   A.   Yes, I did.

1  Q.   In response to that call, what did you do?

2  A.   Deputy Ridley called me from the bond desk and informed

3  me that there was a bond in the system on Inmate Card.  I then

4  called the block and asked them to send Inmate Card to me to

5  be released or bag and baggage is what we call it.

6  Q.   Let me make sure I understand this now.  When you got the

7  word -- for lack of a better word -- from Ridley, what did you

8  do immediately?

9  A.   I picked up the phone and called the block, and said,

10  send me Inmate Card.

11  Q.   And do you recall who you spoke to on the block?

12  A.   Story.

13  Q.   Deputy Story?

14  A.   Yes.

15  Q.   Now, were you occupied with the other duties at the time?

16  A.   Yes, sir, I was.

17  Q.   And what did you rely on Deputy Story to do?

18  A.   To identify that inmate and send them to me in booking.

19  Q.   Now, when the Inmate Card that you just referred to, when

20  he was processed out, where were you?

21  A.   I had stepped out of booking to handle some paperwork.

22  Q.   Who was left at male booking when this Inmate Card was

23  processed out?

24  A.   I had Sergeant Frazier there, so he was okay to release

25  people.

1    Q.    Now, back at the time that you just referred to when an

2    inmate was processed out, would that inmate come back to the

3    booking where you would be working?

4    A.    Could you repeat that?

5    Q.    Yes.  When an inmate was processed out, would he come

6    back to male booking on the way out?

7    A.    Yes, sir.

8    Q.    And what would -- I'm talking about back at that time

9    now, back in '06 -- what would a person such as yourself do

10   when the inmate showed back up at male booking?

11   A.    When they showed up at male booking, we would check the

12   armband to make sure we had the right person, we would give

13   them their property that we had pulled from the property room,

14   and have them dress back out in their civilian clothes.

15   Q.    At that time would you pull up a photo on -- from the

16   computer?

17   A.    No, sir.  Because we had a photo on the armband.

18   Q.    Has that process changed?

19   A.    Yes, sir, it has.

20         MR. CALHOUN:  Nothing further of this witness, Your

21   Honor.

22                    CROSS EXAMINATION

23   BY MR. HOGUE:

24   Q.    Deputy Mattox, you testified a few minutes ago that you

25   placed a phone call to a Deputy Story?

```
 1    A.    Yes, sir.

 2    Q.    To tell Deputy Story to get Inmate Card?

 3    A.    Yes, sir.

 4    Q.    Do you remember writing a report about this incident?

 5    A.    Yes, I do.

 6    Q.    Not long after it happened -- do you happen to have it

 7    with you today?

 8    A.    I do.

 9    Q.    And in your report you wrote a narrative or a description

10    of what all happened?

11    A.    Yes, sir.

12    Q.    Now, just briefly, I know you probably written many

13    reports in your career, right?

14    A.    Yes, sir.

15    Q.    And you write them not long after the events happen when

16    your memory is still fresh?

17    A.    Yes, sir.

18    Q.    And if you took any notes, you transfer your notes to

19    your report?

20    A.    Yes, sir.

21    Q.    In this case you had no notes, though, you're just going

22    from memory?

23    A.    Yes, sir.

24    Q.    All right.  So, this may be a memory thing, but if you'll

25    look at your report, you said today you call Deputy Story.
```

1    Isn't it the case that it was a different law enforcement

2    officer who called Deputy Story to have Inmate Card sent to

3    bag and baggage?  Somebody else, not you?  Look at your second

4    paragraph on your narrative, the second to the last line?

5    A.   I'm sorry, I'm missing what you're saying.

6    Q.   I show it as page four of five in your report.

7    A.   I only have two pages in my report.

8    Q.   Let me show her the one I have.  Okay, this is --

9    A.   Yes.

10           MR. HOGUE:  May I stay here a moment, Your Honor?

11   Q.   Is what I just showed you different from what you have in

12   front of you?

13           MR. CALHOUN:  Your Honor, I want to make sure I

14   understand what Frank is doing.  Is the report that he's

15   showing her now, is that a report of her interview, or is that

16   a report of someone else's interview?

17           MR. HOGUE:  Well, just so the record is clear and

18   the court knows, I'm showing her what I have received in

19   evidence from the government that looks like -- in fact, it's

20   called Bibb County Sheriff's Office Investigative Arrest

21   Report -- the reporting officer was Lynn Mattox.  It says it's

22   five pages long, and I have five pages here, and I was

23   directing her to a paragraph that I think she wrote on page

24   four of this report.

25           THE WITNESS:  Can I clarify that?  This is actually

1   the -- this is a jail report.  This is the stat file that has

2   to go through criminal processing, and I was wrong, it was

3   Sergeant Frazier that made the phone call, even in this

4   report.

5   Q.   Oh, even in that one?

6   A.   Yes.

7   Q.   Okay.  All right, so just to clarify for all of us, but

8   especially for the jury, you have actually written two reports

9   regarding the incident that you're here testifying about?

10  A.   Yes, sir, I have.  But this basically was copy pasted to

11  do that.  It's the same thing.

12  Q.   So they're essentially the same thing?

13  A.   Yes, sir, they are.

14  Q.   And even in the one you're looking at, as well as the one

15  I've been looking at, you now say that you stand corrected

16  that you did not call Deputy Story, and you did not request

17  that Deputy Story bring Inmate Card to bag and baggage; is

18  that correct?

19  A.   This is true.  Sergeant Frazier did that.

20  Q.   All right, and so you can't testify at all to what

21  Sergeant Frazier may have said to Deputy Story?

22  A.   I can only tell you what is normally said.

23          MR. HOGUE:  Thank you.

24          MR. CALHOUN:  No redirect, Your Honor.

25          THE COURT:  All right, you may go down.

1          MS. COLVIN:  Your Honor, at this time we call Sean

2     Story.

3          DEPUTY CLERK:  Do you solemnly swear that your

4     testimony in this case shall be the truth, the whole truth,

5     and nothing but the truth, so help you God?

6          THE WITNESS:  I do.

7          DEPUTY CLERK:  State your name for the jury, please.

8          THE WITNESS:  Sean Story.

9          DEPUTY CLERK:  Please spell your name, first and

10    last.

11         THE WITNESS:  S-e-a-n, S-t-o-r-y.

12                              **SEAN STORY**

13      Witness, having first been duly sworn, testified on

14                        DIRECT EXAMINATION

15    BY MS. COLVIN:

16    Q.   Good morning, Mr. Story.  Back in December 31st, 2006,

17    where were you employed?

18    A.   Bibb County Sheriff's Department.

19    Q.   Are you still in their employment?

20    A.   Yes, ma'am.

21    Q.   Let me ask you, what were your duties back on that

22    specific date in question?

23    A.   I worked in the jail on east -- it was west control that

24    night.

25    Q.   And, Mr. Story, you may have to come up some and move

1    that mike closer toward your mouth.  Thank you.  Did you have

2    an occasion that particular date, namely December 31st, 2006,

3    to receive a call regarding an inmate, Frederick Card?

4    A.   Yes, from booking.

5    Q.   Could you please explain to the jury where that call came

6    from and what you did?

7    A.   Booking had called and asked for Frederick Card to come

8    to booking.  At that time I looked on the roster, seen that he

9    was in cell 13.  I opened up cell 13, and who I believed was

10   Card came down.  I asked him was he Card; yes.  He returned to

11   his cell and got his stuff, and at that time he went to

12   booking.

13   Q.   So this person who you allowed to come out -- asked to

14   come out of the cell, actually came out the cell that you had

15   shown was designated for Frederick Card?

16   A.   Yes, it was assigned to Fred Card.

17   Q.   And what do you do with this person once they came out of

18   the cell and retrieved their items from inside the cell?

19   A.   I told him to go to booking, and then they walk around --

20   it's only a short walk around to booking.

21   Q.   And did that person comply?

22   A.   Yes.

23   Q.   Did anything alert you at that point as to any problem --

24   was a normal duty of yours?

25   A.   No, ma'am.

1    Q.    When did you become aware of the fact that that person

2    Frederick Card was not in that cell when you came to the cell?

3    A.    Well, I observed someone come out of his cell.  They shot

4    down to Card's cell, which he was Card, and when he went in

5    there, I locked back that cell, and then shortly after another

6    deputy had made a round, and then that's when Card had

7    identified his self that he was Card, and that he was supposed

8    to have a bond.

9    Q.    Now, explain that.  Go a little bit slower.  You're

10   saying after you asked the person who came out of Card's cell

11   initially to go to booking, someone else went into that cell?

12   A.    Yes.  Because Card was in Glawson's cell, and when

13   Glawson cleared the block and left out of sight, he shot out

14   of his cell, which was broke -- shot down the block and ran

15   into that cell, and I closed it to keep him in there to find

16   out who it was, and that's when, after that, another deputy

17   had went around, and he started saying that he was Card.  And

18   we pulled him off the block, asked him for information, and we

19   looked it up in the computer, and we saw, well, if he's not

20   Card, he knows a lot about Card, and the other deputy escorted

21   him to booking.  And that's when we -- it was maybe 45 minutes

22   after this whole incident happened that found out we had --

23   they had released him.

24           MS. COLVIN:   Thank you.

25           MR. HOGUE:    No questions.

1          THE COURT:  You may go down.

2          MR. CALHOUN:  The government next calls Dale

3     Frazier.

4          DEPUTY CLERK:  Do you solemnly swear that your

5     testimony in this case shall be the truth, the whole truth,

6     and nothing but the truth, so help you God?

7          THE WITNESS:  I do.

8          DEPUTY CLERK:  State your name for the jury, please.

9          THE WITNESS:  Leo Frazier.

10         DEPUTY CLERK:  Please spell your name, first and

11    last.

12         THE WITNESS:  L-e-o, F-r-a-z-i-e-r.

13                          **LEO FRAZIER**

14       Witness, having first been duly sworn, testified on

15                      DIRECT EXAMINATION

16    BY MR. CALHOUN:

17    Q.   Officer Frazier, how are you currently employed?

18    A.   I'm currently employed with the courthouse security,

19    Houston County Sheriff Department.

20    Q.   And how were you employed back in December of 2006?

21    A.   I was a booking sergeant with the Bibb County Sheriff's

22    Department.

23    Q.   And being a booking sergeant, I assume you worked in

24    booking; is that correct?

25    A.   That's correct, sir.

1    Q.    How long had you worked in booking as of December 2006?

2    A.    Four and a half years.

3    Q.    Now, drawing your attention to December 31st, 2006,

4    particularly around 11:00 p.m., were you on duty?

5    A.    I was, sir.

6    Q.    Were you working in male booking?

7    A.    I was, sir.

8    Q.    Who was working there with you at the time?

9    A.    Sergeant Mattox and Deputy Harris.

10   Q.    Do you know a Charles Grant?

11   A.    I do, sir.  He worked with Allstate Bonding Company.

12   Q.    Do you recall receiving a call from Mr. Grant around

13   11:00 p.m. on December 31st, 2006?

14   A.    I do, sir.

15   Q.    What did Mr. Grant relate to you?

16   A.    He wanted to know how much longer would it be before we

17   released a -- let's see, the name was Frederick Card.

18   Q.    And had you gotten a call reference a bond on Mr. Card?

19   A.    We had earlier, correct.

20   Q.    And what did you do once you received the information

21   that a bond had been made for Mr. Card?

22   A.    We verified that it's completed in the system from the

23   service desk.  Once we verify that the bond is complete,

24   generally one of us will go get the property out of the

25   property room, the person's clothes, and once we get

1    everything established there in male booking, we'll call for

2    that person off the blocks.

3    Q.    And after you had been notified of the bond on Card, whom

4    did you call?

5    A.    Initially, no one.  Sergeant Mattox and Deputy Harris

6    took care of all that.  When we were ready after the bonding

7    company called -- Sergeant Mattox had just stepped out --

8    Deputy Harris was completing his work, he had already gotten

9    the property clothes, I made the call to the blocks and spoke

10   with Deputy Story and told him that we needed Frederick Card

11   in male booking at bag and baggage.

12   Q.    Now, at the time you made the call to Officer Story, had

13   you gone into the computer and verified everything about the

14   bond?

15   A.    Yes, sir.

16   Q.    Now, what did you relate to Officer Story when you made

17   the call to him?

18   A.    That we needed Frederick Card, he was housed in A-213,

19   that we needed him in bag and baggage in booking to be

20   released.

21   Q.    And after you notified Officer Story of that, did a

22   subject come to your location in male booking?

23   A.    About 10, 15 minutes later, yes, sir.

24   Q.    And do you see that person in court today?

25   A.    Yes, sir.

1   Q.   Can you point to him and describe what he's wearing?

2   A.   He's got on a blue shirt.

3   Q.   And when this subject got to male booking, describe for

4   the jury what took place once he arrived there?

5   A.   Once he arrived in male booking, he identified himself as

6   Frederick Card.

7   Q.   Is that the same -- the person you're talking about as

8   the person you had in male booking --

9   A.   That's correct.

10   Q.   -- is that the person you identified in court?

11   A.   That's correct.

12   Q.   What other information did the person give you at the

13   time he approached you?

14   A.   On his right arm he had a red armband.  The red armband

15   had Frederick Card and had a slightly faded picture that was

16   similar to the person sitting here in court today.

17   Q.   Did you have any other conversation with that person

18   prior to that person leaving the jail?

19   A.   After we verified who he was, we gave him his clothes.

20   The clothes that we got from the property room was Frederick

21   Card, he put those clothes on, he came into male booking.

22   Part of the out-processing of the bond, we'll ask the person

23   -- verify the name again -- we ask for a current address and

24   two telephone numbers.

25   Q.   And did the subject give you those telephone numbers?

1    A.    That's correct, sir.

2    Q.    And what did you do with those numbers?  What kind of

3    checks did you perform?

4    A.    We literally just input them on the bond, and that's just

5    for callback information.

6    Q.    Was that the last step in terms of this person being

7    released?

8    A.    Yes, sir.

9    Q.    Did you have any other discussion with this person who

10   was presumed to be Card reference his mother?

11   A.    He had information -- Card was in for family violence.

12   Part of the stipulation when you're bonding out, you can't go

13   back to your residence.  He had information about his mother,

14   and he was asking how could he get his clothes, they were at

15   his mother's address, he knew he couldn't go back, what was --

16   you know, what was the process, could he get an officer to

17   come out.  He knew -- basically just talking to him that there

18   was no reason not to know that, you know, this was Card

19   standing before me.

20          MR. CALHOUN:  Nothing further, Your Honor.

21                      CROSS EXAMINATION

22   BY MR. HOGUE:

23   Q.    Sergeant Frazier, Mr. Calhoun asked you about some

24   telephone numbers --

25   A.    Yes, sir.

1    Q.    -- that Mr. Glawson gave to you.  Do you have your report

2    there with you because I'm guessing you're not going to

3    remember those?

4    A.    I do, sir.

5    Q.    He gave you two numbers?

6    A.    Uh-huh.

7    Q.    478 -- I need to get my glasses.  478-986-6335, right?

8    A.    Correct.

9    Q.    And 478-972-3931, correct?

10   A.    That's correct, sir.

11   Q.    And did you nothing at that time except input those?

12   Didn't call them, check out, see where they --

13   A.    No, sir.

14   Q.    Okay.  Thank you.

15         MR. HOGUE:  Nothing further.

16         MR. CALHOUN:  I've got one question, Your Honor.

17                       REDIRECT EXAMINATION

18   BY MR. CALHOUN:

19   Q.    Deputy Frazier, when -- this person that you've

20   identified as Richard Glawson in court today, did he sign

21   anything on the way -- as part of the out-processing, what did

22   he sign?

23   A.    The bond itself, you have to sign your name.  Let me

24   find -- he signed Frederick Broadus Card, Jr., on the bond.

25   Q.    Okay, now, help me with this.  Did he sign a hard copy of

1   something, or exactly what did he sign?

2   A.   It's similar to going to a bank, it's electronic, and

3   when you sign electronic, it transfers onto the computer onto

4   to the bond.

5           MR. CALHOUN:   Thank you.

6                       RECROSS EXAMINATION

7   BY MR. HOGUE:

8   Q.   And, Sergeant Frazier, when you answered Mr. Calhoun just

9   now --

10  A.   Yes, sir.

11  Q.   -- and you said what name Mr. Glawson signed, you picked

12  up a piece of paper, the one you're holding right now and read

13  from it.   That's, in fact, your own report, right?

14  A.   That's correct, sir.

15  Q.   So you're not looking at the thing he signed, are you?

16  A.   No, sir.

17  Q.   And reading the signature he signed?

18  A.   No, sir.

19  Q.   All right, thank you.

20  A.   You're welcome.

21          MR. CALHOUN:   Nothing further, Your Honor.

22          THE COURT:   You may go down.   We'll recess here for

23  lunch.   We'll be in recess until 1:15.   Please be back in your

24  jury room shortly before that hour.

25  *(RECONVENED; ALL PARTIES PRESENT 1:15 p.m.)*

```
 1                    THE COURT:  Is the government ready?

 2                    MR. CALHOUN:   Yes, Your Honor.

 3                    THE COURT:  Defense?

 4                    MR. HOGUE:   Yes, we're ready.

 5                    THE COURT:  Ask the jury to come in please and call

 6       your next witness.

 7                    MR. CALHOUN:  The government calls Robert McComb.

 8       (Jury In)

 9                    DEPUTY CLERK:  Do you solemnly swear that your

10       testimony in this case shall be the truth, the whole truth,

11       and nothing but the truth, so help you God?

12                    THE WITNESS:  I do.

13                    THE COURT:  State your name for the jury, please.

14                    THE WITNESS:  Robert Hendricks McComb.

15                    THE COURT:  Please spell your name, first and last.

16                    THE WITNESS:  R-o-b-e-r-t, M-c-C-o-m-b.

17                    ROBERT HENDRICKS MCCOMB

18          Witness, having first been duly sworn, testified on

19                         DIRECT EXAMINATION

20       BY MR. CALHOUN:

21       Q.   Mr. McComb, how are you currently employed?

22       A.   I'm retired from the sheriff's office.

23       Q.   Were you employed with the sheriff's office back in 2003?

24       A.   Yes, I was.

25       Q.   In 2005?
```

1    A.    No, I wasn't.

2    Q.    Now, what were your duties with the sheriff's office in

3    2003?

4    A.    I was the evidence custodian.

5    Q.    When did you leave the sheriff's department?

6    A.    In 2004.

7    Q.    And what were your duties as evidence custodian?

8    A.    I was responsible for receiving evidence taken in

9    criminal cases, preserving it, transporting it to and from the

10   crime lab, and any other functions regarding the storage and

11   preservation of the evidence.

12   Q.    Did this also include drug evidence?

13   A.    Yes, it did.

14   Q.    Now, can you describe to the jury the procedure when

15   evidence such as drug evidence was brought to you?

16   A.    When evidence was brought to me, I would receive an

17   evidence log from the agent that defined the defendant's name,

18   the case number, and a description bag-for-bag, the contents

19   of each bag.  I would enter it into our computer program which

20   is a barcode program.  I would place a barcode printed label

21   on the evidence bags and either store them in my facility or

22   return them to the officer to be taken to the crime lab.

23   Q.    Exactly what was that barcode number or barcode used for?

24   A.    It served two purposes.  I had a hand scanning device so

25   that I could scan any evidence in my evidence locker and

1    instantly pull up the case information, as well as its

2    location.

3    Q.   Did you implement that procedure yourself?

4    A.   Yes, sir, I did.  Well, let me back up.  Billy Johnson

5    started that, and we continued it when I took over.

6    Q.   Now, you placed the barcode on the evidence, did the

7    barcode go along with the exhibit?

8    A.   Yes.  It was not actually physically on the exhibit.  It

9    was on the storage bag or sometimes on weapons, it was

10   directly on weapons.

11   Q.   So if I understand you, the barcode would be attached to

12   the bag, say, for example?

13   A.   Yes, sir.

14   Q.   And if evidence was returned to you from the crime lab,

15   what would you do?

16   A.   I periodically picked up from the crime lab.  I'd bring

17   it back to my office, scan the barcodes, and enter the

18   location in the evidence lockers that it would be stored in.

19   Q.   Now, the evidence locker that you referred to, is that a

20   secured facility?

21   A.   Yes, sir.  Drugs are inside a combination safe.

22   Q.   Who had access to the evidence room during the time you

23   were there?

24   A.   During my time there, the total access -- if you want me

25   to go through everybody -- would include the Sheriff and chief

1   deputy.  But I had one assistant, Charles Sanfarar, and he

2   really wasn't assigned to me, but occasionally worked there,

3   was Dennis Haggerman.  All of this was under my supervision.

4   Q.   Now, when evidence was sent back to you from the crime

5   lab, what would you normally do with it?

6   A.   Again, I would scan it, mark in the computer program that

7   it had been returned, and store it in its appropriate place.

8            MR. CALHOUN:  May I approach, Your Honor.

9   Q.   Mr. McComb, let me show you what's been marked as

10  exhibits 53, 54, 55, and 56.  I'm going to display those in

11  front of you there.  Did you have occasion to come in

12  possession of those exhibits?

13  A.   Yes, I did.

14  Q.   And from whom?

15  A.   From Joseph Whitehead.

16  Q.   And once you came into possession of those exhibits, were

17  they sealed?

18  A.   Yes.

19  Q.   And what, if anything, did you do with those exhibits

20  after you came into possession of them?

21  A.   When I originally got them and entered the barcode

22  program, placing the stickers on the bag, I returned them to

23  Officer Whitehead, who told me he took them to the crime lab.

24            MR. HOGUE:  Objection to the hearsay, Your Honor.

25            MR. CALHOUN:   Now, you say you turned those over to

1    Whitehead.  Don't --

2              THE COURT:  Your objection is sustained.  That was

3    hearsay.  Don't tell what other people told you.

4              THE WITNESS:  Yes, sir.

5    BY MR. CALHOUN:

6    Q.   And you said once you took possession of them, you did

7    what with them now?

8    A.   I returned them to Agent Whitehead.

9    Q.   How long did you keep them before turning them back over

10   to Agent Whitehead?

11   A.   I kept them just long enough while he was still in the

12   building -- still there with me to put the barcode on them,

13   and he was right there.

14   Q.   Agent Whitehead was still present when you took them?

15   A.   Yes, sir.

16   Q.   And the barcode that you mentioned -- I draw your

17   attention to exhibit number 53, do you see the barcode on

18   there?

19   A.   Yes, sir.

20   Q.   Is that your barcode?

21   A.   Yes, sir.

22   Q.   I notice there's some writing on the exhibit, looks like

23   in red pen, do you recognize that?

24   A.   Yes, sir.

25   Q.   And did you place that there?

1   A.   Yes, sir.

2   Q.   What is that?

3   A.   B-03 that is written there is -- is the bin number 03

4   that was the physical location within the drug safe that it

5   was located in.

6   Q.   I noticed a number of seals on this exhibit, are any of

7   these your seals?

8   A.   Not on this one, no, sir.

9   Q.   Let me show you exhibit number 54 and ask you to look at

10  that, please.  Is there a barcode on that exhibit?

11  A.   Yes, sir.

12  Q.   And did you place the barcode on that exhibit?

13  A.   Yes, sir.

14  Q.   And I see some writing on that barcode, is that your

15  writing?

16  A.   Yes, sir.

17  Q.   What exactly is that?

18  A.   That's another B-03, and there's also a B-5 here.  What

19  that indicated was that it was originally stored in B-5, and

20  it was crossed through, and it was moved to B-3.

21  Q.   Now, do you -- are your initials anywhere on this

22  exhibit?

23  A.   No, sir.

24  Q.   Okay, now --

25  A.   I mean, I'm sorry, sir, I'm incorrect.  That is my

1    initial right there.

2    Q.   I see in the top right-hand corner there's "RM?"

3    A.   Yes, sir.

4    Q.   Did you place that there?

5    A.   Yes, sir.

6    Q.   Did you place it there at the time you received it?

7    A.   I cannot say that for certainty because the circumstances

8    with this was that it had to be split so that the crime lab

9    would take the cocaine because they would not take the

10   marijuana which had originally been packaged together.

11   Q.   And what was the purpose of putting your initials "RM" on

12   this portion of the exhibit?

13   A.   Any time I broke a secured seal on any evidence and

14   resealed it, I indicated that I had done so by initialing the

15   seal.

16   Q.   And let me show you exhibit number 55 and ask you to look

17   at that, please.  Now, is there a barcode affixed to that

18   exhibit?

19   A.   Yes, sir.

20   Q.   Did you place the barcode on that exhibit?

21   A.   Yes, I did.

22   Q.   And there's also some writing in red on that barcode.

23   Did you place that there?

24   A.   Yes, sir.

25   Q.   What exactly is that?

1    A.    Again, it's B-03, for bin 0-3.

2    Q.    And do your initials appear anywhere on that exhibit?

3    A.    Yes, sir.  They appear in this upper right-hand corner,

4    again, where we opened the -- where I opened and resealed the

5    bag.

6    Q.    Okay.  And let me show you exhibit number 56 and ask you

7    to look at that, please.  Do you recognize that, the barcode?

8    A.    The barcode is certainly, you know, our -- my office's

9    barcode.  Because there's no writing on this bag at all, I

10   cannot say that I specifically did this.

11   Q.    Do you recall obtaining this particular exhibit from

12   someone?

13   A.    This is -- let me look at this for a second.  Yes, sir.

14   Q.    Who did you obtain that from?

15   A.    This came from Joseph Whitehead.

16   Q.    And the document you were looking at a moment ago, what

17   exactly is that document?

18   A.    It is an evidence log.

19   Q.    Now, is that evidence log affixed to -- well, did you

20   normally affix the evidence log to each piece of evidence that

21   you took in?

22   A.    No, sir.

23   Q.    Let me ask you about one other -- I'm not sure if you did

24   this, but I'll ask it.  Let me show you government's exhibit

25   59 and ask you to look at that.  Is that a piece of evidence

1   that was received by you?

2   A.   No, sir.

3   Q.   Had you left the lab by this time?

4   A.   Yes, sir.  And that's what I was looking for was the date

5   to make sure that was correct.

6   Q.   I want to be sure.  Now, after you had returned these

7   exhibits back over to Deputy Whitehead, did they come back in

8   your possession some later time?

9   A.   No, sir.

10  Q.   Mr. McComb, you indicated that after you gave these

11  exhibits back to Agent Whitehead they did not come back in

12  your possession at a later time?

13  A.   Well, let me try to clarify that just a little bit.

14  There was -- because there's several cases here, the case that

15  I had, the case number 51-089, those never left my office.  I

16  signed for them, and they stayed with me.  The other items

17  never came back to my possession during my tenure.

18  Q.   All right, just to make sure I'm clear on this,

19  Mr. McComb, let me ask you again about exhibit number 59.  I'm

20  going to ask you to look at that exhibit again and just for

21  purposes of clarification, indicate whether you ever had

22  custody of that exhibit?

23  A.   Yes, sir.

24  Q.   You did?

25  A.   I have.  I'm looking at this barcode, but this is the

1    crime's lab barcode.

2    Q.    That's not your barcode?

3    A.    No.

4    Q.    Okay.

5    A.    That was my mistake.

6    Q.    So looking at your barcode, there's a number affixed to

7    that barcode?

8    A.    Yes, sir.

9    Q.    And did you place that number there?

10   A.    Yes, sir.

11             MR. CALHOUN:   That's all I have, Your Honor.

12                       CROSS EXAMINATION

13   BY MR. HOGUE:

14   Q.    Mr. McComb, with respect to the plastic bags themselves

15   that we've been talking about here in exhibits -- government

16   exhibits 53, 54, 55, and 56, those bags in the normal course

17   of things are initially acquired by the officer who seizes the

18   item and puts it in the bag and seals the bag, right?

19   A.    Yes, sir.

20   Q.    And then you're typically not present when that happens?

21   A.    That's correct.

22   Q.    They may be, you know, at their own office or at some

23   other part of the -- even some other police agency perhaps,

24   but by the time you get, you weren't there when it got put in

25   the bag and sealed and all the writing was put on the bag,

1   right?

2   A.   That's normally true.  Occasionally it wasn't, but --

3   Q.   Now, each of these bags that I'm looking at has on the

4   front of it looks like a form that's printed on the plastic

5   bag itself which has lots of blank lines where that officer,

6   whoever he may be, can fill in all this information or as much

7   of it as they choose to, right?

8   A.   That's correct.

9   Q.   Everything from case number, agency, the suspect, the

10   date, all that kind of stuff, right?

11   A.   That's correct.

12   Q.   And then each of them has one other large section where

13   there's a -- it says at the heading of it, chain of custody,

14   and it'll have a column that says "from," a column that says

15   "to," and then a column for the date, right?

16   A.   That's correct.

17   Q.   And the way it should normally work then is that when the

18   seizing officer puts the item in the bag and seals the bag and

19   then writes on the front of the bag, he or she would put his

20   or her name as the person who put it in the bag, right?

21   A.   That's correct.

22   Q.   And then if they gave it to someone or turned it into an

23   evidence locker or wherever they sent it, once it left that

24   person's possession, they would fill in the "to" column, this

25   is where I'm sending it to, bin number or person's name or

1    whatever?

2    A.    No, sir.  They did not do that.

3    Q.    Well, I mean, in the normal course of things, someone,

4    either the sending person or the receiving person would fill

5    that in?

6    A.    No, sir, they did not.

7    Q.    All right, so even though the bags are created with a

8    chain of custody on the bag itself, y'all just used the

9    barcode system or your own paper evidence logs?

10   A.    Yes, sir.

11   Q.    All right.  So, the officer -- the way it works is no one

12   else would write on the bags; you just put these stickers on

13   them?

14   A.    Well, now, I wrote -- would occasionally write on it, as

15   you will see on some of those bags, we wrote the barcode

16   number in larger letters just to be visible, but they would

17   not write any further on those bags.

18   Q.    And the idea behind all of that, of course, as you know

19   from your experience, is that when you have items like drugs

20   these are what are called fungible, that is, one piece of

21   cocaine looks like every other piece of cocaine pretty much,

22   right?

23   A.    Yes, sir.

24   Q.    It's not unique like a firearm would be --

25   A.    No, sir.

1    Q.   -- that has a serial number stamped right into the metal.

2    This just looks like all the cocaine in world pretty much,

3    right?

4    A.   Yes, sir.

5    Q.   So this part of the process is important because we got

6    to know that this cocaine that's now in this courtroom on

7    October 30th, 2007, is the cocaine that was taken from

8    somebody way back in 2003, right?

9    A.   Yes, sir.

10   Q.   All right.  And that's what all this chain of evidence

11   stuff is about, right?

12   A.   Yes, sir.

13   Q.   All right, thank you, sir.  That's all I have.

14          MR. CALHOUN:  Nothing further of Mr. McComb, Your

15   Honor.

16          THE COURT:  All right, sir, you may go down.

17          MR. CALHOUN:  The government next calls Mike Holt.

18          DEPUTY CLERK:  Do you solemnly swear that your

19   testimony in this case shall be the truth, the whole truth,

20   and nothing but the truth, so help you God?

21          THE WITNESS:  Yes, ma'am.

22          DEPUTY CLERK:  State your name for the jury please.

23          THE WITNESS:  Lieutenant Michael Holt.

24                      **MICHAEL HOLT**

25     Witness, having first been duly sworn, testified on

1          DIRECT EXAMINATION

2  BY MR. CALHOUN:

3  Q. Lieutenant Holt, how are you currently employed?

4  A. Bibb County Sheriff's Office.

5  Q. What are your duties with the sheriff's office?

6  A. I'm currently the supervisor in the communications

7  section.

8  Q. And have you ever worked in the evidence room?

9  A. Yes, sir.

10  Q. And during what time period did you work in the evidence

11  room?

12  A. In 2005.

13  Q. And what were your duties in the evidence room?

14  A. The evidence custodian.

15  Q. And as evidence custodian, what was your job?

16  A. It was to make sure that all the evidence within the Bibb

17  County Sheriff's Office was brought in and properly stored and

18  processed.

19  Q. Can you tell the jury what you would normally do -- well,

20  did that include drug evidence as well?

21  A. Yes, sir.

22  Q. Can you tell the jury what you would normally do when a

23  drug exhibit was brought to your location?

24  A. We would tag the evidence with a barcode system, and if

25  it's drug evidence, we would give it back to the officer, and

1    they would take it to the crime lab.  Any other evidence we

2    would store it in the evidence office.

3    Q.    Now, on occasion did you receive evidence back from the

4    crime lab?

5    A.    Yes, sir.

6    Q.    And what procedure did you follow once the evidence was

7    sent back from the crime lab?

8    A.    Then you would go and re-enter the evidence at the

9    location that you -- from the barcode and properly store that

10   evidence back into the vault.

11   Q.    What was that barcode used for?

12   A.    It was used to track the evidence.

13   Q.    And was any kind of paperwork generated when the evidence

14   was introduced into the evidence room?

15   A.    Yes, sir.  It's an evidence log.

16   Q.    Did that log accompany the exhibit?

17   A.    Yes, sir.

18   Q.    And when the evidence was sent back from the lab, what

19   was that log used for?

20   A.    It was used to track the evidence and to match up the

21   barcodes on the packaging and the evidence log.

22   Q.    Let me show you government's exhibits 53, 54, 55, and 56.

23   Have you had occasion to come into possession of those

24   exhibits?

25   A.    Yes, sir.

1    Q.   And can you -- do you recall when you came into

2    possession of those exhibits?

3    A.   According to evidence log that I have, I resigned those

4    items out to Deputy Whitehead on June 30th, 2005.

5    Q.   And at the time you signed them out, were they sealed?

6    A.   Yes, sir.

7    Q.   And you say you gave them to Deputy Whitehead.  For what

8    purpose?

9    A.   For him to take them to the crime lab.

10   Q.   And at some later time did the exhibits come back into

11   your possession?

12   A.   Yes, sir.

13   Q.   And approximately when was that?

14   A.   That was probably after the crime lab did their analysis,

15   then they would submit them back to us, and I would go and get

16   the evidence and put it back in its storage facility at our

17   evidence office.

18   Q.   And when you received those exhibits back from the crime

19   lab, do you recall whether they were still sealed?

20   A.   Yes, sir.

21   Q.   And when you put them back into the evidence vault, were

22   they still sealed?

23   A.   Yes, sir.

24   Q.   And have you had any contact with those exhibits since

25   you left your position as evidence custodian?

```
 1   A.    No, sir.
 2              MR. CALHOUN:  That all I have, Your Honor.
 3              MR. HOGUE:  No questions.
 4              THE COURT:  All right, sir, you may go down.
 5              MR. CALHOUN:  Your Honor, the government next calls
 6   Officer Billy Johnson.
 7              DEPUTY CLERK:  Do you solemnly swear that your
 8   testimony in this case shall be the truth, the whole truth,
 9   and nothing but the truth, so help you God?
10              THE WITNESS:  Yes, ma'am, I do.
11              DEPUTY CLERK:  State your name for the jury, please.
12              THE WITNESS:  Billy Johnson.
13                         BILLY JOHNSON
14        Witness, having first been duly sworn, testified on
15                       DIRECT EXAMINATION
16   BY MR. CALHOUN:
17   Q.    Officer Johnson, how are you employed?
18   A.    I work for the Bibb County Sheriff Department and
19   presently assigned to the Middle Georgia Drug Task Force as a
20   deputy commander.
21   Q.    How were you employed back on November 30th of 2004?
22   A.    I was assigned to the Middle Georgia Drug Task Force as a
23   deputy commander.
24   Q.    Let me show you what has been marked as government
25   exhibit 59 and ask you to look at that please.
```

1   A.   It's marijuana.

2   Q.   Did you have occasion to come in possession of that

3   marijuana?

4   A.   Yes, sir, I did.

5   Q.   And when was that?

6   A.   On October 17th.

7   Q.   And who provided you with that exhibit?

8   A.   Lieutenant Randy Collins.

9   Q.   And when you were provided with that exhibit, what did

10  you do with it?

11  A.   I took it to the state crime lab.

12  Q.   And when you took it to the state crime lab, was it

13  sealed?

14  A.   Yes, sir.

15  Q.   Was it sealed in the same fashion it is now?

16  A.   Yes, sir.

17  Q.   And after it was taken to the state crime lab, did you

18  have occasion to come back into possession of that exhibit?

19  A.   Yes, sir, I did.

20  Q.   And when was that?

21  A.   On October 29th.

22  Q.   And where did you come into possession of that exhibit?

23  A.   At the state crime lab.

24  Q.   You went and picked it up?

25  A.   Yes, sir.

1   Q.   When you picked it up, was it still sealed?

2   A.   Yes, sir.

3   Q.   Was it still sealed in the same fashion it is now?

4   A.   Yes, sir.

5   Q.   When you picked it up from the state crime lab, what did

6   you do with it?

7   A.   Brought it to the federal courthouse.

8   Q.   And you picked it up in preparation for trial?

9   A.   Yes, sir.

10  Q.   And did you maintain contact -- maintain custody until

11  you turned it over?

12  A.   Yes, sir, I did.

13  Q.   Are your initials anywhere on that exhibit?

14  A.   No, sir.

15  Q.   So the only thing you did was just picked it up?

16  A.   Yes, sir.

17          MR. CALHOUN:  No further questions.

18          MR. HOGUE:  No questions.

19          THE COURT:  All right, sir, you may go down.

20          MR. CALHOUN:  The government next calls Randy

21  Collins.

22          DEPUTY CLERK:  Do you solemnly swear that your

23  testimony in this case shall be the truth, the whole truth,

24  and nothing but the truth, so help you God?

25          THE WITNESS:  I do.

1          DEPUTY CLERK:  State your name for the jury, please.

2          THE WITNESS:  Randy Collins.

3                         **RANDY COLLINS**

4     Witness, having first been duly sworn, testified on

5                      DIRECT EXAMINATION

6   BY MR. CALHOUN:

7   Q.   Is it Officer Randy Collins?

8   A.   It is, lieutenant.

9   Q.   And how are you currently employed?

10  A.   With the Bibb County Sheriff's Office, evidence

11  custodian.

12  Q.   And as evidence custodian, what basically is your job

13  basically?

14  A.   When evidence is brought in, they bring it into me, I log

15  it and store it.

16  Q.   And we've heard previously the testimony of Officer Holt.

17  Was he the evidence custodian before you?

18  A.   Yes, sir.

19  Q.   Now, could you describe the procedures for -- that were

20  utilized by you when evidence was brought to you for placement

21  in the lab -- in the evidence vault, rather?

22  A.   This evidence was there prior to me getting there.

23  Q.   All right, let me show you this exhibit before you start

24  testifying about the specific exhibit.  Let me show you

25  exhibit number 59 and ask you to look at that please.  Do you

1    recognize that exhibit?

2    A.    I do.

3    Q.    Did you have occasion to take custody of that exhibit?

4    A.    I gave this evidence to someone.

5    Q.    Who did you give it to?

6    A.    Lieutenant Billy Johnson.

7    Q.    And when did you give it to Lieutenant Johnson?

8    A.    On December -- or, I'm sorry, October 17th.

9    Q.    And at the time you gave it to Lieutenant Johnson, was it

10   sealed?

11   A.    It was.

12   Q.    Do you have any seal on that exhibit at all?

13   A.    Yes, sir.

14   Q.    And where is your seal?

15   A.    Here.

16   Q.    That's the red portion?

17   A.    Yes, sir.

18   Q.    Are your initials on that seal?

19   A.    It is.

20   Q.    When did you come into possession of that exhibit?

21   A.    Lieutenant Johnson came down October 17th to retrieve the

22   marijuana.

23   Q.    It was already in the evidence room?

24   A.    It was.

25   Q.    And you took it out and gave it to Lieutenant Johnson?

1   A.   Yes, sir.

2   Q.   Is that when you put your seal on there?

3   A.   Yes, sir.  There was a drivers license in it.  When

4   evidence goes out to the crime lab, they wouldn't want that

5   drivers license to be in the bag.

6   Q.   I see.  So you went into the exhibit?

7   A.   Yes, sir.

8   Q.   And you went in for the purpose of removing the license?

9   A.   That's right.

10  Q.   And is that when you resealed it?

11  A.   That's correct.

12  Q.   And are there any initials on here that belong to you?

13  A.   Yes, sir.

14  Q.   Where are the initials?

15  A.   On the bar tab.

16       MR. CALHOUN:  No further questions, Your Honor.

17       MR. HOGUE:  No questions.

18       THE COURT:  All right, sir, you may go down.

19       MS. COLVIN:  Your Honor, at this time the government

20  would call Dustin Collins.

21       DEPUTY CLERK:  Do you solemnly swear that your

22  testimony in this case shall be the truth, the whole truth,

23  and nothing but the truth, so help you God?

24       THE WITNESS:  Yes, ma'am.

25       DEPUTY CLERK:  State your name for the jury please.

1              THE WITNESS:  Dustin Collins.

2              DEPUTY CLERK:  Please spell your name, first and

3    last.

4              THE WITNESS:  D-u-s-t-i-n, C-o-l-l-i-n-s.

5                          **DUSTIN COLLINS**

6      Witness, having first been duly sworn, testified on

7                        DIRECT EXAMINATION

8    BY MR. COLLINS:

9    Q.   Mr. Collins, where are you currently employed?

10   A.   I'm a chemist at Robins Air Force Base in Warner Robins,

11   Georgia.

12   Q.   When did you start employment there?

13   A.   July 9th of this year, 2007.

14   Q.   Prior to July 2007, where were you employed?

15   A.   At the GBI crime lab in Macon, Georgia.

16   Q.   And how long have you been in their employment?

17   A.   Nine years.

18   Q.   What was your position with the crime laboratory prior to

19   your departure?

20   A.   I was a forensic chemist.

21   Q.   And in your capacity as a forensic chemist, have you

22   undergone special training?

23   A.   Yes, ma'am.  I underwent about a four-month training

24   program specifically dealing with drug identification at the

25   headquarters crime laboratory in Atlanta, Georgia.  Prior to

1    that I underwent -- let's see -- I got a four-year bachelor's

2    of science degree in chemistry from Georgia College in

3    Milledgeville, Georgia.  I've attended DEA Analyst Seminar in

4    Chantilly, Virginia.  To date I've tested over 8,000 drug

5    cases.

6    Q.   And have you previously testified as an expert in the

7    area of forensic chemistry in federal court?

8    A.   Yes, ma'am.

9    Q.   Roughly, approximately how many times have you had an

10   opportunity to do that?

11   A.   Maybe ten.

12        MS. COLVIN:  Your Honor, at this time we would seek

13   to qualify Mr. Collins as an expert in the area of forensic

14   chemistry.

15        MR. HOGUE:  No questions, no objections.

16        THE COURT:  He is qualified.

17        MS. COLVIN:  Thank you, Your Honor.

18   BY MS. COLVIN:

19   Q.   Mr. Collins, did you have occasion to receive evidence in

20   a case regarding a subject AKA/Terry Butler, Richard Ben

21   Glawson?

22   A.   Yes, ma'am.

23   Q.   Going to your first exhibit -- and I'll just start off

24   with one -- namely your case number 2003-4002446.

25   A.   Okay.

1    Q.    Did you have occasion to receive evidence in that

2    particular case?

3    A.    Yes, ma'am, we did.

4    Q.    Let me show you what has been identified as government's

5    exhibit number 53 for the purpose of identification.  Do you

6    recognize that?

7    A.    Yes.

8    Q.    How is it that you recognize that, Mr. Collins?

9    A.    I recognize this by the unique crime laboratory case

10   number placed on this package 2003 dash 4002445, item 1A.  I

11   also recognize my handwriting on the inner package with the

12   abbreviated crime lab case number, as well as my initials on

13   the inner package.  I also recognize the seal of crime lab

14   tape, the blue tape here, with my initials across that tape.

15   Q.    And have any of your initials on that -- within that

16   package or on that package been distorted in any way?

17   A.    It doesn't appear so.

18   Q.    Now, you've mentioned a barcode that's on that.  What is

19   the purpose of you having a crime lab sort of barcode on that

20   particular evidence?

21   A.    The barcode is just a means of how we track evidence

22   throughout the crime lab system as it moves from place to

23   place or person to location.  It's a barcode scanned by the

24   computer system, and at any one time we can tell where the

25   evidence package is.

1    Q.   Once you received that, did you have an occasion to test

2    that particular substance inside the packet?

3    A.   Yes, ma'am.

4    Q.   Could you please tell the jury what you did to conduct

5    your testing?

6    A.   Well, the first thing I do is cut the bag open, the

7    sealed bag, and then I remove the contents.  I then weigh the

8    sample and perform a net weight, which the net weight is the

9    sample weight without any of the packaging, and I'll document

10   that weight.  I then proceed to take a sample of the evidence,

11   and in this case, I performed high performance liquid

12   chromatography, gas chromatography and mass spectrometry and

13   infrared spectroscopy.

14   Q.   And as a result of those testings that you conducted,

15   what were your final analysis?

16   A.   This sample is positive for cocaine base.  It weighs

17   10.37 grams, plus or minus 0.03 grams.

18   Q.   Now, moving on to your case number 2003-4002728.  Did you

19   receive this particular sample in the crime lab regarding a

20   subject AKA/Terry Butler, subject, Richard Ben Glawson?

21   A.   Yes, ma'am.

22   Q.   Let me show you what has been marked as government

23   exhibit number 54, and if you can take a moment to look at

24   that and see if you can identify it.

25   A.   Yes.

1   Q.    And how can you identify that exhibit, namely

2   government's exhibit number 54?

3   A.    By the unique crime laboratory case number placed on this

4   package, 2003 dash 4002728, item one, as well as my initials

5   on the inner package, as well as the abbreviated crime lab

6   case number on that inner package, and the blue tape across

7   the package where I opened it and resealed it, as well as my

8   initials on that blue tape.

9   Q.    When you received this particular exhibit, what did you

10  do with this exhibit?

11  A.    I tested it in the same manner as I did exhibit 53.

12  Q.    And what were your test analysis showing once you did

13  that test?

14  A.    This substance is positive for cocaine base.  It weighed

15  18.71 grams, plus or minus 0.03 grams.

16  Q.    Regarding case number 2003-4002729, namely government's

17  exhibit number 55, do recognize that exhibit?

18  A.    Yes, ma'am.

19  Q.    And how is it that you recognize that exhibit?

20  A.    The unique crime laboratory case number that's placed on

21  this is 2003 dash 4002729, item one.  I see my initials and

22  inner writing -- writing on the inner bag, as well as the

23  abbreviated case number on this inner package.  I also

24  recognize my initials across the blue tape where I opened this

25  package and resealed it.

1  Q.   And this exhibit, exhibit 55, as well as exhibit 54, any

2  indication of any alteration of your seal or your initials?

3  A.   No, ma'am.

4  Q.   What type of testing did you do on exhibit number 55?

5  A.   The same test were performed on this package as the

6  previous two exhibits.

7  Q.   And what did that analysis show?

8  A.   That this sample tested positive for cocaine base.  It

9  weighed 7.86 grams, plus or minus 0.03 grams.

10  Q.   Mr. Collins, let me ask you, was that the extent of the

11  substances that you tested for this particular case?

12  A.   To my knowledge, yes, ma'am.

13  Q.   Prior to your testing these substances, had they been

14  tested by another chemist?

15  A.   They had been.

16  Q.   And did you re-test the substance after her departure?

17  A.   Yes, ma'am.

18  Q.   And did she -- is there anything on the exhibit that

19  indicates to you that she went through the same procedures

20  that you had to regarding the sealing and initialing of the

21  items?

22  A.   The packages all appear to have been opened and resealed

23  with her initials near that seal.

24  Q.   Just one moment.

25          MS. COLVIN:  Your Honor, at this time the government

1    seeks to introduce what's been marked as government exhibit

2    53, 54, and 55.

3           MR. HOGUE:   Objection.   The basis is Rule 901A, that

4    these items have not been fully authenticated yet so that the

5    proponent of them has proven that they are what they claimed

6    them to be.   Not that that we dispute what this witness says.

7    We have no dispute with what Mr. Collins says, that the stuff

8    in those bags is what he says it is.   Our issue under 901A has

9    to do with the chain of custody so that those items he's

10   talking about should be connected to this case, and we have

11   missing links in the chain, so we would object to the --

12          THE COURT:   Well, why don't you help us and tell us

13   what links are missing?

14          MR. HOGUE:   Whitehead.

15          THE COURT:   What about Whitehead, Ms. Colvin?

16          MS. COLVIN:   Your Honor, Deputy Whitehead is

17   deceased, as the court is well aware, and in light of that, we

18   have brought every other person who has had some affiliation,

19   some association with each of these items of drugs to show

20   that the chain was always intact, that none of the substances

21   were tampered with, and there is no way to bring the person

22   who -- the case agent, Deputy Whitehead.   So we have done is

23   gone far and beyond what we will typically do to establish

24   chain when we do have the person who was the case agent in

25   this case, and I would ask the court to allow the submission

1   of this evidence, and, if anything, it will go toward the

2   weight, but not whether or not the evidence is capable of

3   being introduced.

4         THE COURT:  Anything else, Mr. Hogue?

5         MR. HOGUE:  No, Your Honor.

6         THE COURT:  Any case you want to cite?

7         MR. HOGUE:  I want to cite again Federal Rule of

8   Evidence 901A.

9         THE COURT:  I've got that cite.  Have you got a

10  case?

11        MR. HOGUE:   United States versus Ladd --

12        THE COURT:  What does it say?

13        MR. HOGUE:  -- 885.  It says that the government

14  must establish a chain of custody.

15        THE COURT:  Is it in that book?

16        MR. HOGUE:  Yes, it is.

17        THE COURT:  No, I mean, other than the cite.

18        MR. HOGUE:  You want to know other than the cite

19  what --

20        THE COURT:  Yes.  I mean, have you read that case?

21        MR. HOGUE:  No, I'm reading the notes concerning

22  that.

23        THE COURT:  Are the facts on all fours with this

24  case or --

25        MR. HOGUE:  I don't know.

1       THE COURT:  All right, the objection is overruled.

2    G53, 54, and 55 are admitted.

3       MS. COLVIN:  Thank you, Your Honor.  That's all I

4    have of this witness, Your Honor.

5                    CROSS EXAMINATION

6    BY MR. HOGUE:

7    Q.   Agent Collins, Margaret Litley is the person whose name

8    you were referring to earlier, without saying her name, who

9    was the former chemist --

10   A.   Yes, sir.

11   Q.   -- whose name or initials at least appeared on some of

12   those bags?

13   A.   Yes, sir, MRL.

14   Q.   What happened to her?

15   A.   She --

16       MR. CALHOUN:  Objection, Your Honor.

17       THE COURT:  Pardon?

18       MR. CALHOUN:  Objection.

19       THE COURT:  What is the objection?

20       MR. CALHOUN:  Your Honor, I just don't see what is

21   relevant for this witness to get into what might have happened

22   to another chemist who tested the drugs previously.  I don't

23   see how that's relevant, and also I think it would get into

24   hearsay.

25       THE COURT:  Mr. Hogue?

1      MR. HOGUE:  Well, I don't know that it's hearsay if

2  Mr. Collins, in fact, knows what I believe the answer --

3      THE COURT:  What is the relevance?

4      MR. HOGUE:  Well, Your Honor, if you'd like me to

5  answer that right here, I will.  I think the relevance is

6  this, but I have to say this, in all fairness, my answering

7  your question is going to reveal what the government may be

8  objecting to, but I'll be glad to do it.

9      MR. CALHOUN:  The only thing I'm objecting to

10  relevancy, Your Honor.  This witness is called as a chemist.

11  He's not called to give testimony about what happened to

12  another chemist before he examined those exhibits.

13      THE COURT:  Why don't y'all come up here, and we'll

14  talk about it.

15  (SIDEBAR)

16      THE COURT:  All right, what's the relevance?

17      MR. HOGUE:  Well, she is another link in the chain.

18  We just learned that she -- and I had seen before there was

19  another crime lab report written by this person indicating

20  that she has also handled this evidence and is not here to

21  testify, and so far as I know she's not deceased, and I see

22  differences that may be explainable between her reports and

23  Mr. Collins' reports, but I also happen to know, Your Honor,

24  that I believe Ms. Litley left the GBI under some questionable

25  circumstances having to do with handling of evidence, so I've

1    heard.  I don't know if he knows all of this, but he might.

2              THE COURT:  Did these questions or circumstances

3    have anything to do with the handling of these exhibits?

4              MR. HOGUE:  I don't know.

5              MR. CALHOUN:  I know, Judge.  They didn't.

6              THE COURT:  What about the chain of custody?

7              MR. CALHOUN:  Your Honor, once before this

8    particular chemist examined those exhibits they were sealed

9    inside of the crime lab.  And I think as he's testified to

10   that, that once he got them out, they were still sealed, he

11   opened them, tested them, and resealed them again.

12             MR. HOGUE:  If I may respond, Your Honor, Ms. Litley

13   also received these items some two years before Mr. Collins

14   did, and I presume, though we don't know, that she also opened

15   them and did a bunch of stuff to them and put them back in

16   maybe, I guess.  And that's why I say she's no longer there, I

17   hear through my sources.  It's somewhat questionable why, but

18   I don't know that, I didn't investigate her.

19             MR. CALHOUN:  Judge, it also goes back to what Ms.

20   Colvin alluded to -- a gap in the chain of custody does not

21   make the exhibit is admissible.  It goes to the weight the

22   jury can accord it.  In addition, Your Honor, I think Mr.

23   Hogue is covering a matter not covered on direct.  At no time

24   did Ms. Colvin ever get into that.  At most, if he wanted to

25   question this witness, he'd have to call him back as far as

 1 | his case.

 2 | MR. HOGUE:  Let me say, the items have already been

 3 | admitted into evidence over objection, so we're are no longer

 4 | even arguing chain of custody, I suppose.  That's been

 5 | overruled.

 6 | THE COURT:  Well, if that is no longer a question,

 7 | what's the point of your cross examining the witness?

 8 | MR. HOGUE:  Well, let me show the court.  I don't

 9 | know what the answer to this is --

10 | THE COURT:  No, listen to me.

11 | MR. HOGUE:  Yes, sir.

12 | THE COURT:  I mean, you're saying two things.

13 | You're saying you want to cross examine this witness in

14 | connection with a chain of custody question, and then, in the

15 | next breath you say that the chain of custody is no longer a

16 | question.

17 | MR. HOGUE:  No, let me clarify myself, Your Honor.

18 | THE COURT:  Did you misstate that?

19 | MR. HOGUE:  I objected to the admission of these

20 | exhibits because of the chain of custody.  I identified

21 | Whitehead.  I should have also identified Litley at least with

22 | respect to three of them that I can tell that she handled and

23 | also has not been here to testify.  But even though I didn't

24 | mention her in response to the court's inquiry a moment ago,

25 | the court has admitted those items.  So my questions to him

1    won't necessarily be -- I guess it's partially chain of

2    custody, but it's more -- my focus would be more on why are

3    there differences between what he's got and what she had, and

4    I think it's relevant to inquire, well, why isn't she the one

5    here talking about, she tested all this stuff too, and the

6    reports are different from his reports.  That may be

7    explainable.

8              THE COURT:  I think that those are all things that

9    you can bring in if you want to.  I don't think you're

10   entitled to ask him why she is not the witness testifying in

11   this case.  She's not here.  I don't think you can ask him

12   about her tests.

13             MR. HOGUE:  Well, I didn't ask why she wasn't here

14   testifying.  I asked him what happened to her.  Now, what if

15   he knows, well, she got fired for lying and cheating and doing

16   whatever.

17             THE COURT:  Unless you can establish that that has

18   something to do with tests that she did on this evidence,

19   which tests have been admitted in this case, that is not

20   relevant.  So ruled.

21             MR. HOGUE:  Very well, Your Honor, what I'd like to

22   do then at some point I suppose without the jury here is

23   perfect the record with the witness.

24             THE COURT:  Very good.  Sure -- well, wait a minute.

25             MR. HOGUE:  Because there's more I haven't been able

1   to say here at this side bar that I would ask this witness

2   that I contend would be relevant and admissible.

3         THE COURT:  Okay, we'll go into that when the jury

4   is out.

5   *(BENCH CONFERENCE CONCLUDED)*

6         THE COURT:  I think we'll take a short recess here,

7   ladies and gentlemen step back to the jury room.

8   *(Jury Excused, 2:07 p.m.)*

9         THE COURT:  Mr. Hogue, it might be clearer for all

10   of us if you would now in the absence of the jury restate your

11   position with respect to your prospective cross examination.

12         MR. HOGUE:   Well, the basis for my cross

13   examination is to test the chain of evidence regarding the

14   identity of the evidence noted here as government exhibits 53,

15   54, and 55 by questioning Agent Collins concerning differences

16   between his tests results and those of the prior chemist that

17   he was asked about on direct examination when he was asked if

18   there was another chemist whose initials are on the bag who

19   tested this stuff before you did, and it was resubmitted to

20   you, and you tested it.  All of that came out on direct.

21       So within the scope of my cross, I believe it's fair

22   for me to be able to say to him, why are you retesting it, and

23   then, further, I mean, it may be explainable, I keep saying

24   that, and I don't know what his answer will be, but there are

25   some differences between his tests and hers, and I think I

1    know what the explanation for that will be, but I wanted to

2    ask him about that and ask him if he knows of his own personal

3    knowledge why she's not there, and he had to retest, and then

4    he had to come here testify instead of her.  Margaret Litley

5    is the person I'm talking about.  So that's the basis for the

6    cross I was about to go into when I drew the objection.

7              THE COURT:  What does the government say?

8              MR. CALHOUN:  Your Honor, the government would

9    object to Mr. Hogue asking this witness about the results of

10   another chemist.  That's hearsay.  And the government also

11   objects to going into -- assuming Mr. Hogue can lay a

12   sufficient foundation that this witness has knowledge why

13   Ms. -- the other chemist is no longer employed is irrelevant.

14   As the court has pointed out, the evidence has already been

15   admitted, so it's irrelevant to bring up what another chemist

16   did on a prior occasion.

17             THE COURT:  The jury is not here.  Let's hear the

18   questions and hear what the witness has to say outside of the

19   presence of the jury.

20             MR. HOGUE:  Thank you, Your honor.

21   BY MR. HOGUE:

22   Q.   Agent Collins, do you know what happened to Margaret

23   Litley?

24   A.   Yes, sir.  She was forced to resign.

25   Q.   Do you know why?

1    A.    What was told to me was --

2              MR. CALHOUN:   Objection, Your Honor, he's getting

3    into hearsay.

4              THE COURT:   I understand it's hearsay.  I want to

5    hear the answer.

6              THE WITNESS:   Her quality of work was less than

7    sufficient.   Nothing questionable about her practices other

8    than she just got the wrong answer on several occasions.   In

9    other words, for example, she missed some drugs in -- when she

10   should have reported them positive for a certain drug, she

11   actually went through the examinations and missed the

12   identification of that drug.  Never did I hear anything that

13   was questionable about her practices whereas she was doing

14   anything like swapping evidence or anything to that extent.

15   It was just a matter of her ability not to be able to the test

16   drugs to the full extent of her training.

17   BY MR. HOGUE:

18   Q.    Including cocaine?

19   A.    No, sir.  The cocaine was the easy thing to test.  I

20   mean, I never knew that she got a positive test wrong.  It was

21   always the negative things where she would say that something

22   was negative for common drugs of abuse, and there actually

23   were drugs present.  That was where she had her problems.

24   Q.    Now, you've been asked to identify on direct examination

25   by number, three of your own official reports and the test

1   results you reached and those numbers were 2003 -- I'm going

2   to try to get these in order.

3           THE COURT:  Why don't you just refer to them by

4   exhibit number?

5           MR. HOGUE:  Well, I will do both, Your Honor, just

6   so the record will be very clear about this.

7   BY MR. HOGUE:

8   Q.   Government's exhibit 53, which corresponds to your case

9   number 2003-4002446.  Now, you did a net weight of the total

10  sample you testified to at 10.37 grams, plus or minus

11  0.03 grams right?

12  A.   Yes, sir.

13  Q.   And in retesting these drugs and in preparing them for

14  trial, I presume, and you tell me, that you had access to the

15  official report of Margaret Litley concerning these same drugs

16  presumably?

17  A.   I think I was shown just prior to testimony.  I don't

18  recall what it stated.

19  Q.   And you know the way the department works is when a

20  chemist assigns or whoever does the assigning of a case

21  number, that case number stays with the case throughout, even

22  if there's ten different chemists, right?

23  A.   Yes, sir, it is the same case number.

24  Q.   So you have been shown a case number that's identical to

25  the one we just identified, but was done by Margaret Litley?

1   A.   Yes, sir, prior -- I probably looked at it when I tested

2   this package initially, but I don't recall.  Also I think I

3   was shown one by the U.S. Attorney's Office prior to this

4   testimony just as we got back from lunch, but I don't recall

5   what the weight was or what the results were.

6   Q.   When you say you were shown it, you were given a copy of

7   it?

8   A.   No, I was not given the copy.  It was just displayed in

9   front of my eyes.

10  Q.   But you were able to read it and note if there were any

11  differences between your report and her report?

12  A.   I recall there being differences, but not to what extent.

13  Q.   Do you recall there being differences in the weight of

14  the drugs?

15  A.   Yes, sir, but not to what extent.

16  Q.   All right, well, may I ask then, what -- would you have

17  any explanation for those differences?  And I'll just say for

18  clarity of the record that there are differences between each

19  of the three exhibits, 53, 54, and 55, between your reports

20  and her reports, right?

21  A.   That's what I recall, yes, sir.

22  Q.   Do you have an explanation for that?

23  A.   Other than I retested a lot of different exhibits from

24  different chemists, and the weight was never the same exactly.

25  My only scientific explanation could be that it loss weight

1    due to evaporation of water.  Or also, it could be that some

2    residual amounts were left in the package and left on the

3    package, the inner bag itself.

4            MR. HOGUE:  Well, Your Honor, that concludes the

5    proffer that I wanted to make concerning my examination of

6    this witness.  I have nothing further to ask him or argue

7    concerning what I wanted to do.

8            THE COURT:  Anything the government wants to say?

9            MS. COLVIN:  Your Honor, just one question for him.

10           THE COURT:  All right.

11   BY MS. COLVIN:

12   Q.   Outside of the differing weights, was your analysis of

13   the substance and what it was the same?

14   A.   I believe she did find cocaine.  I don't know that she

15   found cocaine base.  I'm not sure that that initial test was

16   performed.  I would have to look at her report to see that.

17   Q.   And you were asked to perform the additional test of

18   cocaine base?

19   A.   Yes, ma'am.

20   Q.   Thank you.

21           MR. HOGUE:  Your Honor, if I may.

22   BY MR. HOGUE:

23   Q.   So to clarify that, which I'm now looking at what you

24   were just asked, what you tested in these three exhibits we're

25   talking about you concluded was cocaine base, right?

1  A.   Yes, sir.

2  Q.   And so as far as you can tell what Ms. Litley concluded

3  was simply cocaine.  She didn't identify whether it was

4  cocaine base or not?

5  A.   That's my recollection from reading her reports.

6           MR. HOGUE:   Thank you.

7           MS. COLVIN:   Nothing further, Your Honor.

8           THE COURT:   As I understand it, the reports of the

9  tests made by Ms. Litley are here in the courtroom?

10           MS. COLVIN:   Yes, Your Honor.

11           THE COURT:   There's no question about their

12  authenticity?

13           MS. COLVIN:   No, Your Honor.

14           THE COURT:   They were made on the same samples which

15  make up government's exhibits 53, 54, and 55.

16           MS. COLVIN:   That's correct, Your Honor.

17           THE COURT:   I think the defendant, since the test is

18  here and there's no question about it, I think the defendant

19  is entitled to cross examine Mr. Collins -- well, I don't know

20  if you call it cross examine or not -- but he can use

21  Mr. Collins to establish the fact that there was another test,

22  and I think that test ought to be admitted to -- just be

23  admitted and the results of that tests, and he can ask him

24  what in his opinion as an expert witness accounts for the

25  difference.  I do not think that the earlier testimony about

1    where Ms. Litley is and why she left the crime lab and under

2    what circumstances, that seems to me to be mostly hearsay, and

3    I'm not going to admit that, but if you want to do the other,

4    I'll let you do that.

5            MR. HOGUE:  Your Honor, if I may say, I'm not sure

6    what the -- now, without the story of Margaret Litley's

7    departure from the GBI would be the advantage to the defense

8    to go into it except for the difference between her finding

9    that it was cocaine and his finding that it was cocaine base.

10   I'm thinking ahead now to, you know, a guidelines' issues too,

11   as well as --

12           THE COURT:  I understand that.

13           MR. HOGUE:  -- as well as issues here for the jury.

14           THE COURT:  Yes, sir.

15           MR. HOGUE:  Because I know Mr. Collins, and I think

16   he's a fine chemist, and when he says it's cocaine base, I'm

17   not going to doubt him.  I'm just curious as to, you know,

18   what to do with this other witness who's not here who has a

19   different weight and a different drug -- sort of.  I mean, I

20   never really thought them to be different, but they are,

21   according to Congress, and I'm no chemist.

22           So, unless this witness were going to tell the jury,

23   yeah, okay, maybe it's cocaine and not cocaine base, and I

24   don't think he's going to do that, I'm not sure what more I

25   can do with it other than the chain argument which I made

1    already and that goes to admissibility, but it's been

2    admitted, and I'm doing this proffer to raise that issue

3    again.  I want the record to be clear about that.

4         But actually since he's given a lesser weight than her

5    report gives, that's to our advantage.  I don't want to undo

6    that.  However, the cocaine base-cocaine issue, I know -- and

7    I can't remember now, there's some recent changes in the law

8    concerning that or at least they're being discussed.  I don't

9    think they've occurred yet, but I don't know that that's an

10   issue for the jury, in other words, I'm not sure.

11        THE COURT:  Well, that's a matter that addresses

12   itself to you, not me.

13        MR. HOGUE:  Well, I'm thinking as I talk, Your

14   Honor, trying to decide.

15        THE COURT:  Well, I'm going to -- you can talk to

16   these other people while we take a recess.

17        MR. HOGUE:  All right.

18        THE COURT:  Unless there's something else to be

19   said.  All right, we'll take 10 minutes.

20   *(RECONVENED; ALL PARTIES PRESENT, 2:35 p.m.)*

21        THE COURT:  Is the government ready to proceed?

22        MS. COLVIN:  Yes, Your Honor.

23        THE COURT:  Mr. Hogue?

24        MR. HOGUE:  Yes, Your Honor.  I'm not going to have

25   further questions for Mr. Collins when the jury comes back

```
 1   in.
 2              THE COURT:  No more?
 3              MR. HOGUE:  No more.
 4              THE COURT:  All right, thank you.  Any other
 5   questions of this witness from the government?
 6              MS. COLVIN:  No other questions, Your Honor.
 7              THE COURT:  You're excused, Mr. Collins.  Ask the
 8   jury to come back in.  Well, let me ask, are you going to have
 9   any more witnesses?
10              MS. COLVIN:  Yes, Your Honor.  We have two more
11   witnesses, another crime lab and then a stipulation of fact
12   which I'll read into evidence, and then Jay Bagwell, who will
13   be very short.
14              THE COURT:  Very good.
15   (Jury In)
16              MS. COLVIN:   Your Honor, at this time the
17   government would call Jeanne Gibbs.
18              DEPUTY CLERK:  Do you solemnly swear that your
19   testimony in this case shall be the truth, the whole truth,
20   and nothing but the truth, so help you God?
21              THE WITNESS:  I do.
22              DEPUTY CLERK:  State your name for the jury please.
23              THE WITNESS:  Jeanne Gibbs.
24              DEPUTY CLERK:  Will you spell your name, first and
25   last.
```

1        THE WITNESS:  J-e-a-n-n-e, G-i-b-b-s.

2                      **JEANNE GIBBS**

3     Witness, having first been duly sworn, testified on

4                      DIRECT EXAMINATION

5   BY MS. COLVIN:

6   Q.   Good afternoon, Ms. Gibbs.

7   A.   Hello.

8   Q.   Where are you employed?

9   A.   With the Georgia Bureau of Investigation at the Central

10  Regional Crime Laboratory.

11  Q.   And what is your position at the crime laboratory?

12  A.   I am a forensic chemist assigned to analyze substances to

13  determine if they contain any drugs, any substances in

14  violation of the Georgia Controlled Substances Act.

15  Q.   And what is your educational background?

16  A.   I earned a bachelor's degree in chemistry from Wesleyan

17  College here in Macon.

18  Q.   And you've had training since your tenure at the crime

19  laboratory?

20  A.   Yes.  I received eight months of training with the GBI in

21  drug identification.

22  Q.   And how long have you been employed in the capacity of a

23  forensic chemist?

24  A.   A little over three years.

25  Q.   Have you been qualified previously in federal court as an

1   expert?

2   A.   Not in federal court.  In state court, I have.

3   Q.   And how many times have you been qualified as an expert

4   in superior court?

5   A.   I think 32 or 33.

6        MS. COLVIN:  Your Honor, at this time we seek to

7   have Ms. Gibbs qualified as an expert in the field of forensic

8   chemistry.

9        MR. HOGUE:  No questions, no objections.

10       THE COURT:  She is qualified.

11       MS. COLVIN:  Thank you, Your Honor.

12  BY MS. COLVIN:

13  Q.   Ms. Gibbs, did you have an occasion to receive evidence

14  in the crime laboratory regarding a subject, Richard Glawson?

15  A.   Yes, I did.

16  Q.   First, let me show you what's been previously marked as

17  government's exhibit number 56.  Can you recognize that

18  exhibit?

19  A.   Yes, I do.

20  Q.   And how is it that you can recognize that exhibit?

21  A.   It has my initials on it where I tested it, and it has

22  the unique DOSS case number on it that is the number on the

23  report that I issued.

24  Q.   Thank you.  And looking at your report, who did you

25  receive this particular exhibit from?

1   A.   It was received from the Bibb County Sheriff's Office on

2   October 17th, 2007.

3   Q.   And was the test requested by a B. Johnson?

4   A.   Yes, it was.

5   Q.   What type of testing did you do with this particular

6   exhibit?

7   A.   Because it's leafy material, I tested it for the presence

8   of marijuana.  I performed gas chromatography, mass

9   spectrometry, and a microscopic analysis of the material.  I

10  also obtained a net weight of the leafy material.

11  Q.   And what did your test results reveal?

12  A.   That the substance is marijuana and the weight of the

13  sample was 28 point -- was 26.86 grams.

14  Q.   Now, let me show you what has been marked as government's

15  exhibit number 59.  Do you recognize this particular exhibit?

16  A.   Yes, I do.  Again, it has my initials on the bag and on

17  the individual bags inside that I tested, and it has the

18  unique DOSS case number on it that I issued a report under.

19  Q.   And did you also receive this for a test requested by B.

20  Johnson?

21  A.   Yes.  It was received on the same date, October 17th,

22  2007, from B. Johnson with the Middle Georgia Drug Task Force.

23  Q.   And what tests did you perform terms on this particular

24  substance?

25  A.   The same three tests.  I use a balance to determine the

1    net weight.  I used gas chromatography, mass spectrometry and

2    microscopy.

3    Q.   And what was your analysis on this particular testing

4    situation?

5    A.   The analysis showed that the substance is marijuana, and

6    the net weight of the total sample was 99.57 grams.

7          MS. COLVIN:  Your Honor, at this time the government

8    would seek to introduce what's been marked as government

9    exhibit 56 and 59.

10         MR. HOGUE:  Well, Your Honor, first I object to them

11   both on chain of custody grounds, in addition to the absence

12   of Investigator Whitehead, I would also like to note that as

13   far as I can tell it, with respect to government's 56 the

14   absence of another crime lab chemist who's also apparently

15   handled this evidence at some point in its history.  And

16   lastly, what I would like to say with respect to government's

17   exhibit 59, I presume there's a scientific report concerning

18   it, that I don't have it, and I need to have it to be able to

19   respond to government's motion to admit it.

20   (Pause)

21         MR. HOGUE:  Your Honor, my objection is now made for

22   purposes of 56 and 59 regarding their admissibility.

23         THE COURT:  The objection is overruled.  56 and 59

24   are admitted.

25         MS. COLVIN:  Thank you, Your Honor.  That's all we

1  have.

2       MR. HOGUE:  If I may have a moment, Your Honor, with

3  this report that I was just handed.

4                    CROSS EXAMINATION

5  BY MR. HOGUE:

6  Q.   Ms. Gibbs -- hello.

7  A.   Hi.

8  Q.   Are you -- you're aware that with respect to government's

9  exhibit number 56, the marijuana you spoke about a moment ago,

10 that you identified as having weighed 20 -- I'm trying to read

11 this report -- 26.86 grams?

12 A.   Yes.

13 Q.   And that's your report number 2003-4002446?

14 A.   Yes.

15 Q.   You're aware that it was previously handled or tested by

16 some other GBI crime lab chemist?

17 A.   Yes.

18 Q.   Okay.  And with respect to the second amount of marijuana

19 you just testified to, I'm looking at a report that was just

20 handed to me a moment ago, number 2007-4003237, that's your

21 report, right?

22 A.   Yes, it is.

23 Q.   All right.  And it says that you received that evidence

24 which we've now marked here in this case as government's

25 exhibit 59, on October 17th of 2007, right?

1  A.   That's correct.

2  Q.   And so far as you know this is the first report produced

3  by the GBI concerning that evidence?

4  A.   Yes, that is correct.

5  Q.   And you've written this report that I'm holding in my

6  hand -- you don't know that's what I have, I guess -- but you

7  have your own report up there, right?

8  A.   That's correct.

9  Q.   And when you received this evidence on October 17th,

10 2007, the seal placed on the evidence bag had no initials of

11 any kind of it, did it?

12 A.   That is true.  It was sealed properly, but the seal was

13 not initialed.

14 Q.   It wasn't marked?

15 A.   No, it was not.

16 Q.   And that's the way you understand it's supposed to be

17 done, right?

18 A.   Our crime laboratory accreditation requires that all

19 evidence be sealed and initialed, so we put the statement on

20 the report that it was not initialed because that is a part of

21 our accreditation standards.

22 Q.   Not only is it a part of your accreditation standards --

23 and I know you haven't been doing this a real long time -- but

24 you also know that it's important when you're dealing with

25 fungible items like drugs in order to track them from their

1  seizure from some suspect all the way through all the

2  different folks who handle it, including you, right back here

3  to this courtroom, right?

4  A.   We are only concerned with chain of custody once it

5  actually enters the laboratory.  From that point, yes, we do

6  maintain a strict chain of custody of the items.

7  Q.   But my question is this:  You understand over and above

8  your own agency's accreditation purposes, that there's another

9  very important purpose for that chain of custody stuff, right?

10  And it has to do with what we're doing in this courtroom right

11  now.  You understand that, right?

12  A.   Well, yes, chain of custody involves who's had possession

13  of the item.

14  Q.   -- in order for us to know that this is the very item

15  that was seized.  So when a bag is not initialed properly, you

16  note that as did you in this case, right?

17  A.   Right.  We noted it, but there's also paperwork that is

18  submitted with the item, and we have to have that paperwork to

19  indicate who -- which agency and the agency case number and

20  subject, and the submitting officer has to be on that

21  paperwork for to us accept the evidence for analysis.

22  Q.   And all of that is critical because one bag of marijuana

23  looks pretty much like every other bag of marijuana on the

24  planet, right?

25  A.   Yes, it does.

1    Q.    Thank you, Ms. Gibbs.

2          MS. COLVIN:   Just one or two followups.

3                      REDIRECT EXAMINATION

4    BY MS. COLVIN:

5    Q.    Ms. Gibbs, defense counsel asked you about the fact that

6    you tested government's exhibit 56, you received that on

7    October 17th, '07?

8    A.    Yes.

9    Q.    Let me ask you, what is the crime lab's policy regarding

10   the testing of marijuana?

11   A.    At this point we test marijuana when it is submitted.   We

12   have gone through several different phases where we did not

13   test or we did test.   At this point we are testing marijuana

14   when it is submitted.   We have police officers throughout the

15   state who are trained to test marijuana, but if for whatever

16   reason an agency does not -- is not able to test that

17   marijuana, we will test it.

18   Q.    Now, prior to this new change, say, in 2004, 2005, was it

19   policy not to test marijuana?

20   A.    Yes.

21   Q.    And typically what would happen if the marijuana came

22   into your laboratory for testing?

23   A.    It was usually just placed into a pending box, and all

24   other drug evidence was worked first, and then if we were

25   caught up with all other drug evidence we would eventually

1   possibly get to the marijuana if we had enough staff.

2   Q.   And this request was made to you in October of '07 by

3   your supervisor after I requested it from Mathis?

4   A.   That's correct.

5   Q.   And that's the reason for your testing of that substance?

6   A.   Yes.

7            MS. COLVIN:   Thank you.

8            MR. HOGUE:   No questions.

9            THE COURT:   All right, you may go down, thank you.

10            THE WITNESS:   May I be excused?

11            MS. COLVIN:   Yes.   Your Honor, at this time I'd like

12   to state in my place that we have a stipulation of facts which

13   we have marked as government exhibit 51.

14            THE COURT:   All right.

15            MS. COLVIN:   If I may read that, Your Honor?

16            MR. HOGUE:   Your Honor, may I ask that the court

17   explain to the jury what a stipulation is?

18            THE COURT:   I'll be glad to.   Ladies and gentlemen,

19   Ms. Colvin and Mr. Hogue, or the government and the defense in

20   this case, have agreed to certain facts.   Their agreement has

21   been reduced to writing and is contained in the document

22   called a stipulation of fact which Ms. Colvin is about to read

23   to you.   You may accept the facts contained in this agreement

24   as true and correct for the purpose of your deliberations in

25   this case.

```
 1              MS. COLVIN:  Thank you, Your Honor.  Stipulation of
 2    Fact:   "Comes now the United States of America by and through
 3    its attorney the United States Attorney for the Middle
 4    District of Georgia and the Defendant Richard Ben Glawson by
 5    and through his attorney of record, Frank Hogue, and do hereby
 6    agree to stipulate to the following as facts in the
 7    above-styled case, United States versus Richard Ben Glawson.
 8    Defendant and the United States of America stipulate that
 9    prior to June 3rd, 2003 Richard Ben Glawson had been
10    previously convicted in the Superior Court of Bibb County,
11    Georgia, of a crime punishable by imprisonment for a term in
12    excess of one year, a felony offense.  The parties further
13    stipulate that this fact may be presented to the jury to
14    satisfy the convicted felon element of the violation of 18
15    U.S.C. subsection 922(g)(1) in lieu of the submission to the
16    jury of the defendant's prior felony conviction.  So
17    stipulated this 30th day of October 2007."  Signed by Richard
18    Ben Glawson, Frank Hogue, and Charles Calhoun.
19              THE COURT:  Very good.
20              MR. HOGUE:  Your Honor, may I ask the court indicate
21    that that is just one element of this offense that we have
22    stipulated to and not the offense, just to make sure that's
23    clear.  And I, of course, will argue it later in the case, but
24    I would like to ask the court to make that additional note to
25    the stipulation or explanation you gave earlier.
```

1    THE COURT:  The statement that Mr. Hogue just made

2    is accurate.  This stipulation covers only one fact which the

3    government is under an obligation to prove beyond a reasonable

4    doubt.  All right, what else?

5    MS. COLVIN:  Your Honor, at this time the government

6    would call Jay Bagwell.

7    DEPUTY CLERK:  Do you solemnly swear that your

8    testimony in this case shall be the truth, the whole truth,

9    and nothing but the truth, so help you God?

10    THE WITNESS:  I do.

11    DEPUTY CLERK:  State your name for the jury, please.

12    THE WITNESS:  Jay Bagwell.

13    DEPUTY CLERK:  Spell your name, first and last.

14    THE WITNESS:  J-a-y, Bagwell.

15                              **JAY BAGWELL**

16      Witness, having first been duly sworn, testified on

17                         DIRECT EXAMINATION

18    BY MS. COLVIN:

19    Q.   Mr. Bagwell -- Agent Bagwell?

20    A.   Yes.

21    Q.   Were are you employed?

22    A.   For the ATF, Bureau of Alcohol, Tobacco, and Firearms.

23    Q.   And what is your position with ATF?

24    A.   I'm a special agent.

25    Q.   And as a special agent, do you also have special training

1    in the identification of firearms, weapons?

2    A.    Yes.

3    Q.    Could you please relate to the jurors the training that

4    you've received in that particular area?

5    A.    Yes.  We have a program, they call it Firearms Interstate

6    Nexus, which is basically identifying and determining the

7    origin of firearms that are used in crimes.  Specifically as

8    regarding to the training that you mentioned, there are

9    several schools that I've attended regarding this, on-the-job

10   training, traveling to different firearms manufacturers,

11   importers, manufactures, ammunition facilities.  Probably

12   about -- it's about a 15-month ongoing program.

13   Q.    And in addition to that training, do you have yearly or

14   quarterly training in the further identification and origin of

15   weapons?

16   A.    Not necessarily regarding the identification of them.  We

17   do have quarterly firearms training, but that's actually more

18   regarding marksmanship and things like that, but pretty much

19   on a daily basis, I deal with firearms on a daily basis.

20   Q.    Let me ask you, how long have you been employed with ATF?

21   A.    Since 1993.

22   Q.    And how long have you been dealing with the

23   identification and origin of weapons?

24   A.    Approximately four years now.

25              MS. COLVIN:  Your Honor, at this time the government

1  would like to offer Agent Bagwell as an expert in the

2  identification and origin of weapons.

3          MR. HOGUE:  No questions and no objections.

4          THE COURT:  He's qualified.

5  BY MS. COLVIN:

6  Q.   Did you have occasion, Special Agent Bagwell, to become

7  involved with assisting Agent Ahmad with the investigation

8  regarding a firearm that was seized from a subject identified

9  as Richard Ben Glawson?

10 A.   Yes.

11 Q.   Could you please relate to the jurors how you became

12 involved in that investigation?

13 A.   Yes.  I was asked to look at and make a determination

14 about a Smith and Wesson automatic pistol -- semi-automatic

15 automatic pistol, excuse me -- that was seized from the

16 defendant regarding to its origin, where it was manufactured.

17          MR. HOGUE:  Your Honor, I do have to object to the

18 form of the question and answer just given when the questioner

19 and the answerer both say that the gun was seized from the

20 defendant.  All he's doing is testing a gun he got from

21 another law enforcement agent.  The other stuff is for the

22 jury to decide.

23          THE COURT:  Ms. Colvin?

24          MS. COLVIN:  Your Honor, I can rephrase.

25          THE COURT:  All right, I sustain the objection.

1    Rephrase the question.

2    BY MS. COLVIN:

3    Q.    Did you have opportunity to examine the firearm that was

4    given to you by Agent Ahmad in the investigation of this case

5    that you know the government is proceeding on today?

6    A.    Yes.

7    Q.    Let me show you what's been previously identified as

8    government exhibit number 52, and I believe it's been

9    introduced as well -- is that correct -- yes.  Do you

10   recognize that?

11   A.    Yes.

12   Q.    And what is that weapon?

13   A.    It's a Smith and Wesson nine millimeter, semi-automatic

14   pistol.

15   Q.    And what is the serial number of that particular weapon?

16   A.    It's A, as in Alpha, 618307.

17   Q.    And did you give the model and make of that weapon?

18   A.    Yes.  It's model 39 dash two.

19   Q.    And what type of weapon?

20   A.    It's a nine millimeter, semi-automatic pistol.

21   Q.    And does it have another designation in N-A-T-O, NATO?

22   A.    No.  Oh, as far as the caliber?

23   Q.    Yes.

24   A.    There are several -- nine millimeter is also known as

25   nine millimeter NATO, nine millimeter Parabellum, nine

1   millimeter Luger.  It's basically what's commonly referred to

2   as a nine millimeter.

3   Q.   And can you please tell the jury where that weapon was

4   manufactured?

5   A.   It was manufactured in Springfield, Massachusetts.

6   Q.   As a result of it being manufactured in Springfield,

7   Massachusetts, did it affect interstate commerce?

8   A.   By the nature that it was recovered or possessed in

9   Georgia, I believe yes.

10  Q.   And could you explain to the jury what that means, it

11  affected interstate commerce?

12  A.   Basically --

13       MR. HOGUE:  Your Honor, if I may, that is the

14  ultimate question for the jury, I believe.  All he can say is

15  where the gun was made, what state we're in, and where the gun

16  was seized, and that's it.  To go further is to invade the

17  province of the jury.

18       MS. COLVIN:  Your Honor, I think he can explain his

19  testimony, what he means by that.  I don't think those are

20  terms of art that people use on an everyday basis.

21       THE COURT:  Start over.  Repeat your question

22  please.

23       MS. COLVIN:  The question was:  Could you explain to

24  the jury what you mean by affecting interstate commerce.

25       MR. HOGUE:  And that is the question I am objecting

1    to because his previous answer was where the gun was made, he

2    named a town and a state, and then he told us where he got the

3    gun.  We've had previous testimony about where others got the

4    gun, and that's as far as he should be allowed to go.

5             THE COURT:  Why should that not be the rule?

6             MS. COLVIN:  I don't think most lay people

7    understand what that means.

8             THE COURT:  The court will cover that in its charge.

9             MS. COLVIN:  Thank you, Your Honor.  That all we

10   have.

11            MR. HOGUE:  No questions, Your Honor.

12            THE COURT:  All right, you may go down.

13            MS. COLVIN:  Your Honor, at this time the government

14   would rest.  If we could check with the court reporter to make

15   sure we've gotten in all of our exhibits.

16            THE COURT:  Well, we're going to have time to do

17   that.

18            MS. COLVIN:  Thank you.

19            THE COURT:  We don't need to stop and do that now.

20   All right, ladies and gentlemen, the government has declared

21   that it rests, which means that it has presented to you all of

22   the evidence it intends to present in support of its case the

23   chief.  There are several matters that I must discuss now with

24   the attorneys, and I'll ask you to step back to the jury room

25   while I do that.

 1    *(Jury Excused, 3:00 p.m.)*

 2              THE COURT:  Mr. Hogue.

 3              MR. HOGUE:  Yes, Your Honor, just one moment.  Your

 4    Honor, with respect to Count Seven of the indictment, I'd like

 5    to make a motion pursuant to Rule 29 of the Federal Rules of

 6    Criminal Procedure, motion for judgment of acquittal.  Even

 7    though the grand jury says "on or about December 25, 2006,"

 8    and I noted in my opening that the government used a different

 9    date on its chart, the testimony of at least one of its

10    witnesses was a different date than that, and I don't know how

11    far "on or about" should extend, but it wasn't the specific

12    date alleged in the indictment upon which an escape allegedly

13    occurred.  So I make that Rule 29 motion with respect to Count

14    Seven, and I do concede that all other counts should go to the

15    jury.

16              THE COURT:  Well, the government is not required to

17    prove exact dates.  All they got to prove is that the alleged

18    offense occurred on or about the date or near to the date

19    mentioned in the indictment, and what is "on or about or near"

20    is a question of fact for the jury.  So the motion is

21    overruled.  Mr. Hogue, do you plan to present any evidence?

22              MR. HOGUE:  No, I do not, Your Honor.

23              THE COURT:  All right, does government close?

24              MR. CALHOUN:  The government does, Your Honor.

25              THE COURT:  All right, how much time do y'all want

1    to argue?

2           MR. CALHOUN:  Your Honor, I think I can cover

3    opening and final close, twenty minutes a piece for both

4    opening and final close.

5           THE COURT:  How about you, Mr. Hogue?

6           MR. HOGUE:  I didn't hear how much Mr. Calhoun said?

7           THE COURT:  He wants a total of 40 minutes.

8           MR. HOGUE:  I -- probably in the 20 minute range.

9           THE COURT:  All right.  Let me speak to your client.

10   Stand up please, Mr. Glawson.  Can you hear me all right?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Mr. Glawson, I asked your lawyer, Mr.

13   Hogue, a moment ago if he intends to present any witnesses,

14   and he said that he does not, which suggests to me that you do

15   not plan to testify in this case.  I want to tell you that you

16   have the right to testify if you wish to testify in this case.

17   You also have the right not to testify if you do not wish to

18   testify in this case.

19          If you elect to testify, you'll have to testify under

20   oath, and you'll be subject to cross examination and

21   questioning by the attorneys for the government.  If you elect

22   not to testify, the jury will be instructed that they are not

23   to consider the fact that you did testify in any way in

24   deciding your guilt or innocence under this indictment.

25          The decision as to whether or not you testify is a

```
 1    decision which you, yourself must make.  It cannot be made by

 2    your lawyer or anyone else.  I would assume, of course, in

 3    making that decision that you would consult with Mr. Hogue and

 4    that you would listen to his advice, but in finality, it's a

 5    personal decision that you must make.  Have you and Mr. Hogue

 6    discussed whether or not you should testify in this case?

 7              THE DEFENDANT:  Yes, sir.

 8              THE COURT:  And have you decided whether or not you

 9    will or will not testify?

10              THE DEFENDANT:  Yes, sir.

11              THE COURT:  And your decision is what?

12              THE DEFENDANT:  Not to testify.

13              THE COURT:  Okay, thank you.  You may be seated.

14    Mr. Calhoun, how long will it take to you get ready here?  Are

15    you ready now?

16              MR. CALHOUN:  No, I was hoping we would do that in

17    the morning.

18              THE COURT:  In the morning?

19              MR. CALHOUN:  I was hoping, Judge.

20              THE COURT:  Well, I mean, we can't get through with

21    the case until in the morning.  Mr. Hogue, does it suit you to

22    argue in the morning?

23              MR. HOGUE:  That's fine by me, Judge, whenever.

24              THE COURT:  Well, I don't think it makes a great

25    deal of difference.  The most we can do is this afternoon
```

1  would be to get the arguments in, and we can do that in the

2  morning just as well.  All right, ask the jury to come back,

3  please.

4  (Jury In; 3:05 p.m.)

5            THE COURT:  Ladies and gentlemen of the jury, the

6  evidence in the case is closed.  The government has announced

7  that it intends to present no more evidence.  The defendant

8  will not present evidence, and thus you have heard all the

9  evidence that you will hear in the case.  There remains for

10  your consideration the arguments of counsel and the charge of

11  the court.

12            Those items cannot be completed between now and

13  5 o'clock, so I'm going to recess for the afternoon, and we

14  will start again at 9 o'clock tomorrow morning promptly with

15  the arguments of counsel, which will be followed by the charge

16  of the court, and hopefully we will conclude those things

17  before noon, and when that is done, you will have the case for

18  your consideration and deliberation.

19            I want to uplift to you all of the instructions I gave

20  you concerning your conduct as jurors not to discuss the case

21  among yourselves or with others and so forth as I talked to

22  you about.  I also want to caution you that you should not

23  begin your deliberations or consideration of the case until

24  after you have heard everything, including the arguments of

25  counsel and charge of the court.

```
 1              I also instruct you that all of your deliberations

 2      must take place in the jury room and only in the jury room and

 3      that you must not begin your deliberations until you have been

 4      instructed by the court to do so.  Do any of you have any

 5      questions about that?  Any other instructions desired by the

 6      government?

 7              MR. CALHOUN:  No, Your Honor.

 8              THE COURT:  By the defendant?

 9              MR. HOGUE:  No, Your Honor.

10              THE COURT:  All right, you are excused for the

11      afternoon.  Please be back in your jury room shortly before

12      9 o'clock tomorrow.  Thank you.

13      (Jury Excused; 3:10 p.m.)

14              THE COURT:  Mr. Calhoun and Mr. Hogue, if you all

15      will remain with us here for just a few moments, I will have a

16      draft of the charge prepared for you.

17              MR. CALHOUN:  Yes, Your Honor.

18              THE COURT:  And you can read that this afternoon and

19      tonight, and if you have any objections or suggestions, I'll

20      be glad to hear from you in the morning.

21              MR. CALHOUN:  Yes, Your Honor.

22              THE COURT:  Mr. Hogue, you're on your feet, I assume

23      you wish to speak.

24              MR. HOGUE:  Just one short thing, Your Honor.  I

25      would like one item of evidence that was marked as
```

1    government's exhibit 18, which was a bag that had writing on

2    it and was the basis for a motion for mistrial, I would like

3    that to be included in the record for appeal purposes, if an

4    appeal becomes necessary.  I don't, of course, wish it be part

5    of the evidence in the case that goes out to the jury.

6            THE COURT:  I understand.  Ms. Holmstrom will deal

7    with that.

8            MR. HOGUE:  Thank you.  I think the government may

9    still have the bag, but if we can make sure that gets into the

10   evidence, I'd appreciate it.

11           THE COURT:  All right, would one of the government

12   lawyers identify that now?

13           MS. COLVIN:  We have it, Your Honor.

14           THE COURT:  All right, why don't you go ahead and

15   deliver that to the clerk, and we'll have that out of the way.

16   Anything else?

17           MR. CALHOUN:  Nothing else, Your Honor.

18           THE COURT:  Diane, that is to remain with the

19   record, but is not an exhibit to go to the jury room.

20           DEPUTY CLERK:  Yes, sir.

21           THE COURT:  All right, let me go in there and finish

22   the draft of the charge, and I'll send it out here in a few

23   minutes.

24           ( JURY TRIAL PROCEEDINGS ADJOURNED OCTOBER 30, 2007)

25

1      *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
*TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE*
2  *ABOVE-ENTITLED MATTER THIS 7TH DAY OF MAY, 2008.*

3      *S/SALLY L. GRAY, USCR,*
     *U.S. DISTRICT COURT-MIDDLE DISTRICT OF GEORGIA*
4      *E-mail: Sally_Gray@gamd.uscourts.gov*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25